# EXHIBIT B

Case 2:22-cv-00706-RJC   Document 1-2   Filed 05/12/22   Page 2 of 20



# City of Pittsburgh

510 City-County Building
414 Grant Street
Pittsburgh, PA 15219

## Legislation Details (With Text)

| | | | |
|---|---|---|---|
| **File #:** | 2021-1414  **Version:** 1 | **Status:** | Passed Finally |
| **Type:** | Ordinance | | |
| **File created:** | 4/23/2021 | **In control:** | Committee on Land Use and Economic Development |
| **On agenda:** | 4/27/2021 | **Final action:** | 6/15/2021 |
| **Enactment date:** | 6/15/2021 | **Enactment #:** | 17 |
| **Effective date:** | 6/23/2021 | | |
| **Title:** | Ordinance amending and supplementing the Pittsburgh Code, Title 9, Zoning; Article III, Overlay Zoning District, Chapter 907: Development Overlay Districts, removing subsection 907.02.K for IPOD-6 Inclusionary Housing Overlay District and creating 907.04.A Inclusionary Housing Overlay District. (Public Hearing held 6/2/21) | | |
| **Sponsors:** | | | |
| **Indexes:** | PGH. CODE ORDINANCES TITLE 09 - ZONING | | |
| **Code sections:** | | | |
| **Attachments:** | 1. 2021-1414 -Cover Letter_IZ_2021, 2. 2021-1414 -LawrencevilleMailer_Map, 3. Summary 2021-1414 | | |

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| 6/23/2021 | 1 | Mayor | Signed by the Mayor | |
| 6/15/2021 | 1 | City Council | Passed Finally | Pass |
| 6/9/2021 | 1 | Standing Committee | Affirmatively Recommended | Pass |
| 6/2/2021 | 1 | Committee on Hearings | Public Hearing Held | |
| 5/5/2021 | 1 | Standing Committee | Held for Cablecast Public Hearing | Pass |
| 4/27/2021 | 1 | City Council | Read and referred | |

Ordinance amending and supplementing the Pittsburgh Code, Title 9, Zoning; Article III, Overlay Zoning District, Chapter 907: Development Overlay Districts, removing subsection 907.02.K for IPOD-6 Inclusionary Housing Overlay District and creating 907.04.A Inclusionary Housing Overlay District.
*(Public Hearing held 6/2/21)*

**The Council of the City of Pittsburgh hereby enacts as follows:**

**Section 1.** The Pittsburgh Code, Title 9, Zoning; Article III, Overlay Zoning District, Chapter 907: Development Overlay Districts is hereby amended by removing subsection 907.02.K  IPOD-6 Inclusionary Housing Overlay District as follows:

# SEE ATTACHMENT

907.02. - IPOD, Interim Planning Overlay District.

### 907.02.A   Intent

**File #:** 2021-1414, **Version:** 1

The intent of the IPOD is to provide a mechanism for interim zoning controls in geographically defined areas of the City where current use, height, area or procedural controls are found to be deficient, when other code provisions do not address such deficiencies, and when ongoing planning studies may inform the preparation of permanent controls which would be appropriate for the area.

### 907.02.B   Application

1. Unless noted within the special IPOD District below, all use, height, and area provisions of the underlying zoning districts shall apply;

2. Unless noted with the special districts below, all provisions of Article I, Article V, Article VI, Article VII, Article VIII and Article IX of this Zoning Ordinance shall apply; and

3. In instances where there is found to be a conflict between the provisions of the IPOD and the underlying zoning district or Article I, Article V, Article VI, Article VII, Article VIII and Article IX, the more stringent of the regulations shall apply.

### 907.02.C   Time Limit

An IPOD shall be in effect for no more than eighteen (18) months from its effective date, except that one (1) six-month extension may be granted by Council if requested by the City Planning Commission before the end of the 18-month period.

### 907.02.D   Special Definitions

1. Interim Planning Overlay District or IPOD means a district which is geographically coincidental with one (1) or more districts or portions of districts as defined on the Zoning District Map, and to which additional regulations apply for a limited, specified period as defined in this chapter of the Zoning Ordinance.

### 907.02.E   Special Districts

To carry out the purpose and provisions of the Zoning Ordinance, the following Interim Planning Overlay Districts are hereby established as zoning classifications:

1. IPOD-1, Oakland

### 907.02.F   Reserved

### 907.02.G   Reserved

### 907.02.H   BCCOD Baum-Centre Corridor Overlay District

907.02.H.1   General Boundaries

The Baum-Centre Corridor Overlay District is generally defined by properties along the Baum Boulevard and Centre Avenue corridors between North Oakland and East Liberty. Specific boundaries of the district are mapped as a supplement to the City's Zoning District Map.

907.02.H.2   Intent

File #: 2021-1414, Version: 1

The intent of the Baum-Centre Corridor Overlay District is to create a regulatory mechanism in an area where substantial development growth is imminent and where both the impact of individual development projects and the collective impact of such development on public resources and private properties are not mitigated through the existing regulations of the Code. Specifically, the intent of the Baum-Centre Corridor Overlay District is:

(a) To protect existing residential, commercial and office uses and encourage new uses that are complimentary to the context of the mixed-use nature of the Baum-Centre Corridor; and

(b) To protect and enhance the Corridor's architectural context, which includes building siting, massing, facade treatment, materials, proportion, and scale.

907.02.H.3   Need for Overlay District

The Baum-Centre Corridor Overlay District is necessary to provide the proper balance between competing land uses, development pressures and regional economic factors. The existing zoning in the corridor encourages the following:

(a) A mix of uses which do not necessarily protect the value of land, while promoting the continued redevelopment of the corridor; and

(b) Poor design of development that is inconsistent with the existing character of the mixed-use nature of the district.

907.02.H.4   Applicability

In the Baum-Centre Corridor Overlay District, every change of land use; every building demolition; every new, enlarged or reconstructed advertising sign; every new or enlarged parking area; and every structure erected or enlarged, with the exceptions noted in the following sub paragraph, shall, in addition to conforming to all regulations the Zoning Code, be in accord with an Overlay District Project Development Plan (PDP) of Sec. 922.13.C approved by the Planning Commission.

