UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BUILDERS ASSOCIATION OF METROPOLITAN PITTSBURGH,<br><br>*Plaintiff,*<br><br>v.<br><br>CITY OF PITTSBURGH; *et al.*,<br><br>*Defendants*. | Civil Action<br><br>No. 2:22-cv-706-RJC<br><br>Judge Robert J. Colville |

MEMORANDUM IN SUPPORT OF PROPOSED DEFENDANT INTERVENORS'
<u>MOTION TO INTERVENE</u>

Lawrenceville United, The Bloomfield Development Corporation, The Polish Hill Civic Association, The Hill District Consensus Group, and The Fair Housing Partnership of Greater Pittsburgh (together, "Intervenors") submit this memorandum in support of their Motion to Intervene as Defendants pursuant to Rule 24(a) of the Federal Rules of Civil Procedure or, in the alternative, pursuant to Rule 24(b).

I. INTRODUCTION

Inclusionary zoning ("IZ") is an important policy that hundreds of municipalities use to maintain a healthy cultural and economic balance in areas that are experiencing development. Pittsburgh's challenged Inclusionary Zoning Ordinance ("IZO"), similar to many IZ policies that courts have upheld across the country, ensures that new housing units are available at a variety of price points in neighborhoods experiencing rapid development. And by integrating affordable units into market-rate projects, Pittsburgh's IZO creates opportunities for racially and socioeconomically diverse households to have access to the same types of community amenities and services.

1

Intervenors have a strong, vested interest in upholding the IZO. Indeed, Intervenors are five of the nonprofit community organizations in Pittsburgh that advocated for passage of the challenged IZO and represent members and communities who will benefit from the inclusive mixed-income neighborhoods the IZO aims to foster. Intervenors, at the initial stages of this litigation, timely seek to defend their significantly protectable interests in affordable housing and inclusive communities, which stand to be impaired if Plaintiff Builders Association of Metropolitan Pittsburgh ("BAMP") were granted the relief it requests. Overturning the IZO would significantly undermine Intervenors' missions, accelerate displacement and deepen segregation by limiting their communities' and members' access to affordable housing, and would negate hours of work and expenditure of resources. Intervenors' interests in this litigation are unique and not adequately represented by the City whose focus will largely center on vindicating its authority to enforce a duly enacted ordinance. Finally, Intervenors' unique perspectives and experience will be valuable to the Court as it assesses the issues in the case. Accordingly, Intervenors satisfy the requirements for intervention as of right under FED. R. CIV. P. 24(a)(2). *See Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005).

Alternatively, the Court should grant intervention under Rule 24(b). Because Intervenors seek leave to defend against BAMP's attempt to invalidate the IZO, their claims and defenses necessarily share common questions of law and fact with the main action. And their timely motion would neither delay nor prejudice the orderly adjudication of BAMP's claims. In short, they should be permitted to intervene to defend the IZO and their distinct interests in affordable and inclusive neighborhoods.

## II.     FACTS

### A.     Market Conditions Are Eliminating Economically and Socially Balanced Communities.

The City of Pittsburgh is facing an affordable housing crisis that is pushing low-income families, particularly Black families, to find housing outside of the City limits. Between 2010 and 2020, Pittsburgh lost 10,660 Black residents, a 13.4% decline.[1] At the same time, Pittsburgh is experiencing a multifamily housing construction boom—between 2010 and 2019, developers built roughly the same number of multifamily units as in the previous three decades combined.[2] Rapid development is outpacing incomes and leaving low-wage working Pittsburghers behind. Residential housing prices in the Pittsburgh metropolitan area are increasing at the fastest rate since the 1970s.[3] In 2021, rents increased by 18.5% and home sale prices increased by 14%.[4]

Meanwhile, nearly half of renter households in Pittsburgh are cost burdened, meaning they are paying over 30% of their income on housing costs, and more than a quarter are severely cost burdened and paying over one-half of their income on housing costs.[5] Black Pittsburgh residents are particularly burdened. The median household income for Black households in Pittsburgh is $27,635[6] while that for non-Hispanic white households is $58,788.[7] The City has an estimated