(a) Developments which do not require approval of an Overlay District Project Development Plan are:

(1) Structures involving exterior alterations not in excess of fifty thousand dollars ($50,000.00);

(2) Residential structures that are proposed to contain no more than four (4) dwelling units; and

(3) Interior renovations.

(b) Plans and documents submitted as required by the Baum-Centre Corridor Overlay District Project Development Plan process shall be prepared in a manner set forth in submissions requirements established by the Zoning Administrator, and shall include but not be limited to, site plans, building elevations with construction material descriptions, landscaping plans with mixes and types of plant materials, lighting and sign plans, and planning studies as defined in Chapter 922 of this Zoning Ordinance.

(c) Development which is subject to Overlay District Project Development Plan review and approval shall comply with all requirements specified hereunder and with all applicable standards and criteria contained in the plans and policy documents adopted by the Planning Commission which were noted at the time of application

**File #:** 2021-1414, **Version:** 1

for the Overlay District PDP.

**907.02.I   Reserved**

**907.02.J   Reserved**

**907.02.K   IPOD-6, Inclusionary Housing Overlay District**

907.02.K.1   General Boundaries

The Inclusionary Housing Interim Planning Overlay District (IPOD-6) is generally defined by properties located in the Lower, Central, and Upper Lawrenceville neighborhoods. Specific boundaries of the district are mapped a supplement to this Section and as an amendment to the City's Zoning District Map, in accordance with Section 902.03.

907.02.K.2   Need for Interim Zoning

The Inclusionary Housing Interim Planning Overlay District is necessary to increase the production of affordable housing to meet existing and anticipated housing and employment needs and to provide a diverse range of housing choices within the District boundaries. The updated zoning will provide adequate balances by ensuring that the neighborhoods can continue to offer new housing units at a variety of price points. This need was set forth by the recommendations set forth by the City's Inclusionary Housing and Incentive Zoning Exploratory Committee in 2017.

907.02.K.3   Purpose and Intent

The intent of the Inclusionary Housing Interim Planning Overlay District is to promote the public health and welfare by increasing the supply of affordable housing for a range of family sizes and promoting economic integration within the District boundaries. Due to the unique circumstances involved with development within this area, the existing zoning mechanisms do not serve to carry out the purpose and intent of Chapter 901 (General Provisions) and all provisions of this Zoning Ordinance. Specifically, the intent of the Inclusionary Housing IPOD is to encourage quality, economically-balanced development by:

(a) Leveraging development pressure by connecting the production of affordable housing with the current market production of housing units;

(b) Encouraging diverse and balanced housing available for households of all income levels and ensuring that when developing the limited supply of developable land, housing opportunities for persons of variety of income levels are provided; and

(c) Utilizing sites in IPOD-6 as opportunities to build mixed income developments. Because remaining land appropriate for residential development within in the IPOD-6 is limited, it is essential that a reasonable proportion of such land be developed into housing units affordable to low and moderate-income people.

907.02.K.4   Definitions

- **Administrative Agent** means with respect to Inclusionary Rental Housing, the Housing Authority of the City of Pittsburgh or such other qualified entity, as determined by the Director of City Planning, that enters into an agreement with the City to monitor and enforce compliance with the requirements of this Section and its

**File #:** 2021-1414, **Version:** 1

regulations. With respect to Inclusionary Owner-Occupied Housing, the Urban Redevelopment Authority of the City of Pittsburgh or such other qualified entity, as determined by the Director of City Planning, that enters into an agreement with the City to monitor and enforce compliance with the requirements of this Section and its regulations.

- **Affordable Housing Provider** means the Housing Authority of the City of Pittsburgh and such other approved owner/manager of affordable housing, as approved by the Director of City Planning, that enters into an agreement with the City to lease Inclusionary Rental Units exclusively to Eligible Households in compliance with this Section and its regulations.

- **Affordability Term** means a minimum of thirty-five (35) years from the date of initial occupancy of an Inclusionary Unit.

- **Allowable Pricing** means with respect to Inclusionary Rental Units, the monthly rent paid by the Eligible Household, plus all mandatory or essential fees and charges and an approved Utility Allowance, shall not exceed thirty (30) percent of the monthly income of a household earning fifty (50) percent of AMI with a household size one-and-a-half (1.5) times the bedroom count of the Dwelling Unit. Only tenant-paid costs are subject to the Allowable Pricing. If a rental subsidy is provided, the total of all monthly rent, fees, charges and approved Utility Allowance may exceed the Allowable Pricing so long as the portion paid by the household does not. With respect to Inclusionary Owner-Occupied Units, the initial sale price shall be set a level that ensures that a household earning seventy (70) percent of AMI for a household size one-and-a-half (1.5) times the bedroom count of the Dwelling Unit will spend no more than twenty-eight (28) percent of gross monthly income on their mortgage payment (principal and interest); taxes and insurance; and all mandatory or essential fees and charges (including condo/HOA dues), assuming a five-percent down payment and a thirty-year fixed rate mortgage at the then current mortgage rate (determined as the National Average Contract Mortgage rate by the Federal Housing Finance Agency).

- **Area Median Income (AMI)** means the median household income for the Pittsburgh metropolitan area published annually by the U.S. Department of Housing and Urban Development ("HUD").

- **Community Land Trust** means a non-profit entity whose primary mission to create or preserve permanently affordable housing, and approved by the Director of City Planning, and that enters into an agreement with the City to convey Inclusionary Owner-Occupied Units exclusively to Eligible Households for owner occupancy subject to a ground lease that requires compliance with this Section and implementing regulations.

- **Development Project** means one (1) or more Developments (as defined in Title IX, Ch. 926.67) that are located in whole or in part within IPOD-6 that meet the Applicability Requirements of Section 907.02.K.5.

- **Eligible Household** means with respect to Inclusionary Rental Units, a household that earns no more than fifty (50) percent of AMI. With respect to Inclusionary Owner-Occupied Units, a household that earns no more than eighty (80) percent of AMI.