---

[1] *First Look at the 2020 Decennial Census: Pittsburgh Region,* U. OF PITTSBURGH CENTER FOR SOCIAL & URBAN RES. (August 12, 2021), https://ucsur.pitt.edu/perspectives.php?b=20210821103378 (citing 2020 Decennial Census of Population and Housing data).
[2] Robert Damewood, *Building Inclusive Communities: A Review of Local Conditions, Legal Authority and Best Practices for Pittsburgh*, REGIONAL HOUSING LEGAL SERVICES, 3 (Jan. 2022), https://www.rhls.org/2022/01/building-inclusive-communities-report-on-inclusionary-zoning-updated-with-new-information/
[3] *Pittsburgh real estate values rising their fastest since the 1970s*, U. OF PITTSBURGH CENTER FOR SOCIAL & URBAN RES. (Jan. 7, 2022), https://bit.ly/3w4E3Wm (last visited Aug. 15, 2022).
[4] Jiayi Xu & Danielle Hale, *December Rental Data: Rents Surged by 10.1% in 2021*, REALTOR.COM (January 26, 2022), https://www.realtor.com/research/december-2021-rent/
[5] *Building Inclusive Communities,* at p. 3.
[6] U.S. Census Bureau, "American Community Survey 5-Year Estimates, 2020 – Pittsburgh city," accessed August 11, 2022, https://bit.ly/3dlTBhU.
[7] U.S. Census Bureau, "American Community Survey 5-Year Estimates, 2020 – Pittsburgh city," accessed August 11, 2022, https://bit.ly/3piQeer.

shortage of 8,200 housing units affordable to households with incomes at or below 30% of AMI.[8] In other words, the market is not meeting the housing needs of Pittsburgh's low-wage working families.

### B. Community Efforts to Promote Inclusive Neighborhoods.

To address the affordable housing crisis, Intervenors and other community groups successfully advocated for the City of Pittsburgh to enact the IZO in various stages, between June 2019 and April 2022. *See* PITTSBURGH, PA, ZONING CODE, Tit. IX, art. III, § 907.04.A (2021). The IZO ties the creation of affordable housing with new market-rate development. As noted in the Ordinance, City officials view IZ as "necessary to increase the production of affordable housing to meet existing and anticipated housing and employment needs and to provide a diverse range of housing choices within the District boundaries." *Id*. at § 907.04.A.2. "Because remaining land appropriate for residential development within the IZ-O is limited, it is essential that a reasonable proportion of such land be developed into housing units affordable to low and moderate-income people." *Id*. at § 907.04.A.3(c).

The IZO creates "Inclusionary Zoning Districts" in certain Intervenor neighborhoods—Lower, Central, and Upper Lawrenceville; Bloomfield; and Polish Hill—to increase the production of affordable housing to meet existing and anticipated housing and employment needs and to provide a diverse range of housing choices. *Id*. at § 907.04.A.1. The IZO's Inclusionary Standards apply to "[n]ew construction or Substantial Improvement of one or more buildings that collectively contain . . . 20 or more dwelling units." *Id*. at § 907.04.A.5. Ten percent of all units in covered properties are to be set aside as "Inclusionary Units," to be rented or sold at below-market prices,

---

[8] *Building Inclusive Communities,* at pp. 3-4.

for low and moderate-income households. *Id*. at § 907.04.A.6(e). The Affordability Term—the time period for which the requirements of the IZO apply—is 35 years. *Id*. at § 907.04.A.4.[9]

BAMP filed this litigation seeking to invalidate the IZO on the grounds that it constitutes an improper taking of private property without just compensation in violation of the Takings Clause of the Fifth Amendment, and likewise violates the Due Process Clause of the Fourteenth Amendment. BAMP also asserts state law claims.