- **Family-Sized Units** means dwelling units that contain a minimum of two (2) bedrooms.

- **Inclusionary Owner-Occupied Unit** means an Inclusionary Unit that is both owned and occupied by one (1) or more persons as a primary residence. The term does not include a unit that is occupied pursuant to a lease-purchase agreement or contract of sale.

- **Inclusionary Rental Unit** means an Inclusionary Unit other than an Inclusionary Owner-Occupied Unit.

**File #:** 2021-1414, **Version:** 1

- **Inclusionary Unit** means a Dwelling Unit that satisfies the Inclusionary Standards set forth in Section 907.02.K.6 or 907.02.K.7.

- **Market-Rate** Unit means a Dwelling Unit in a Development Project that does not satisfy the Inclusionary Standards set forth in Section 907.02.K.6 or 907.02.K.7.

- **Networked Walkshed** means the land area within a defined walking range, traversable on established streets or pathways.

- **Off-Site Units** means inclusionary units constructed within one-quarter (¼) mile of the subject site, but not on a parcel adjacent to the subject site.

- **Substantial Improvement** means any reconstruction, rehabilitation, addition, or other improvement of a structure, of which the cost equals or exceeds one hundred (100) percent of the market value of the structure before the "start of construction" of the improvement, that occurs within a five-year period. This term includes structures which have incurred "substantial damage" regardless of the actual repair worked performed. The term does not, however include any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions.

- **Utility Allowance** means an allowance for tenant-paid utilities, updated annually and approved by the Director of City Planning or their designee. The term shall include the applicable utility allowance published annually by the Housing Authority of the City of Pittsburgh or a utility allowance prepared by the Owner using methodology approved by the Pennsylvania Housing Finance Agency. In either case, the Utility Allowance must be appropriate for the size and type of dwelling unit and the kind of heat and appliances used, and must be approved by the Administrative Agent.

907.02.K.5   Applicability

In the Inclusionary Housing IPOD-6, all applications for the following shall be subject to the standards of this Section:

(a) New construction or Substantial Improvement, of one (1) or more buildings that collectively contain twenty (20) or more dwelling units either (i) on one (1) or more zoning lots marketed as a single or unified project, (ii) sharing common elements or common financing, or (iii) comprising a part of a planned development.

(b) New construction or Substantial Improvement of one (1) or more buildings that collectively contain twenty (20) or more sleeping rooms either: (i) within a Multi-Suite Residential use, (ii) one (1) or more zoning lots marketed as a single or unified project, (iii) sharing common elements or common financing, or (iv) comprising a part of a planned development.

(c) New construction or Substantial Improvement of one (1) or more buildings that collectively contain any combination of twenty (20) or more dwelling units and sleeping rooms either: (i) within a Multi-Suite Residential use, (ii) on one (1) or more zoning lots marketed as a single or unified project, (iii) sharing common elements or common financing, or (iv) comprising a part of a planned development.

907.02.K.6   On-Site Inclusionary Standards

File #: 2021-1414, Version: 1

(a) To qualify for initial occupancy in an Inclusionary Unit, a household must be an Eligible Household. With respect to an Inclusionary Rental Unit, the Eligible Household must provide annual documentation of income and household composition to the Administrative Agent. In the event that household income exceeds eighty (80) percent of AMI, the household must vacate the unit by the later of either (i) the expiration of the next scheduled lease renewal or (ii) sixty (60) days after the household income exceeds eighty (80) percent of AMI. With respect to an Inclusionary Owner-Occupied Unit, the Eligible Household must continue to reside in the unit as the household's primary residence.

(b) Prior to the issuance of a Certificate of Occupancy for an Inclusionary Rental Unit, the Applicant shall either:

1. Record a deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary standards and related City regulations, such restriction to be prepared by the Director of City Planning or their designee, or

2. Enter into a master lease of the unit with an Affordable Housing Provider for the entire Affordability Term.

(c) Prior to the issuance of a Certificate of Occupancy for an Inclusionary Owner-Occupied Unit, the Applicant shall either:

1. Record a deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary standards and related City regulations, such to be prepared by Director of City Planning or their designee, obliging owner-occupancy of the unit and restricting additional debt that can be secured against the property, or

2. Sell the unit to a Community Land Trust.

(d) Inclusionary Units must satisfy the Allowable Pricing criteria set forth in Section 907.02.K.4.

(e) A minimum of ten (10) percent of units shall be Inclusionary Units. When this yields a fraction, the number of units shall be rounded up to the nearest whole units.

(f) Rental and Owner-Occupied Inclusionary Units will remain affordable for a minimum of thirty-five (35) years. If the Inclusionary Unit or any property containing an Inclusionary Unit is sold during the Affordability Term, the Affordability Term shall automatically renew for an additional thirty-five (35) years.

(g) Inclusionary Units must be integrated within, and distributed throughout, each building, except for:

1. Inclusionary Units are not required to be placed on the top floor in buildings of less than six (6) stories.

2. In buildings of six (6) stories or more, Inclusionary Units are not required to be placed on the top three (3) floors.

(h) Except as provided in Section 902.02.K.5(j), on-site Inclusionary Units shall be equivalent to market-rate units within the building in all ways, including appliances, finishes, and square footage.

(i) Core building and Development Project amenities, such as a gym, pool or parking space, must be shared with no additional charges or restrictions to residents in Inclusionary Units unless those charges are subtracted from rent or HOA dues for all residents regardless of unit or rental price.