### C. Intervenors Promote Pittsburghers' Interests in Affordable and Inclusive Housing and Communities.

Lawrenceville United ("LU") is an inclusive, resident-driven, non-profit organization with 824 members that works to improve the quality of life for all Lawrenceville residents. LU works in the areas of community planning and development, community engagement and advocacy, and community restoration and beautification. **Exhibit A**, LU Declaration, ¶¶ 4-9. LU has led numerous housing advocacy campaigns to support homeowners at risk of being priced out of their homes. LU also provides direct support services to homeowners and renters facing housing issues. *Id*. at ¶¶ 7-8. LU has dedicated significant time, resources and effort to advancing IZ as a tool for carrying out its mission. LU led campaigns to adopt the first iteration of an inclusionary zoning ordinance in Pittsburgh—the Interim Planning Overlay District (IPOD) in Lawrenceville and later the IZO at issue. *Id*. at ¶ 10.  LU has been involved in the implementation of the IZO, supporting developers and City Planning staff and maintains a list of residents who are interested in inclusionary units as they become available. *Id*. at ¶¶ 11-13. Thus, LU has an interest in defending

---

[9] The Ordinance includes an exception to the IZ requirements, allowing for the construction of off-site inclusionary units with a twelve percent set-aside where on-site units are unfeasible. *See* PITTSBURGH, PA, ZONING CODE, Tit. IX, art. III, § 907.04.A.7. If the developer does not own land that meets the off-site criteria, they may alternatively, "contribute two hundred thousand dollars ($200,000.00) or greater per Inclusionary Unit to the off-site development through an agreement with a developer who owns the site or has site control." *Id*. There is an enhanced 10-year LERTA (Local Economic Revitalization Tax Assistance Act) tax abatement available for owners who comply with IZ affordability requirements. *See* PITTSBURGH CODE, TITLE II, ARTICLE IX, § 267.05(e).

the IZO, which will directly benefit residents of Lawrenceville and LU's members. Invalidating the IZO would be devastating to LU's mission and years of work, undermining the self-determination of the Lawrenceville community. *Id*. at ¶¶ 15-16. If the IZO is overturned, LU will have to re-direct resources to support members and residents in need of affordable housing and to address deepening segregation and displacement in Lawrenceville. *Id*. at ¶¶ 17-19.

The Polish Hill Civic Association ("PHCA") is a membership-based community benefit organization with 51 members that organizes neighborhood activities in the Polish Hill neighborhood of Pittsburgh and advocates for the Polish Hill community. Part of its mission is to preserve the sense of community in Polish Hill while promoting economic and housing development opportunities to improve the quality of life for the Polish Hill community. **Exhibit B**, PHCA Declaration, ¶¶ 4-5, 7. The PHCA works to promote affordable housing in numerous ways and has vigorously advocated for the IZO to increase affordable housing and promote an inclusive community. *Id*. at ¶¶ 6, 8. Overturning the IZO would undermine the PHCA's mission and work. Countless hours and significant resources have gone toward the passage of the IZO. The work of the PHCA, to advance IZ, is reflective of the priorities of the Polish Hill community to ensure that major residential developments in the neighborhood are accessible to people with a variety of incomes. *Id*. at ¶¶ 9-10. If the IZO is overturned, the PHCA will have to direct resources toward supporting families living in the neighborhood as they grapple with housing costs that outpace their income. Displacement will accelerate and the PHCA will have to re-direct scarce resources to respond. *Id*. at ¶¶ 11-12.

The Bloomfield Development Corporation ("BDC") is the Registered Community Organization (RCO) for the Bloomfield neighborhood. The BDC's members include the 8,000+ residents and 180 businesses in the neighborhood. The BDC works to build a thriving, diverse

community through equitable engagement. **Exhibit C**, BDC Declaration, ¶¶ 4-5. The BDC carries out its mission via four primary program areas: housing; mobility & infrastructure; business district support; and a farmers market. *Id*. at ¶ 6-9. The BDC works to promote an inclusive community in numerous ways and has long advocated for IZ as a means to achieve this. Bloomfield is in need of affordable housing as part of proposed and anticipated developments in the neighborhood. To this end, the BDC has made the expansion of IZ to Bloomfield an organizational priority since 2019. *Id*. at ¶¶ 9-10. If the IZO were overturned, the BDC's extensive efforts and expenditure of resources to advance IZ would be lost. The significant need for affordable housing in the neighborhood would remain unmet. Moreover, the BDC would have to divert further resources to support members and Bloomfield residents in need of affordable housing. *Id*. at ¶¶ 12-13. This additional but necessary work would limit the BDC's capacity to work on food access and business development. *Id*. at ¶ 14.