**File #:** 2021-1414, **Version:** 1

~~(j) The percentage of Inclusionary Units that are also Family-sized Units shall be equal or greater to the percentage of Market-Rate Units that are also Family-sized Units.~~

~~907.02.K.7   Off-Site Inclusionary Standards~~

~~Where provision of Inclusionary Units on-site is determined not to be feasible, inclusionary units constructed off-site may be permitted as a Special Exception in accordance with Section 922.07, subject to the following standards:~~

~~(a) Off-site Units shall be subject to the standards of Section 907.02.K.6 except for Section 907.02.K.6(e).~~

~~(b) A minimum of twelve (12) percent of the subject application's number of units shall be in Inclusionary Units. When this yields a fraction, the number of units shall be rounded up to the nearest whole number.~~

~~(c) The applicant shall identify an alternative site suitable for residential housing which the applicant owns, has site control (e.g., purchase agreement, option to purchase, lease), or is otherwise available for the development of Inclusionary Units pursuant to an agreement between the applicant and a developer who owns the site or has site control. With respect to Rental Inclusionary Units, the Applicant must either:~~

~~1. Own a controlling interest in the off-site development; or~~

~~2. Provide evidence of an enforceable commitment to contribute two hundred thousand dollars ($200,000.00) or greater per Inclusionary Unit to the off-site development through an agreement with a developer who owns the site or has site control.~~

~~With respect to Owner-Occupied Inclusionary Units, the Applicant must either:~~

~~1. Own the land and develop the off-site housing, or~~

~~2. Provide evidence of an enforceable commitment to contribute two hundred thousand dollars ($200,000.00) or greater per Inclusionary Unit to the off-site development through an agreement with a developer who owns the site or has site control.~~

~~(d) The Certificate of Occupancy for off-site Inclusionary Units must be obtained prior to the issuance of the final Certificate of Occupancy for the subject property.~~

~~(e) The off-site units shall be located no more than one-quarter (¼) mile of the subject site, within City limits.~~

~~(f) The applicant must submit analysis to establish that the off-site property has comparable public transit service as the subject site, evaluated by distance from transit stop(s) via Networked Walkshed, number of routes available, and frequency of service.~~

**Section 2**.   The Pittsburgh Code, Title 9, Zoning; Article III, Overlay Zoning District, Chapter 907: Development Overlay Districts is hereby amended by creating 907.04.A   IZ-O, Inclusionary Housing Overlay Districts as follows:

**907.04.A   IZ-O, Inclusionary Housing Overlay District**

907.04.A.1   General Boundaries

**File #:** 2021-1414, **Version:** 1

The Inclusionary Housing Planning Overlay District (IZ-O) is generally defined by properties located in the Lower, Central, and Upper Lawrenceville neighborhoods. Specific boundaries of the district are mapped a supplement to this Section and as an amendment to the City's Zoning District Map, in accordance with Section 902.03.

907.04.A.2   Need for Zoning Overlay

The Inclusionary Housing Planning Overlay District is necessary to increase the production of affordable housing to meet existing and anticipated housing and employment needs and to provide a diverse range of housing choices within the District boundaries. The updated zoning will provide adequate balances by ensuring that the neighborhoods can continue to offer new housing units at a variety of price points.

907.04.A.3   Purpose and Intent

The intent of the Inclusionary Housing Planning Overlay District is to promote the public health and welfare by increasing the supply of affordable housing for a range of family sizes and promoting economic integration within the District boundaries. Due to the unique circumstances involved with development within this area, the existing zoning mechanisms do not serve to carry out the purpose and intent of Chapter 901 (General Provisions) and all provisions of this Zoning Ordinance. Specifically, the intent of the Inclusionary Housing IZ-O is to encourage quality, economically-balanced development by:

(a) Leveraging development pressure by connecting the production of affordable housing with the current market production of housing units;

(b) Encouraging diverse and balanced housing available for households of all income levels and ensuring that when developing the limited supply of developable land, housing opportunities for persons of variety of income levels are provided; and

(c) Utilizing sites in IZ-O as opportunities to build mixed income developments. Because remaining land appropriate for residential development within in the IZ-O is limited, it is essential that a reasonable proportion of such land be developed into housing units affordable to low and moderate-income people.

907.04.A.4   Definitions

• **Administrative Agent** means with respect to Inclusionary Rental Housing, the Housing Authority of the City of Pittsburgh or such other qualified entity, as determined by the Director of City Planning, that enters into an agreement with the City to monitor and enforce compliance with the requirements of this Section and its regulations. With respect to Inclusionary Owner-Occupied Housing, the Urban Redevelopment Authority of the City of Pittsburgh or such other qualified entity, as determined by the Director of City Planning, that enters into an agreement with the City to monitor and enforce compliance with the requirements of this Section and its regulations.

• **Affordable Housing Provider** means the Housing Authority of the City of Pittsburgh and such other approved owner/manager of affordable housing, as approved by the Director of City Planning, that enters into an agreement with the City to lease Inclusionary Rental Units exclusively to Eligible Households in compliance with this Section and its regulations.

• **Affordability Term** means a minimum of thirty-five (35) years from the date of initial occupancy of an

Inclusionary Unit.

• **Allowable Pricing** means with respect to Inclusionary Rental Units, the monthly rent paid by the Eligible Household, plus all mandatory or essential fees and charges and an approved Utility Allowance, shall not exceed thirty (30) percent of the monthly income of a household earning fifty (50) percent of AMI with a household size one-and-a-half (1.5) times the bedroom count of the Dwelling Unit. Only tenant-paid costs are subject to the Allowable Pricing. If a rental subsidy is provided, the total of all monthly rent, fees, charges and approved Utility Allowance may exceed the Allowable Pricing so long as the portion paid by the household does not. With respect to Inclusionary Owner-Occupied Units, the initial sale price shall be set a level that ensures that a household earning seventy (70) percent of AMI for a household size one-and-a-half (1.5) times the bedroom count of the Dwelling Unit will spend no more than twenty-eight (28) percent of gross monthly income on their mortgage payment (principal and interest); taxes and insurance; and all mandatory or essential fees and charges (including condo/HOA dues), assuming a five-percent down payment and a thirty (30)-year fixed rate mortgage at the then current mortgage rate (determined as the National Average Contract Mortgage rate by the Federal Housing Finance Agency).

• **Area Median Income (AMI)** means the median household income for the Pittsburgh metropolitan area published annually by the U.S. Department of Housing and Urban Development ("HUD").