The Hill District Consensus Group's ("HDCG") mission is to create effective pathways for intergenerational residents to overcome economic, social, and housing disparities. **Exhibit D**, HDCG Declaration, ¶ 4, 6. The HDCG's membership includes numerous neighborhood groups and 200 individual members. *Id*. at ¶ 5. The HDCG has long advocated for development agendas that reflect community priorities, specifically organizing to ensure that development efforts achieve shared prosperity across diverse economic and demographic groups. The HDCG has used economic justice organizing strategies to prevent market forces from developing land that will cause residential displacement, gentrification and other forms of economic oppression in the Hill District. *Id*. at ¶ 7. The HDCG sees IZ as an important tool for ensuring housing equity in Pittsburgh and has spent significant time and resources on passing the IZO, even though it does not, yet, cover the Hill District. *Id*. at ¶ 8. The Hill District is comprised of majority low-income

Black residents already facing significant displacement because of a lack of affordable housing and the increasing cost of living. *Id*. at ¶ 9. The Hill District borders the neighborhoods where the IZO applies, and in light of current conditions, the HDCG has a significant interest in protecting IZ. The HDCG sees this lawsuit as a moment of reckoning for racial justice in Pittsburgh. *Id*. at ¶ 10.

The Fair Housing Partnership of Greater Pittsburgh ("FHP") is a full-service fair housing enforcement non-profit organization that ensures equal housing choice through education, fair housing analysis, enforcement actions, outreach, and community organizing in western Pennsylvania. **Exhibit E**, FHP Declaration, ¶¶ 4-5. The FHP works to end racial segregation in housing. The FHP identifies the quantifiable racial segregation in the Pittsburgh region and takes action to foster residential integration by making affordable housing available in middle and high-income areas with substantial white populations. To this end, the FHP has been a constant advocate for IZ in and around Pittsburgh. *Id*. at ¶¶ 6-7. Overturning the IZO would directly frustrate the FHP's mission of "ensuring equal housing choice." The FHP's service area is quantifiably racially segregated. Thus, the FHP is directing scarce resources toward defending the IZO. Should BAMP prevail in this litigation, it could create a legal precedent that would prevent the implementation of IZ throughout the FHP's service area. *Id*. at ¶¶ 8-9. Pittsburgh is losing Black residents as a result of housing displacement. Invalidating the IZO would only accelerate displacement and would force the FHP to re-direct further resources from its education, legal, outreach, and community organizing work to support displaced Pittsburghers and combat worsening segregation. *Id*. at ¶ 10.

### III.   ARGUMENT

#### A.   Intervenors Are Entitled to Intervene As a Matter of Right.

Intervenors are entitled to intervene as of right upon establishing: "(1) a timely application

for leave to intervene, (2) a sufficient interest in the underlying litigation, (3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and (4) that the existing parties to the action do not adequately represent [their] interests." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216 at 220 (internal citation omitted). Here, Intervenors satisfy each of these requirements and the Court should grant intervention. *See Transource Pennsylvania, LLC v. Dutrieuille,* No. 21-2567, 2022 WL 2235466, at *2 (3d Cir. June 22, 2022) ("Federal Rule of Civil Procedure 24(a)(2) requires a district court to grant intervention as of right if" the four criteria are satisfied).

### 1. The Motion to Intervene Is Timely.

In determining whether intervention is timely courts consider three factors: "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Wallach v. Eaton Corp.*, 837 F.3d 356, 371 (3d Cir. 2016) (internal citation omitted). Ultimately, "[t]he timeliness of a motion to intervene is determined from all the circumstances" and in the court's "sound discretion." *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 500 (3d Cir. 1982) (internal citation omitted).

Defendants' responsive pleadings to BAMP's Complaint are due August 15, 2022. Intervenors' are filing their Motion and accompanying proposed responsive pleading by this same deadline to avoid any delay in the litigation. There is no question intervention is timely and does not impede the advancement of the action, or otherwise prejudice the parties under Rule 24. *See, e.g.*, *Cmty. Vocational Schs. of Pittsburgh, Inc. v. Mildon Bus Lines, Inc.*, 2017 WL 1376298, at *5 (W.D. Pa. Apr. 17, 2017) (motion to intervene timely where "discovery not yet closed").