• **Community Land Trust** means a non-profit entity whose primary mission to create or preserve permanently affordable housing, and approved by the Director of City Planning, and that enters into an agreement with the City to convey Inclusionary Owner-Occupied Units exclusively to Eligible Households for owner occupancy subject to a ground lease that requires compliance with this Section and implementing regulations.

• **Development Project** means one (1) or more Developments (as defined in Title IX, Ch. 926.67) that are located in whole or in part within IZ-O that meet the Applicability Requirements of Section 907.04.A.5.

• **Eligible Household** means with respect to Inclusionary Rental Units, a household that earns no more than fifty (50) percent of AMI. With respect to Inclusionary Owner-Occupied Units, a household that earns no more than eighty (80) percent of AMI.

• **Family-Sized Units** means dwelling units that contain a minimum of two (2) bedrooms.

• **Inclusionary Owner-Occupied Unit** means an Inclusionary Unit that is both owned and occupied by one (1) or more persons as a primary residence. The term does not include a unit that is occupied pursuant to a lease-purchase agreement or contract of sale.

• **Inclusionary Rental Unit** means an Inclusionary Unit other than an Inclusionary Owner-Occupied Unit.

• **Inclusionary Unit** means a Dwelling Unit that satisfies the Inclusionary Standards set forth in Section 907.04.A.6 or 907.04.A.7.

• **Market-Rate Unit** means a Dwelling Unit in a Development Project that does not satisfy the Inclusionary Standards set forth in Section 907.04.A.6 or 907.04.A.7.

• **Networked Walkshed** means the land area within a defined walking range, traversable on established streets or pathways.

• **Off-Site Units** means inclusionary units constructed within one-quarter (¼) mile of the subject site, but not on

File #: 2021-1414, Version: 1

a parcel adjacent to the subject site.

• **Substantial Improvement** means any reconstruction, rehabilitation, addition, or other improvement of a structure, of which the cost equals or exceeds one hundred (100) percent of the market value of the structure before the "start of construction" of the improvement, that occurs within a five (5)-year period. This term includes structures which have incurred "substantial damage" regardless of the actual repair worked performed. The term does not, however include any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions.

• **Utility Allowance** means an allowance for tenant-paid utilities, updated annually and approved by the Director of City Planning or their designee. The term shall include the applicable utility allowance published annually by the Housing Authority of the City of Pittsburgh or a utility allowance prepared by the Owner using methodology approved by the Pennsylvania Housing Finance Agency. In either case, the Utility Allowance must be appropriate for the size and type of dwelling unit and the kind of heat and appliances used, and must be approved by the Administrative Agent.

907.04.A.5   Applicability

In the Inclusionary Housing IZ-O, all applications for the following shall be subject to the standards of this Section:

(a) New construction or Substantial Improvement, of one (1) or more buildings that collectively contain twenty (20) or more dwelling units either (i) on one (1) or more zoning lots marketed as a single or unified project, (ii) sharing common elements or common financing, or (iii) comprising a part of a planned development.

(b) New construction or Substantial Improvement of one (1) or more buildings that collectively contain twenty (20) or more sleeping rooms either: (i) within a Multi-Suite Residential use, (ii) one (1) or more zoning lots marketed as a single or unified project, (iii) sharing common elements or common financing, or (iv) comprising a part of a planned development.

(c) New construction or Substantial Improvement of one (1) or more buildings that collectively contain any combination of twenty (20) or more dwelling units and sleeping rooms either: (i) within a Multi-Suite Residential use, (ii) on one (1) or more zoning lots marketed as a single or unified project, (iii) sharing common elements or common financing, or (iv) comprising a part of a planned development.

907.04.A.6   On-Site Inclusionary Standards

(a) To qualify for initial occupancy in an Inclusionary Unit, a household must be an Eligible Household. With respect to an Inclusionary Rental Unit, the Eligible Household must provide annual documentation of income and household composition to the Administrative Agent. In the event that household income exceeds eighty (80) percent of AMI, the household must vacate the unit by the later of either (i) the expiration of the next scheduled lease renewal or (ii) sixty (60) days after the household income exceeds eighty (80) percent of AMI. With respect to an Inclusionary Owner-Occupied Unit, the Eligible Household must continue to reside in the unit as the household's primary residence.

(b) Prior to the issuance of a Certificate of Occupancy for an Inclusionary Rental Unit, the Applicant shall either:

**File #:** 2021-1414, **Version:** 1

1. Record a deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary standards and related City regulations, such restriction to be prepared by the Director of City Planning or their designee, or

2. Enter into a master lease of the unit with an Affordable Housing Provider for the entire Affordability Term.

(c) Prior to the issuance of a Certificate of Occupancy for an Inclusionary Owner-Occupied Unit, the Applicant shall either:

1. Record a deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary standards and related City regulations, such to be prepared by Director of City Planning or their designee, obliging owner-occupancy of the unit and restricting additional debt that can be secured against the property, or

2. Sell the unit to a Community Land Trust.

(d) Inclusionary Units must satisfy the Allowable Pricing criteria set forth in Section 907.04.A.4.

(e) A minimum of ten (10) percent of units shall be Inclusionary Units. When this yields a fraction, the number of units shall be rounded up to the nearest whole units.

(f) Rental and Owner-Occupied Inclusionary Units will remain affordable for a minimum of thirty-five (35) years. If the Inclusionary Unit or any property containing an Inclusionary Unit is sold during the Affordability Term, the Affordability Term shall automatically renew for an additional thirty-five (35) years.

(g) Inclusionary Units must be integrated within, and distributed throughout, each building, except for:

1. Inclusionary Units are not required to be placed on the top floor in buildings of less than six (6) stories.

2. In buildings of six (6) stories or more, Inclusionary Units are not required to be placed on the top three (3) floors.

(h) Except as provided in Section 902.04.A.5(j), on-site Inclusionary Units shall be equivalent to market-rate units within the building in all ways, including appliances, finishes, and square footage.

(i) Core building and Development Project amenities, such as a gym, pool or parking space, must be shared with no additional charges or restrictions to residents in Inclusionary Units unless those charges are subtracted from rent or HOA dues for all residents regardless of unit or rental price.