### 2. Intervenors Have Sufficient Interests in the Underlying Litigation.

To justify intervention as of right, an intervenor must have an interest "relating to the property or transaction which is the subject of the action that is significantly protectable." *Seneca Res. Corp. v. Twp. of Highland, Elk Cty., Penn.*, 863 F.3d 245, 256–57 (3d Cir. 2017) (internal citation omitted). That is to say, an intervenor must demonstrate that its interest is "specific to [it], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998). "[T]he polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote." *Id.*

Here, Intervenors have a significantly protectable interest in defending their members' access to affordable and inclusive housing in this litigation.[10] Intervenors represent the individuals and communities who will directly benefit from the IZO or who stand to lose if the IZO is overturned. Courts routinely grant potentially impacted beneficiaries, and those who represent them, leave to intervene. *See, e.g., Commonwealth of Pennsylvania v. President U.S. of Am.,* 888 F.3d 52, 58 (3d Cir. 2018) (permitting religious nonprofit organization to intervene who stood to benefit from challenged regulatory protection). Numerous courts have likewise granted intervention as of right where the particular interests of a special interest group were threatened. *E.g. Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983) (holding that the Audubon Society, a nonprofit organization, was entitled as a matter of right to intervene in action challenging the legality of a measure it had supported); *Planned Parenthood v. Citizens for Cmty. Action*, 558

---

[10] Intervenors have Article III standing to participate in the litigation as defendants, whether on behalf of their members or in their own right, to pursue relief that is different from that sought by the parties. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342– 43 (1977).

F.2d 861 (8th Cir. 1977) (holding that a neighborhood association was entitled to intervene in action challenging constitutionality of local ordinance).

In addition, Intervenors have a protectable interest in efforts to defend the IZO, because such efforts go to the core of their mission and work. LU, PHCA, HDCG, BDC and FHP spent countless hours, resources and energy on advancing the IZO as a tool for ensuring a balanced and inclusive Pittsburgh. Intervenors led advocacy campaigns, held community meetings to educate the public and gather input, met with policy makers, and assisted with crafting the IZO legislation. *See* **Ex. A**, LU Decl., ¶¶ 10-11, 14;  **Ex. B**, PHCA Decl., ¶¶ 8-9; **Ex. C**, BDC Decl., ¶¶ 10-11, **Ex. D**, HDCG Decl. ¶ 8; **Ex. E**, FHP Decl., ¶¶ 7-9. Several Intervenors have supported developers with compliance with the IZO, and several work to connect Pittsburgh residents in need of affordable housing with units as they become available.  *See* **Ex. A**, LU Decl., ¶¶ 12-14; **Ex. B**, PHCA Decl., ¶ 6; **Ex. C**, BDC Decl., ¶ 9. The IZO's intent and purpose not only dovetail with the missions of these organizations, but also benefit their members and communities tangibly by promoting the economically balanced development these communities desire.

### 3. Disposition of this Case May Impair Intervenors' Interests.

An Intervenor as of right also "must demonstrate that [its] legal interests may be affected or impaired[ ] as a practical matter by the disposition of the action." *Commonwealth of Penn. v. President U.S.A.,* 888 F.3d at 59  (quoting *Brody By & Through Sugzdinis v. Spang,* 957 F.2d 1108, 1122 (3d Cir. 1992). "It is not sufficient that the claim be incidentally affected; rather, there must be a tangible threat to the applicant's legal interest." *Id.* (quoting *Brody*, 957 F.2d at 1123). The inquiry focuses on the practical effects of the litigation, and the court "may consider any significant legal effect on the applicant's interest, including a decision's *stare decisis* effect or a proposed remedy's impact on the applicant for intervention." *Id.* (quoting *Brody*, 957 F.2d

at 1122–23).