(j) The percentage of Inclusionary Units that are also Family-sized Units shall be equal or greater to the percentage of Market-Rate Units that are also Family-sized Units.

907.04.A.7   Off-Site Inclusionary Standards

Where provision of Inclusionary Units on-site is determined not to be feasible, inclusionary units constructed off-site may be permitted as a Special Exception in accordance with Section 922.07, subject to the following standards:

**File #:** 2021-1414, **Version:** 1

(a) Off-site Units shall be subject to the standards of Section 907.04.A.6 except for Section 907.04.A.6(e).

(b) A minimum of twelve (12) percent of the subject application's number of units shall be in Inclusionary Units. When this yields a fraction, the number of units shall be rounded up to the nearest whole number.

(c) The applicant shall identify an alternative site suitable for residential housing which the applicant owns, has site control (e.g., purchase agreement, option to purchase, lease), or is otherwise available for the development of Inclusionary Units pursuant to an agreement between the applicant and a developer who owns the site or has site control. With respect to Rental Inclusionary Units, the Applicant must either:

1. Own a controlling interest in the off-site development; or

2. Provide evidence of an enforceable commitment to contribute two hundred thousand dollars ($200,000.00) or greater per Inclusionary Unit to the off-site development through an agreement with a developer who owns the site or has site control.

With respect to Owner-Occupied Inclusionary Units, the Applicant must either:

1. Own the land and develop the off-site housing, or

2. Provide evidence of an enforceable commitment to contribute two hundred thousand dollars ($200,000.00) or greater per Inclusionary Unit to the off-site development through an agreement with a developer who owns the site or has site control.

(d) The Certificate of Occupancy for off-site Inclusionary Units must be obtained prior to the issuance of the final Certificate of Occupancy for the subject property.

(e) The off-site units shall be located no more than one-quarter (¼) mile of the subject site, within City limits.

(f) The applicant must submit analysis to establish that the off-site property has comparable public transit service as the subject site, evaluated by distance from transit stop(s) via Networked Walkshed, number of routes available, and frequency of service.



City of Pittsburgh

510 City-County Building
414 Grant Street
Pittsburgh, PA 15219

## Legislation Details (With Text)

| | | | | |
|---|---|---|---|---|
| **File #:** | 2021-1707 | **Version:** 3 | | |
| **Type:** | Ordinance | | **Status:** | Mayor's Office for Signature |
| **File created:** | 7/13/2021 | | **In control:** | Committee on Land Use and Economic Development |
| **On agenda:** | 4/13/2022 | | **Final action:** | 4/19/2022 |
| **Enactment date:** | | | **Enactment #:** | |
| **Effective date:** | | | | |
| **Title:** | Ordinance amending the Pittsburgh Code, Title Nine, Zoning, Article I, Section 902.03 Zoning Map, and amending Article III, Overlay Zoning District, Chapter 907: Development Overlay Districts, 907.04.A, to expand the boundaries of the Inclusionary Overlay District. (Report and recommendation received 1/26/22) (Public Hearing held 4/5/22) | | | |
| **Sponsors:** | Deborah L. Gross | | | |
| **Indexes:** | PGH. CODE ORDINANCES TITLE 09 - ZONING | | | |
| **Code sections:** | | | | |
| **Attachments:** | 1. 2021-1707 attachment VERSION 2 IZ Map, 2. 2021-1707 Bloomfield-Polish Hill map, 3. 2021-1707 Bloomfield posting map, 4. 2021-1707 Council Bill 2021-1707 Legislation Details (With Text), 5. 2021-1707 Cover Letter IZ 2022, 6. 2021-1707 DRAFT PC Report - IPOD Bloomfield-Polish Hill, 7. 2021-1707 Fiscal Impact Statement IZ 2022, 8. 2021-1707 Polish Hill posting map, 9. 2021-1707 Written Public Comments, 10. 2021-1707 IZ-O Expansion Council Presentation - Polish Hill and Bloomfield | | | |

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| 4/19/2022 | 3 | City Council | Passed Finally | Pass |
| 4/13/2022 | 2 | Standing Committee | AMENDED | Pass |
| 4/13/2022 | 2 | Standing Committee | Affirmatively Recommended as Amended | Pass |
| 4/5/2022 | 2 | Committee on Hearings | Public Hearing Held | |
| 2/16/2022 | 2 | Standing Committee | Held for Cablecast Public Hearing | Pass |
| 7/21/2021 | 2 | Standing Committee | AMENDED BY SUBSTITUTE | Pass |
| 7/21/2021 | 1 | Standing Committee | Referred for Report and Recommendation | Pass |
| 7/13/2021 | 1 | City Council | Read and referred | |

Ordinance amending the Pittsburgh Code, Title Nine, Zoning, Article I, Section 902.03 Zoning Map, and amending Article III, Overlay Zoning District, Chapter 907: Development Overlay Districts, 907.04.A, to expand the boundaries of the Inclusionary Overlay District.
*(Report and recommendation received 1/26/22)*
*(Public Hearing held 4/5/22)*

**The Council of the City of Pittsburgh hereby enacts as follows:**

**Section 1.** Amending the Pittsburgh Code, Title Nine, Zoning, Article I, Section 902.03 Zoning Map, by adding certain properties as identified as mapped in a supplemental document, and generally to include the official boundaries of the following neighborhoods as mapped by the City of Pittsburgh's Geographic

File #: 2021-1707, Version: 3

Information Systems Division of the Department of Innovation and Performance: Bloomfield, Polish Hill, ~~Friendship, Upper Hill, Middle Hill, Crawford-Roberts, Bedford Dwellings, Terrace Village, Bluff, North Oakland, West Oakland, South Oakland, and Hazelwood~~.

**Section 2.** Amending the Pittsburgh Code, Title Nine, Zoning, Article III, Overlay Zoning District, Chapter 907: Development Overlay Districts, 907.04.A, to expand the boundaries of the Inclusionary Overlay District.