In their challenge, BAMP seeks injunctive and declaratory relief that poses a tangible threat to Intervenors' interests in affordable housing and inclusive communities. Invalidating the IZO, as BAMP requests, would significantly undermine Intervenors' missions, numerous hours of work and expenditure of resources, and their communities' and members' access to affordable housing. *See* **Ex. A**, LU Decl., ¶¶ 15-18; **Ex. B**, PHCA Decl., ¶¶ 9-12; **Ex. C**, BDC Decl., ¶¶ 12-14; **Ex. D**, HDCG Decl. ¶¶ 8-11; **Ex. E**, FHP Decl., ¶¶ 8-11. Overturning the IZO would also undercut the self-determination of Intervenors' members who advocated for the IZO as a solution for combatting displacement in their communities. *See* **Ex. A**, LU Decl., ¶ 16; **Ex. B**, PHCA Decl., ¶ 10; **Ex. C**, BDC Decl., ¶¶ 4-6, **Ex. D**, HDCG Decl. ¶¶ 6-7; **Ex. E**, FHP Decl., ¶¶ 8-11. And for two Intervenors, FHP and HDCG, a court decision overturning the IZO could derail their efforts to expand IZ to other areas. *See* **Ex. D**, HDCG Decl. ¶¶ 10-11; **Ex. E**, FHP Decl., ¶ 8.

The IZO is also an important tool for desegregating Pittsburgh and slowing the displacement of Black residents. Overturning the IZO, as BAMP requests, would impair Intervenors' and their members' interests by leading to further displacement of low-income residents and deepening segregation. Displacement and segregation would impact residents' access to transit, amenities, jobs, food, healthcare, and education. It would also make it more difficult for local businesses and organizations to find staff, as the workforce would have less affordable housing nearby. *See* **Ex. A**, LU Decl., ¶ 19; **Ex. B**, PHCA Decl., ¶ 12; **Ex. C**, BDC Decl., ¶ 12, **Ex. D**, HDCG Decl., ¶¶ 9-11; **Ex. E**, FHP Decl., ¶¶ 8-10.

If BAMP's lawsuit is successful, Intervenors will be forced to divert substantial resources from other efforts important to their missions and members, such as other housing work, food access, public safety, public education, local business development, and cleaning and greening

efforts. And instead, Intervenors would need to expend more resources to supporting members of their communities facing the fallout of ongoing development that outpaces affordability. *See* **Ex. A**, LU Decl., ¶¶ 7-9, 17-18; **Ex. B**, PHCA Decl., ¶¶ 6-7, 11; **Ex. C**, BDC Decl., ¶¶ 7-9, 13-14; **Ex. D**, HDCG Decl., ¶¶ 8, 11; **Ex. E**, FHP Decl., ¶ 8.

### 4. Intervenors' Interests Are Not Adequately Represented.

An intervenor has a "minimal" burden of demonstrating that existing parties in the litigation do not adequately represent their interests. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *Commonwealth of Penn. v. President U.S.A.,* 888 F.3d at 60-62. It is sufficient to show that "representation of [the] interest *may* be inadequate." *Trbovich*, 404 U.S. at 538 n.10  (emphasis added) (internal quotation marks omitted). A proposed intervenor need only show that "although [its] interests are similar to those of a party, they diverge sufficiently that the existing party cannot devote [them] proper attention," *United States United States v. Territory of V.I.*, 748 F.3d 514, 519–20 (3d Cir. 2014) (internal quotation marks omitted).

Intervenors in the current matter meet this standard because their interests differ from those of the City government Defendants. The City's responsibility for the administration of zoning policy does not necessarily extend to representation of the interests of Intervenors. "[W]hen an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden [of establishing inadequacy of representation] is comparatively light." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964 at 972.  While Defendants have a generalized interest in preserving validly-adopted zoning laws and promoting an inclusive City, Intervenors have a specific and direct interest in ensuring their members' and communities' personal access to affordable housing, socioeconomic and racial integration, and safeguarding Pittsburgh families' ability to remain in their

neighborhoods of choice. Intervenors have dedicated years of time and toil to advancing IZ. Lack of affordable housing creates a tangible burden for Intervenors and the residents they represent. The outcome of this litigation will directly impact the quality and nature of Intervenors' neighborhoods. Intervenors are therefore particularly well suited to establish the need for and benefits of the IZO in their communities and on behalf of their members. The Defendants, on the other hand, may prioritize broader citywide interests and their interest in legislating via zoning controls.