**907.04.A      IZ-O, Inclusionary Housing Overlay District**

907.04.A.1      General Boundaries

The specific boundaries of the Inclusionary Housing Planning Overlay District (IZ-O) are mapped as a supplement to this Section and as an amendment to the City's Zoning District Map, in accordance with Section 902.03.

907.04.A.2      Need for Zoning Overlay

The Inclusionary Housing Planning Overlay District is necessary to increase the production of affordable housing to meet existing and anticipated housing and employment needs and to provide a diverse range of housing choices within the District boundaries. The updated zoning will provide adequate balances by ensuring that the neighborhoods can continue to offer new housing units at a variety of price points.

907.04.A.3      Purpose and Intent

The intent of the Inclusionary Housing Planning Overlay District is to promote the public health and welfare by increasing the supply of affordable housing for a range of family sizes and promoting economic integration within the District boundaries. Due to the unique circumstances involved with development within this area, the existing zoning mechanisms do not serve to carry out the purpose and intent of Chapter 901 (General Provisions) and all provisions of this Zoning Ordinance. Specifically, the intent of the Inclusionary Housing IZ-O is to encourage quality, economically-balanced development by:

(a)      Leveraging development pressure by connecting the production of affordable housing with the current market production of housing units;

(b)      Encouraging diverse and balanced housing available for households of all income levels and ensuring that when developing the limited supply of developable land, housing opportunities for persons of variety of income levels are provided; and

(c)      Utilizing sites in IZ-O as opportunities to build mixed income developments. Because remaining land appropriate for residential development within in the IZ-O is limited, it is essential that a reasonable proportion of such land be developed into housing units affordable to low and moderate-income people.

907.04.A.4      Definitions

• **Administrative Agent** means with respect to Inclusionary Rental Housing, the Housing Authority of the City of Pittsburgh or such other qualified entity, as determined by the Director of City Planning, that enters into an agreement with the City to monitor and enforce compliance with the requirements of this Section and its regulations. With respect to Inclusionary Owner-Occupied Housing, the Urban Redevelopment Authority of

the City of Pittsburgh or such other qualified entity, as determined by the Director of City Planning, that enters into an agreement with the City to monitor and enforce compliance with the requirements of this Section and its regulations.

• **Affordable Housing Provider** means the Housing Authority of the City of Pittsburgh and such other approved owner/manager of affordable housing, as approved by the Director of City Planning, that enters into an agreement with the City to lease Inclusionary Rental Units exclusively to Eligible Households in compliance with this Section and its regulations.

• **Affordability Term** means a minimum of thirty-five (35) years from the date of initial occupancy of an Inclusionary Unit.

• **Allowable Pricing** means with respect to Inclusionary Rental Units, the monthly rent paid by the Eligible Household, plus all mandatory or essential fees and charges and an approved Utility Allowance, shall not exceed thirty (30) percent of the monthly income of a household earning fifty (50) percent of AMI with a household size one-and-a-half (1.5) times the bedroom count of the Dwelling Unit. Only tenant-paid costs are subject to the Allowable Pricing. If a rental subsidy is provided, the total of all monthly rent, fees, charges and approved Utility Allowance may exceed the Allowable Pricing so long as the portion paid by the household does not. With respect to Inclusionary Owner-Occupied Units, the initial sale price shall be set a level that ensures that a household earning seventy (70) percent of AMI for a household size one-and-a-half (1.5) times the bedroom count of the Dwelling Unit will spend no more than twenty-eight (28) percent of gross monthly income on their mortgage payment (principal and interest); taxes and insurance; and all mandatory or essential fees and charges (including condo/HOA dues), assuming a five-percent down payment and a thirty (30)-year fixed rate mortgage at the then current mortgage rate (determined as the National Average Contract Mortgage rate by the Federal Housing Finance Agency).

• **Area Median Income (AMI)** means the median household income for the Pittsburgh metropolitan area published annually by the U.S. Department of Housing and Urban Development ("HUD").

• **Community Land Trust** means a non-profit entity whose primary mission to create or preserve permanently affordable housing, and approved by the Director of City Planning, and that enters into an agreement with the City to convey Inclusionary Owner-Occupied Units exclusively to Eligible Households for owner occupancy subject to a ground lease that requires compliance with this Section and implementing regulations.

• **Development Project** means one (1) or more Developments (as defined in Title IX, Ch. 926.67) that are located in whole or in part within IZ-O that meet the Applicability Requirements of Section 907.04.A.5.

• **Eligible Household** means with respect to Inclusionary Rental Units, a household that earns no more than fifty (50) percent of AMI. With respect to Inclusionary Owner-Occupied Units, a household that earns no more than eighty (80) percent of AMI.

• **Family-Sized Units** means dwelling units that contain a minimum of two (2) bedrooms.

• **Inclusionary Owner-Occupied Unit** means an Inclusionary Unit that is both owned and occupied by one (1) or more persons as a primary residence. The term does not include a unit that is occupied pursuant to a lease-purchase agreement or contract of sale.

• **Inclusionary Rental Unit** means an Inclusionary Unit other than an Inclusionary Owner-Occupied Unit.

**File #:** 2021-1707, **Version:** 3

- **Inclusionary Unit** means a Dwelling Unit that satisfies the Inclusionary Standards set forth in Section 907.04.A.6 or 907.04.A.7.

- **Market-Rate Unit** means a Dwelling Unit in a Development Project that does not satisfy the Inclusionary Standards set forth in Section 907.04.A.6 or 907.04.A.7.

- **Networked Walkshed** means the land area within a defined walking range, traversable on established streets or pathways.

- **Off-Site Units** means inclusionary units constructed within one-quarter (¼) mile of the subject site, but not on a parcel adjacent to the subject site.

- **Substantial Improvement** means any reconstruction, rehabilitation, addition, or other improvement of a structure, of which the cost equals or exceeds one hundred (100) percent of the market value of the structure before the "start of construction" of the improvement, that occurs within a five (5)-year period. This term includes structures which have incurred "substantial damage" regardless of the actual repair worked performed. The term does not, however include any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions.