Accordingly, there is no guarantee that Defendants will sufficiently attend to Intervenors' specific interests as Defendants attempt to uphold the IZO. *See Kleissler*, 157 F.3d at 967 (concluding that the proposed intervenors had carried their burden by showing "a reasonable doubt whether the government agency would adequately represent [their] concerns"); *Commonwealth of Penn. v. President U.S.A.,* 888 F.3d 52 at 60-62 (concluding the same).

### B.   Alternatively, the Court Should Grant Permissive Intervention.

Even if the Court determines that Intervenors are not entitled to intervene as a matter of right, the Court should exercise its broad discretion to grant permissive intervention. A court may grant permissive intervention when the motion to intervene is timely and "has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b). Even where the district court denies intervention as of right, permissive intervention might be proper or warranted, as it would be here. *See Hoots v. Commw. of Pa.*, 672 F.2d at 1136. "The permissive intervention rule is to be construed liberally with all doubts resolved in favor of permitting intervention." *Mainstreet Am. Assurance Co. v. Weasenforth*, No. CV 21-827, 2021 WL 4459746, at *3 (W.D. Pa. Sept. 29, 2021) (internal citation omitted).

Intervenors seek to assert defenses against BAMP's claims that the IZO is unconstitutional and a violation of Pennsylvania law. Intervenors satisfy the common-questions element of Rule 24(b) because the central arguments that Intervenors will raise in their responsive pleading arise out of the same set of facts as those of BAMP and Defendants.

In exercising discretion as to permissive intervention, courts consider an intervenor's "contributions to the proceedings." *Hoots v. Commw. of Pa.*, 672 F.2d 1133, 1136 (3d Cir. 1982). Specifically, courts consider "whether the proposed intervenors will add anything to the litigation." *Kitzmiller v. Dover Area Sch. Dist.,* 229 F.R.D. 463, 471 (M.D. Pa. 2005). Intervenors collectively represent thousands of Pittsburgh residents and numerous Pittsburgh communities who would be burdened if BAMP were successful in this litigation. As such, they will add to the litigation by presenting a distinct perspective on the legal and factual issues before the Court. Intervenors contributions will complement and amplify Defendants' arguments against BAMP's claims.

Because Intervenors satisfy the baseline commonality requirement of Rule 24(b)(2) and their intervention would not delay or prejudice the adjudication of the original parties' rights, the Court should permit intervention. *See Page v. DTE Midstream, LLC*, No. 2:19-CV-01345-DSC, 2020 WL 5519052, at *6 (W.D. Pa. July 10, 2020) (granting permissive intervention where intervenor raised common questions of law and fact) (subsequent history citation committed); *Hyland v. Harrison*, 2006 WL 288247, at *6 (D. Del. Feb. 7, 2006) (permissive intervention appropriate where applicant's motion "based on the same facts and circumstances as this case, seeks substantially the same relief, and raises similar legal issues").

## IV.   CONCLUSION

For the reasons stated above and in the attached supporting Declarations the Court should grant Intervenors' Motion to Intervene.

Date:  August 15, 2022				Respectfully submitted,


						*/s/ Kevin Quisenberry*

						Kevin Quisenberry (PA No. 90499)
						COMMUNITY JUSTICE PROJECT
						100 Fifth Avenue, Suite 900
						Pittsburgh, PA 15222
						Tel: (412) 434-6002
						kquisenberry@cjplaw.org


						Mary M. McKenzie* (PA No. 47434)
						Mary Elizabeth Schluckebier* (PA No. 320782)
						PUBLIC INTEREST LAW CENTER
						1500 JFK Blvd., Suite 802
						Philadelphia PA 19102
						Tel: (215) 627-7100
						Fax: (215) 627-3183
						mmckenzie@pubintlaw.org
						mbschluckebier@pubintlaw.org


						Thomas Silverstein* (D.C. Bar No.1552406)
						Sophia B. Jayanty* (N.Y. Bar No. 5570056
						LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
						1500 K Street NW, Suite 900
						Washington, DC 20005
						Tel: (202) 662-8307
						Fax: (202) 783-0857
						tsilverstein@lawyerscommittee.org
						sjayanty@lawyerscommittee.org

						* *Pro hac vice* forthcoming.


						*Counsel for Proposed Defendant Intervenors*