- **Utility Allowance** means an allowance for tenant-paid utilities, updated annually and approved by the Director of City Planning or their designee. The term shall include the applicable utility allowance published annually by the Housing Authority of the City of Pittsburgh or a utility allowance prepared by the Owner using methodology approved by the Pennsylvania Housing Finance Agency. In either case, the Utility Allowance must be appropriate for the size and type of dwelling unit and the kind of heat and appliances used, and must be approved by the Administrative Agent.

907.04.A.5     Applicability

In the Inclusionary Housing IZ-O, all applications for the following shall be subject to the standards of this Section:

(a)   New construction or Substantial Improvement, of one (1) or more buildings that collectively contain twenty (20) or more dwelling units either (i) on one (1) or more zoning lots marketed as a single or unified project, (ii) sharing common elements or common financing, or (iii) comprising a part of a planned development.

(b)   New construction or Substantial Improvement of one (1) or more buildings that collectively contain twenty (20) or more sleeping rooms either: (i) within a Multi-Suite Residential use, (ii) one (1) or more zoning lots marketed as a single or unified project, (iii) sharing common elements or common financing, or (iv) comprising a part of a planned development.

(c)   New construction or Substantial Improvement of one (1) or more buildings that collectively contain any combination of twenty (20) or more dwelling units and sleeping rooms either: (i) within a Multi- Suite Residential use, (ii) on one (1) or more zoning lots marketed as a single or unified project, (iii) sharing common elements or common financing, or (iv) comprising a part of a planned development.

File #: 2021-1707, Version: 3

907.04.A.6     On-Site Inclusionary Standards

(a)   To qualify for initial occupancy in an Inclusionary Unit, a household must be an Eligible Household. With respect to an Inclusionary Rental Unit, the Eligible Household must provide annual documentation of income and household composition to the Administrative Agent. In the event that household income exceeds eighty (80) percent of AMI, the household must vacate the unit by the later of either (i) the expiration of the next scheduled lease renewal or (ii) sixty (60) days after the household income exceeds eighty (80) percent of AMI. With respect to an Inclusionary Owner-Occupied Unit, the Eligible Household must continue to reside in the unit as the household's primary residence.

(b)   Prior to the issuance of a Certificate of Occupancy for an Inclusionary Rental Unit, the Applicant shall either:

1.     Record a deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary standards and related City regulations, such restriction to be prepared by the Director of City Planning or their designee, or

2.     Enter into a master lease of the unit with an Affordable Housing Provider for the entire Affordability Term.

(c)   Prior to the issuance of a Certificate of Occupancy for an Inclusionary Owner-Occupied Unit, the Applicant shall either:

1.     Record a deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary standards and related City regulations, such to be prepared by Director of City Planning or their designee, obliging owner-occupancy of the unit and restricting additional debt that can be secured against the property, or

2.     Sell the unit to a Community Land Trust.

(d)   Inclusionary Units must satisfy the Allowable Pricing criteria set forth in Section 907.04.A.4.

(e)   A minimum of ten (10) percent of units shall be Inclusionary Units. When this yields a fraction, the number of units shall be rounded up to the nearest whole units.

(f)   Rental and Owner-Occupied Inclusionary Units will remain affordable for a minimum of thirty-five (35) years. If the Inclusionary Unit or any property containing an Inclusionary Unit is sold during the Affordability Term, the Affordability Term shall automatically renew for an additional thirty-five (35) years.

(g)   Inclusionary Units must be integrated within, and distributed throughout, each building, except for:

1.   Inclusionary Units are not required to be placed on the top floor in buildings of less than six (6) stories.

2.   In buildings of six (6) stories or more, Inclusionary Units are not required to be placed on the top three (3) floors.

(h)   Except as provided in Section 902.04.A.5(j), on-site Inclusionary Units shall be equivalent to market-rate units within the building in all ways, including appliances, finishes, and square footage.

**File #:** 2021-1707, **Version:** 3

(i)   Core building and Development Project amenities, such as a gym, pool or parking space, must be shared with no additional charges or restrictions to residents in Inclusionary Units unless those charges are subtracted from rent or HOA dues for all residents regardless of unit or rental price.

(j)   The percentage of Inclusionary Units that are also Family-sized Units shall be equal or greater to the percentage of Market-Rate Units that are also Family-sized Units.

907.04.A.7   Off-Site Inclusionary Standards

Where provision of Inclusionary Units on-site is determined not to be feasible, inclusionary units constructed off-site may be permitted as a Special Exception in accordance with Section 922.07, subject to the following standards:

(a)   Off-site Units shall be subject to the standards of Section 907.04.A.6 except for Section 907.04.A.6(e).

(b)   A minimum of twelve (12) percent of the subject application's number of units shall be in Inclusionary Units. When this yields a fraction, the number of units shall be rounded up to the nearest whole number.

(c)   The applicant shall identify an alternative site suitable for residential housing which the applicant owns, has site control (e.g., purchase agreement, option to purchase, lease), or is otherwise available for the development of Inclusionary Units pursuant to an agreement between the applicant and a developer who owns the site or has site control. With respect to Rental Inclusionary Units, the Applicant must either:

1.   Own a controlling interest in the off-site development; or

2.   Provide evidence of an enforceable commitment to contribute two hundred thousand dollars ($200,000.00) or greater per Inclusionary Unit to the off-site development through an agreement with a developer who owns the site or has site control.

With respect to Owner-Occupied Inclusionary Units, the Applicant must either:

1.   Own the land and develop the off-site housing, or

2.   Provide evidence of an enforceable commitment to contribute two hundred thousand dollars ($200,000.00) or greater per Inclusionary Unit to the off-site development through an agreement with a developer who owns the site or has site control.

(d)   The Certificate of Occupancy for off-site Inclusionary Units must be obtained prior to the issuance of the final Certificate of Occupancy for the subject property.

(e)   The off-site units shall be located no more than one-quarter (¼) mile of the subject site, within City limits.

(f)   The applicant must submit analysis to establish that the off-site property has comparable public transit service as the subject site, evaluated by distance from transit stop(s) via Networked Walkshed, number of routes available, and frequency of service.