# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BUILDERS ASSOCIATION OF    )
METROPOLITAN PITTSBURGH and  )  Case No. 2:22-cv-706
S. RAND WERRIN,       )
             )
    Plaintiffs,     )
             )
  v.          )
             )
CITY OF PITTSBURGH,     )
             )
    Defendant.    )
             )

_____

## FIRST AMENDED COMPLAINT

Plaintiffs, BUILDERS ASSOCIATION OF METROPOLITAN PITTSBURGH ("BAMP") and S. RAND WERRIN ("Dr. Werrin") (collectively "Plaintiffs") by and through their undersigned counsel, hereby files this First Amended Complaint against the CITY OF PITTSBURGH ("City" or "Defendant"), and in support thereof, avers the following:

## INTRODUCTION

1.  BAMP seeks declaratory and injunctive relief from unconstitutional, illegal, and confiscatory ordinances enacted by the City, in various stages, between June 2019 and March 2023 (individually the "Ordinance", collectively the "Ordinances"). By way of the Ordinances, the City improperly seeks to shift the burden to fund low- and moderate-income housing from the general public to a select population, namely residential real estate developers. The imposition of this burden on BAMP members constitutes an improper taking of private property without just compensation, in violation of the Takings Clause of the Fifth Amendment, made applicable here by the Fourteenth Amendment. As such, the ordinance cannot be permitted to stand.

2.      The Ordinances are also violative of Pennsylvania law, as they violate (i) the Pennsylvania Constitution, Article IX, Section 2; and (ii) the Home Rule Charter and Optional Plans Law (the "Home Rule Law"), 53 Pa.C.S. § 2901 *et seq*.  The Home Rule Law specifically strips from the City the authority to adopt ordinances that either (i) regulate business, occupations and employers by imposing duties, responsibilities or requirements thereon; or (ii) contradict, limit, or enlarge powers granted by statutes applicable to municipalities. By placing onerous, costly conditions on developers' abilities to construct, market, sell, and/or rent their properties, the City is engaging in conduct expressly prohibited by the Home Rule Law (53 Pa.C.S. § 2962(f)).  For these state law reasons as well, the Ordinances constitute an *ultra vires* act and are null and void.

3.      The City's stated "Purpose and Intent" in enacting the Ordinances was "to promote the public health and welfare by increasing the supply of affordable housing for a range of family sizes and promoting economic integration within the District boundaries." Ordinance, § 904.04A.  While this goal may be unobjectionable, and even laudable, it is improper for the City to task BAMP's members with curing this deficit by placing unconstitutional conditions on their use of their private property.  And, while the Ordinances are unlawful whether or not they actually promote their stated objective, the practical effect of the Ordinances is to disincentivize developers from investing in the City's neighborhoods and residents due to the exponentially-increased development costs, thereby limiting the supply of newly constructed units, increasing general housing prices, and ultimately limiting housing opportunities of moderate-income families.

4.      In short, the Ordinances do not pass constitutional muster and do not comport with Pennsylvania law.

## THE PARTIES

5.      Plaintiff, BAMP, is a Pennsylvania non-profit trade association with a principal place of business in Pittsburgh, Pennsylvania. BAMP serves as a trade association, with a membership comprised, in part, of businesses that specialize in residential construction and development, including at times on land owned by such businesses, in and around the City of Pittsburgh and Western Pennsylvania.

6.      BAMP has standing to sue under the doctrine of associational standing as recognized, for example, in *Free Speech Coal., Inc. v. AG of the United States*, 974 F.3d 408, 421 (3d Cir. 2020) and *Pa. Psychiatric Soc'y v. Green Spring Health Servs*., 280 F.3d 278, 283 (2002).

7.      Specifically, BAMP has standing because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Pa. Psychiatric Soc'y* at 283 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343).

8.      BAMP has approximately 400 members in Pittsburgh and Western Pennsylvania, including builders and developers who own property within the areas of Pittsburgh affected by the Ordinances, as well as developers who plan to acquire such property.  BAMP members also own and/or manage properties consisting of rental/dwelling units within the areas of Pittsburgh affected by the Ordinances.  Many BAMP members are among the persons subject to the prohibitions and requirements of the Ordinances and, as such, would have standing to sue in their own right.

9.      The purposes of BAMP include representing the interests of its members on matters of public policy and legislation related to their respective industries, including regulations like

those imposed by the Ordinances challenged by this lawsuit.  The interests that BAMP seeks to protect by this lawsuit are germane to those purposes.

10.     BAMP's standing is further shown by the Declaration of James M. Eichenlaub, which is attached hereto as **Exhibit "A"** and fully incorporated by reference.

11.     BAMP and BAMP members have a substantial, direct and immediate interest in this action because BAMP members are engaged as owners and developers of "Development Project[s]" as defined in Section 907.04.A.4 of the Pittsburgh Code of Ordinances, Title 9, Article III.

12.     Plaintiff, Dr. Werrin, is an adult individual with a current address of 3506 5th Avenue, Pittsburgh, Pennsylvania 15213.

13.     Dr. Werrin is a member of BAMP.

14.     Dr. Werrin is also a property owner with various interests in real properties located at 3504 5th Avenue, Pittsburgh, Pennsylvania 15213, Parcel ID:  0028-F-00029-000-00 (hereinafter "3504 5th"); 3506 5th  Avenue, Pittsburgh, Pennsylvania 15213, Parcel ID:  0028-B-00074-000-00 (hereinafter "3506 5th"); 3508 5th Avenue, Pittsburgh, Pennsylvania 15213, Parcel ID:  0028-B-00076-00; and 3510 5th Avenue, Pittsburgh, Pennsylvania 15213, Parcel ID:  0028-B-00077-000-00 (hereinafter "3510 5th") (3504 5th, 3506 5th, 3508 5th, and 3510 5th are collectively referred to as the "Werrin Properties").

15.     The Werrin Properties are located within the City of Pittsburgh's UC-E Zoning District.  The UC-E Zoning District was created by City of Pittsburgh Ordinance 2022-0592 (the "Oakland Ordinance"), which was adopted on February 28, 2023, and effective as of March 1, 2023.

16.     The Oakland Ordinance, among other things, extends the City of Pittsburgh's Inclusionary Zoning Requirements to large portions of the City's Oakland neighborhoods.

17.     Defendant, City of Pittsburgh ("City"), is a home rule municipality, organized and existing under the Home Rule Charter and Optional Plans Law (the "Home Rule Law"), 53 Pa.C.S. § 2901 et seq., having its principal place of business in Pittsburgh, Pennsylvania.  As a municipality, the City does not possess sovereign immunity with respect to the matters at issue in this lawsuit.  See, e.g., Alden v. Maine, 527 U.S. 706, 756 (1999) ("[Sovereign] immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State.").

## JURISDICTION AND VENUE

18.     This is an action under 42 U.S.C. § 1983 for monetary, declaratory, and injunctive relief for violations of rights secured by the Takings Clause of the Fifth Amendment, made applicable to Defendants by the Fourteenth Amendment.

19.     The Declaratory Judgment Act, 28 U.S.C. § 2201, "allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978). Those conditions apply here.

20.     This is also an action under Pennsylvania law for violations of the Pennsylvania Constitution and the "Business Exclusion" provisions of the Home Rule Law.

21.     This Court has jurisdiction over BAMP's federal claims pursuant to 28 U.S.C. § 1331 because this case arises under the laws and Constitution of the United States, and this Court has supplemental jurisdiction over BAMP's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because all of the claims asserted by Plaintiffs arose in the Western District of Pennsylvania.

## FACTUAL ALLEGATIONS

### a.  Pittsburgh City Ordinance 2021-1414

23.     As the result of various actions taken by the Pittsburgh City Council and its Mayor between July 24, 2019, and May 2, 2022, the City enacted the initial legislation that is the subject of this lawsuit – Ordinance 2021-1414.  A copy of Ordinance 2021-1414 is attached as **Exhibit "B"** and fully incorporated by reference.

24.     The Ordinance can also be found in the Pittsburgh Code of Ordinances at Title Nine, Zoning; Article III, Overlay Zoning District, Chapter 907: Development Overlay Districts by creating 907.04.A, IZ-O, Inclusionary Housing Overlay Districts.

25.     The Ordinance creates so-called "Inclusionary Zoning Districts" in certain areas of the City, namely: (i) Lower, Central, and Upper Lawrenceville, (ii) Bloomfield, and (iii) Polish Hill. Ordinance § 907.04.A.1.  Subsequent revisions to the Ordinance have extended these areas to large portions of the City's Oakland Neighborhoods.  *See infra.*

26.     The Ordinance imposes substantial confiscatory requirements on persons engaged in the development of housing within the Inclusionary Zoning Districts.

27.     Within the Inclusionary Zoning Districts, the Ordinance is broadly written and applies to both multi-family home projects and single-family home projects.  More specifically, the Ordinance applies to all "[n]ew construction or Substantial Improvement of one or more buildings that collectively contain…":

a.  "… 20 or more dwelling units" or "20 or more sleeping rooms… within a Multi-Suite Residential use" or "any combination" of such dwelling units and sleeping rooms (Ordinance § 907.04.A.5(a), (b) and (c) (emphasis added)); or

b.  "…(i) one (1) or more zoning lots marketed as a single or unified project, (ii) sharing common elements or common financing, or (iii) comprising a part of a planned development." (Ordinance § 907.04.A.5(a); see id. at (b) and (c) (emphasis added)).

(all of the foregoing being "Subject Properties).

28.  Under the Ordinance, ten percent of all units in Subject Properties must be set aside as so-called "Inclusionary Units," to be rented or sold at below-market prices, ostensibly for low- and moderate-income households.  Ordinance, § 907.04.A.6(e) (the "Set-Aside Requirement").

29.  The Set-Aside Requirement is also triggered in the event of certain other circumstances, including when a residential complex with more than 20 units for any reason suffers "substantial damage," within the meaning of the Ordinance, even if the owner does not want to rebuild a residential complex (i.e. "regardless of the actual repair work performed").  Ordinance, § 907.04.A.4 (definition of "Substantial Improvement") (emphasis added).

30.  While Inclusionary Units must be rented or sold at below-market prices, the Ordinance requires that "Inclusionary Units shall be equivalent to market rate units within the building in all ways, including appliances, finishes and square footage."  Ordinance, § 907.04.A.6(h) (the "Equivalent Interiors Requirement") (emphasis added).

31.  The Ordinance also prohibits certain measures to mitigate the losses caused by its below-market rental and sales requirement.  For example, the Ordinance states: "Core building and Development Project amenities, such as gym, pool or parking space, must be shared with no

additional charges or restrictions to residents in Inclusionary Units unless those charges are subtracted from rent or HOA dues for all residents regardless of unit or rental price." Ordinance, § 907.04.A.6(i) (emphasis added) ("Equivalent Amenities Requirement").

32.     Inclusionary Units cannot be rented or sold at market rates. Instead, Inclusionary Units must be rented or sold at below-market rates meeting the Allowable Pricing criteria set forth in the Ordinance. For units to be rented, the Ordinance provides:

> ***Allowable Pricing*** means ***with respect to Inclusionary Rental Units***, the monthly rent paid by the Eligible Household, plus all mandatory or essential fees and charges and an approved Utility Allowance, ***shall not exceed*** thirty (30) percent of the monthly income of a household earning fifty (50) percent of AMI [Average Median Income] with a household size one-and-a-half (1.5) times the bedroom count of the Dwelling Unit.

Ordinance, § 907.04.A.4 (emphasis added). [1]

33.     For units to be sold, the Ordinance provides:

> ***With respect to Inclusionary Owner-Occupied Units***, the initial ***sale price shall be set*** [at] a level that ensures that a household earning seventy (70) percent of AMI for a household size one-and-a-half (1.5) times the bedroom count of the Dwelling Unit will spend no more than twenty-eight (28) percent of gross monthly income on their mortgage payment (principal and interest); taxes and insurance; and all mandatory or essential fees and charges (including condo/HOA dues), assuming a five-percent down payment and a thirty (30)-year fixed rate mortgage at the then current mortgage rate (determined as the National Average Contract Mortgage rate by the Federal Housing Finance Agency).

Ordinance, § 907.04.A.4 (emphasis added).

34.     As the result of the foregoing Set-Aside Requirement and Allowable Pricing, developers, owners and landlords of Subject Properties – including BAMP members – will suffer substantial economic losses.

---

[1] The Ordinance then goes on to say: "Only tenant-paid costs are subject to the Allowable Pricing. If a rental subsidy is provided, the total of all monthly rent, fees, charges and approved Utility Allowance may exceed the Allowable Pricing so long as the portion paid by the household does not." Ordinance, § 907.04.A.4.

35.     The Ordinance is enforced by City officials by denying certificates of occupancy where there has not been compliance.  For units to be rented, the Ordinance provides:

> Prior to the issuance of a Certificate of Occupancy for an Inclusionary Rental Unit, the Applicant shall either:  (1) "[r]ecord a deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary standards and related City regulations, such restriction to be prepared by the Director of City Planning or their designee"; or (2) "[e]nter into a master lease of the unit with an Affordable Housing Provider for the entire Affordability Term….

Ordinance, § 907.04.A.6(b) (emphasis added); *see Id.* § 907.04.A.4 (defining "Affordability Term" as "a minimum of thirty-five (35) years from the date of initial occupancy of an Inclusionary Unit").

36.     For units to be sold, the Ordinance provides:

> Prior to the issuance of a Certificate of Occupancy for an Inclusionary Owner Occupied Unit, the Applicant shall either: *(1) "[r]ecord a deed restriction* allowing the City and Eligible Households to enforce these on- site inclusionary standards and related City regulations, such to be prepared by Director of City Planning or their designee, obliging owner-occupancy of the unit and restricting additional debt that can be secured against the property;" *or (2) "[s]ell the unit to a Community Land Trust."*

Id. § 907.04.A.6(c) (emphasis added).

37.     In addition to all of the foregoing provisions, the Ordinance contains other provisions that work to deprive developers, owners and landlords of Subject Properties – including BAMP members – of their property or otherwise imposes unlawful requirements. These include, but are not limited to:

    a.    compelling, as to rental units, evictions/non-renewals of private citizen tenants in certain circumstances.  *See*, e.g., *Id.* § 907.04.A.6;

    b.    regulating the handling of, use rules regarding, and allocations of costs among tenants or among condominium/planned community residents for parking, pools, gyms, and other amenities.  *See*, e.g., *Id.* § 907.04.A.6(i);

c.      requiring the submission to and recording of onerous deed restrictions / master leases against the title (which leases, by exceeding 30 years, require developers to pay a realty transfer tax, part of which goes to the City).  *See Id.* § 907.04.A.6;

d.      regulating or affecting details of, and having material obligations determined based upon, matters of property title.  *See, e.g., Id.* § 907.04.A.5(b) (regarding requirements for recorded covenants and/or recorded master leases), *Id.* § 907.04.A.5(a) (having obligations potentially triggered based on whether a "planned development" or condominium with common elements is used as part of the business structure/form of ownership relating to the property). Also, matters of financing/mortgages relating to the property. *See, e.g., Id.* § 907.04.A.5(a) (aggregating separate developments based on "common financing"), and *Id.* § 907.04.A.4 (setting maximum below-market sale price based on happenstance of future national circumstances applicable to one type of fixed rate mortgage);

e.      requiring owners in certain circumstances to sell at below-market price to certain private "non-profit" entities that may in the future be approved, without standards, by unelected City officials.  *See, e.g., Id.*, § 907.04.A.4 (definition of "Community Land Trust"), and *Id.* § 907.04.A.6(c)(2);

f.      forcing private landlords to act as an adjunct to the governmental housing authority and engage in burdensome annual interactions with such authorities or other non-governmental or governmental parties to whom such powers may be delegated, without any set standards, by the unelected City officials, even though there has been no choice to engage in HUD Section 8 or similar programs.  *See, e.g.,* § 907.04.A.6(b)(2);

g.      prohibiting the use by owners of "lease purchase agreements" in certain contexts. *See e.g., Id.* § 907.04.A.4 (definition of "Inclusionary Owner- Occupied Unit.");

h.      requiring current and future owners of impacted Inclusionary Owner-Occupied Units to either record with the recorder of deeds an onerous deed restriction against the title of the property burdening it with material restrictions--including for example by expressly "restricting additional debt that can be secured against the property"--negatively impacting the value and limiting the practical ability to sell, as well as the use, of such real estate for an initial term of *at least 35 years*, and if sold during that period, ***extending for an additional 35 years***, or be forced to sell it to a "Community Land Trust".  *See, e.g., Id.* § 907.06(c) and (f); and

i.      requiring current and future owners/landlords of impacted Inclusionary Rental Units to either record with the recorder of deeds an onerous deed restriction against the title of the property, or enter into a master lease with an "Affordable Housing Provider," negatively impacting the value and limiting the practical ability to sell and arrange for certain types of financing, as well as the use, of such real estate for an initial term of *at least 35 years*, and if sold during that period, ***extending for an additional 35 years***.  *See, e.g., Id.* § 907.06(b) and (f).

38.     Although the Ordinance provides for a potential alternative method of compliance, other than by setting aside ten percent of a project for "Inclusionary Units," the potential alternative does not cure the constitutional violations because (i) there is no guarantee that BAMP members – or any other person subject to the Ordinance – would be able to use the alternative method, and (ii) the alternative method also entails violations of the Takings Clause and the doctrine of unconstitutional conditions.

39.     The alternative method – found in a portion of the Ordinance entitled "Off-Site Inclusionary Standards" – is only applicable "[w]here provision of Inclusionary Units on-site is determined [by the City] not to be feasible," in which case "inclusionary units constructed off-site [Off-site Units] may be permitted."  Ordinance, § 907.04.A.7.

40.     The same standards applicable to on-site Inclusionary Units are applicable to Off-site Units, except that, in lieu of the ten percent Set-Aside Requirement, "[a] minimum of twelve (12) percent of the subject applicant's number of units shall be Inclusionary Units." Ordinance, § 907.04.A.7(a) and (b) (emphasis added).

41.     In addition, "[t]he off-site units shall be located no more than one-quarter (1/4) mile of the subject site…." Ordinance, § 907.04.A.7(e) (the "Proximity Requirement") and must have "comparable public transit service as the subject site…."  Ordinance, § 907.04.A.7(f) (the "Public Transit Requirement").

42.     Where off-site Units are required, the Ordinance is enforced by City officials by denying certificates of occupancy for the Subject Property until it is under compliance. Ordinance, § 907.04.A.7(d).

**b.  Ordinance 2022-0592**

43.     The Oakland Ordinance, Ordinance 2022-0592, established various regulations that primarily impact the City of Pittsburgh's Oakland neighborhood.  A true and correct copy of Ordinance 2022-0592 is attached as **Exhibit "C"** and fully incorporated by reference.  Some of the relevant provisions of the Oakland Ordinance include:

a.     expanding the City's Inclusionary Zoning Overlap Map to include large sections of the City's Oakland neighborhoods, including the requirement that 10% of the Units within the Oakland Inclusionary District be "affordable" at 50% of AMI;

b.     the creation of a new set of requirements within the UC-E District which are set forth in Section 904.09 of the City's Code. The Oakland Ordinance places particularly onerous restrictions on Multi-Suite Residential (General) Use. The Code defines Multi-Suite Residential (General) as a MultiSuite Residential Use with 8 or more sleeping rooms. Under the Oakland Ordnance,  this use is required to meet the following standards:

In the UC-E District:

Multi-Suite Residential uses shall meet one (1) of the following standards in the

UC-E District:

(a)  All residential shall units meet the requirements of 907.04.A.6 and shall otherwise follow the processes and procedures of 907.04.A, excluding 907.04.A.5 Applicability and 907.04.A.7 Off-Site Inclusionary Standards. ***One hundred (100) percent of the units shall be affordable and shall be located on site***; or

(b)  Residential housing shall be less than fifty (50) percent of the Gross Floor Area in a mixed-use structure. For purposes of this calculation, shared spaces between residential uses and commercial shall be excluded from the calculation of Gross Floor Area. (Emphasis Added).

44.     The result of the imposition of these requirements is that if a property owner wishes to develop a mixed-use residential structure which has greater than 50 percent of the Gross Floor Area as residential, ***one hundred (100) percent of such units*** must be affordable.

**c.  The impact of Ordinance 2022-0592 on the Werrin Properties**

45.     Dr. Werrin seeks to develop, or to sell for development, the Werrin Properties.

46.     The highest and best use of the Werrin Properties is for mixed-use residential, which means that, as applied, the residential component of the Werrin Properties would have to be developed to be 100% affordable.

47.     The unlawful requirements of the Oakland Ordinance, in conjunction with the overall Inclusionary Zoning Ordinance, severely negatively limit Werrin's property rights, as well as the value and utility of the Werrin Properties.

48.     Dr. Werrin had secured interest to develop the Werrin Properties prior to the passage of Ordinance 2022-0592.

49.     Because of the negative impact on the value of the Werrin Properties and the increased cost to develop them due to Ordinance 2022-0592, Dr. Werrin has been unable to reach an agreement to sell and/or develop the Werrin Properties with any developer.

**COUNT I – THE ORDINANCES VIOLATE THE TAKINGS CLAUSE OF THE UNITED STATES CONSTITUTION**

50.     Paragraphs 1 through 49 are incorporated by reference as if fully set forth herein.

51.     The Takings Clause is found in the Fifth Amendment to the U.S. Constitution and states that "private property [shall not] be taken for public use without just compensation."  The Fourteenth Amendment makes the Takings Clause applicable to these Defendants.

52.     Governmental taking of private property for use in addressing a city's need for low- and moderate-income housing can be a permissible use of eminent domain.  *See Berman v. Parker*, 348 U.S. 26 (1954) (upholding the District of Columbia Redevelopment Act of 1945, which

provided use of eminent domain power to redevelop slum areas and possible sale or lease of the condemned lands to private interests).

53.     Unlike the statute upheld in *Berman*, however, the Ordinances represent an attempt by the City to evade its constitutional obligation to provide just compensation for taking Plaintiffs' private property to attain public objectives.

54.     Moreover, unlike the Ordinances, the statute upheld in *Berman* did not require any private person to furnish time, talents, labor, and financial resources to construct housing for the benefit of the City and/or for the benefit of third parties favored by the City.

55.     Under the doctrine of unconstitutional conditions, government cannot condition a benefit generally available to others on the surrender of a constitutional right. *See*, e.g., *Frost v. R.R. Comm'n of Cal.*, 271 U.S. 583, 593 (1926) ("It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold"); *Sullivan v. A. W. Chesterton, Inc.*, 384 F. Supp. 3d 532, 542 (E.D. Pa. 2019) (holding that Pennsylvania statute "violates the unconstitutional conditions doctrine because it conditions the benefit of doing business in the state with the surrender of constitutional due process protections.").

56.     "[T]the logical foundation of the unconstitutional conditions doctrine applies with equal force in any case in which the enjoyment of a government-sponsored benefit is conditioned upon a person's nonassertion of any constitutional right." *Wojtczak v. Cuyler*, 480 F. Supp. 1288, 1306 (E.D. Pa. 1979) (citations omitted).

57.     Unconstitutional conditions cases often arise in the context of the land development or zoning approval process and involve a request that a developer dedicate or turn over property to the municipality, or something similar, in order to obtain a permit.  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) (holding that government could not condition the grant of land use permits upon the applicant's funding of offsite mitigation projects on public land).

58.     As explained by the U.S. Supreme Court:

> Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation.  As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury.

*Koontz*, 570 U.S. at 607 (citations omitted).

59.     Moreover, and of critical importance here, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use."  *Koontz*, 570 U.S. at 599 (citing *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994)) (emphasis added).

60.     A governmentally compelled transfer of property from one person to another is the very essence of a "taking."  *See*, e.g., *Wilkinson v. Leland*, 27 U.S. 627, 658 (1829).

61.     The Ordinances condition permit approval upon the BAMP member's transfer of property interests to the City or to third parties favored by the City by, *inter alia*, (a) requiring BAMP members to dedicate a financial interest in the so-called Inclusionary Units, said interest being secured by a deed of or other recorded conveyance and having a value measured by the difference between the market price and the so-called Affordable Price; (b) restricting BAMP members' right to freely alienate property; and (c) eliminating BAMP members' right to sell or

lease property at a fair market price. Each of those requirements compels the transfer of an interest in property.

62.    The Ordinances violate the Takings Clause and doctrine of unconstitutional conditions because:

    a.    The Ordinances condition the issuance of a government permit (a certificate of occupancy) on the owner's relinquishing a portion of his property as required by the Ordinance (Ordinance, § 907.04A.6(b) and (c) (On-Site Units); § 907.04.A.7(d) (Off-Site Units)); and

    b.    There is neither the required nexus nor rough proportionality between the demands imposed by the Ordinances and the effects of those developments that are subject to the Ordinances.

63.    The lack of the constitutionally required nexus and rough proportionality are shown, *inter alia*, by the following:

    a.    The Ordinances do not state that their purpose is to mitigate any loss of low- and moderate-income housing due to developments that are subject to the Ordinances.

    b.    The Ordinances do not limit their requirements to circumstances where it can be plausibly shown that the development will cause a loss of low- and moderate-income housing.

    c.    The acquisition and development of land for purposes other than low- and moderate-income housing does not cause a loss of low- and moderate-income housing.

    d.    BAMP members neither caused nor contributed to any affordable housing shortage in the City of Pittsburgh. To the contrary, BAMP members are actively building

new housing alternatives for middle-class and first-time homebuyers in the City, with the aim of improving housing affordability, availability, and choice.

e.   *Assuming arguendo* that the acquisition and development of a given parcel of land somehow causes a loss of low- and moderate-income housing, the loss occurs regardless of how that parcel is developed.  Yet, the Ordinances only apply when the parcel is used for certain residential purposes.

f.   Any such loss of low- and moderate-income housing as may be "caused" by the acquisition and development of land subject to the Ordinances is not the sort of impact cognizable for purposes of the nexus and rough proportionality requirements.

g.   The requirements of the Ordinances are not tailored to any perceived impact of a specific project. That is to say that the Ordinances do not provide for any individualized determinations that the requirements they impose are related both in nature and extent to the impact of specific projects.

h.   The requirements of the Ordinances include, but are not limited to, the Equivalency Interiors Requirement, the Equivalent Amenities Requirement, the Affordability Term, the Proximity Requirement, and the Public Transit Requirement, require more than would be necessary to address any perceived loss of low- or moderate-income housing.

64.   The Ordinances have arbitrarily and unreasonably imposed harsh development exactions and have forced BAMP members "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Nollan*, 483 U.S. at 835 n.4.  Indeed, the

Ordinances are "not a valid regulation of land use but an ***out-and-out plan of extortion.'"*** Id. at 837 (citations omitted) (emphasis added).

65.     The Ordinances also improperly effect a taking of private property in violation of BAMP members' constitutional rights because the required exactions are so high, harsh and extreme that they effectively deny landowners like BAMP members the right to the economically viable use of their land and leave them no reasonable return on their investment.

66.     This is demonstrated by Dr. Werrin's unsuccessful efforts to develop the Werrin Properties.

67.     The City's imposition of development exactions under the Ordinances constitute a taking under the Fifth Amendment of the U.S. Constitution, and, because the Ordinances do not contemplate any compensation for the property interests taken, the Ordinances violate the Takings Clause.

68.     The Ordinances do not substantially advance any legitimate government interest and/or deny to property owners – including BAMP members – the economically viable use of their property.

69.     The Ordinances interfere so drastically with property owners – including BAMP members – in their use of their property as to constitute a taking.

70.     The Ordinances cause property owners – including BAMP members – to suffer the permanent physical occupation of their property by others.

71.     A declaration is warranted that the Ordinances are unconstitutional and that Defendant, acting under color of state law, has deprived – and/or threaten to deprive – BAMP members of rights, privileges and immunities secured by the U. S. Constitution, in violation of 42 U.S.C. § 1983. Such a declaration would eliminate confusion and uncertainty as to the

enforceability of the Ordinances and as to whether Plaintiffs are required to comply with the Ordinances.

72.     An injunction is warranted to prohibit Defendant from enforcing the Ordinances.

73.     BAMP is entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II – THE ORDINANCES VIOLATE THE HOME RULE LAW AND ARTICLE IX, SECTION 2 OF THE PENNSYLVANIA CONSTITUTION

74.     Paragraphs 1 through 73 are incorporated by reference as if fully set forth herein.

75.     The City is a home rule municipality pursuant to the Home Rule Law and is bound by the limitations enumerated therein.

76.     Section 2962(f) of the Home Rule Law (the "Business Exclusion") expressly limits the City's home rule powers, stating as follows:

> (f) Regulation of Business and Employment. - A municipality which adopts a home rule charter shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers, including the duty to withhold, remit or report taxes or penalties levied or imposed upon them or upon persons in their employment, except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities. This subsection shall not be construed as a limitation in fixing rates of taxation on permissible subjects of taxation.

53 Pa.C.S. § 2962(f) (emphasis added).

77.     Likewise, Section 2962(c) of the Home Rule Law expressly limits the City's exercise of home rule powers, stating in pertinent part:

> (c) Prohibited Powers. - A municipality shall not:
> …
> (2) Exercise powers contrary to or in limitation or enlargement of powers granted by statutes which are applicable in every part of this Commonwealth.

53 Pa.C.S. § 2962(c)(2).

78.     Article IX, Section 2 of the Pennsylvania Constitution, which permits municipalities to enact home rule charters, specifically limits the authorities conferred upon such municipalities to those "not denied by this Constitution, by [the municipality's] home rule charter or by the General Assembly."

79.     Echoing Article IX, Section 2 of the Pennsylvania Constitution, the Home Rule Law extends home-rule authority only to "function[s] not denied by the Constitution of Pennsylvania, by statute or by [the municipality's] home rule charter."  53 Pa.C.S. § 2961.  Thus, no home rule charter may confer upon a home-rule municipality "power or authority" that is "contrary to or limitation or enlargement of powers granted by statutes which are applicable to a class or classes of municipalities."  *Id.* § 2962(a).

80.     The Ordinances are invalid because they indisputably place "duties, responsibilities, or requirements upon businesses, occupations and employers" in violation of both the Home Rule Law and the Pennsylvania Constitution.  53 Pa.C.S. § 2962(f); Pa. Const. Art. IX, § 2.

81.     The duties, responsibilities, and requirements unlawfully and unconstitutionally imposed by the Ordinances include those described above with respect to the Equivalent Interiors Requirement (supra at ¶ 35), the Equivalent Amenities Requirement (supra at ¶ 36), and Allowable Pricing (supra at ¶¶ 37-38), as well as those requirements with respect to recorded deed restrictions (supra at ¶¶ 40-41), master leases with an Affordable Housing Provider (supra at ¶ 40), and sales to a Community Land Trust. (supra at ¶ 41).  *See also* restrictions, *supra* at ¶ 43(a)–(i).

82.     Section 2962(f) of the Home Rule Law specifically divests the City of the authority to adopt ordinances which regulate business, occupations, and employers by imposing duties, responsibilities or requirements.

83.     The provisions of the Ordinances constitute "duties, responsibilities or requirements placed upon businesses, occupations and employers," conduct that is expressly prohibited by 53 Pa.C.S. § 2962(f).  Therefore, the City's attempt to adopt the Ordinances is an ultra vires act, and the Ordinances are null and void.

84.     By virtue of the foregoing, the Ordinances violate both the plain language of the Home Rule Law and the Pennsylvania Constitution.

85.     A declaration is warranted that, under the Home Rule Law and the Pennsylvania Constitution, the City lacked the authority to enact the Ordinances, and that the Ordinances are null, void, and unenforceable.  Such a declaration would eliminate confusion and uncertainty as to the enforceability of the Ordinances and as to whether BAMP members are required to comply with the Ordinances.

86.     An injunction is warranted to prohibit Defendants from enforcing the Ordinances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Builders Association of Metropolitan Pittsburgh and S. Rand Werrin respectfully request that this Court grant Plaintiffs the following relief:

A.      For the reasons set forth in Count I, enter judgment declaring the Ordinances on their face, and/or as implemented and enforced by Defendant and as applied to BAMP members, violate the Takings Clause (U.S. Constitution, Amends. V and XIV) and the doctrine of unconstitutional conditions and are therefore null, void, and unenforceable;

B.      For the reasons set forth in Count I, enter judgment declaring that Defendant, acting under color of state law, has deprived – and/or threatened to deprive – BAMP members of rights, privileges and immunities secured by the U. S. Constitution, in violation of 42 U.S.C. § 1983;

C.      For the reasons set forth in Count II, enter judgment declaring that the Ordinances on their face, and/or as implemented and enforced by Defendant and as applied to BAMP members, violate the Pennsylvania Constitution, Article IX, Section 2, and the Home Rule Charter and Optional Plans Law, 53 Pa.C.S. § 2901 et seq., and are therefore null, void, and unenforceable;

D.      For the reasons set forth in Counts I and II, enter an injunction restraining and prohibiting Defendant from enforcing the Ordinances against any BAMP member;

E.      For the reasons set forth in Counts I and II, award BAMP its attorneys' fees and costs herein incurred, pursuant to 42 U.S.C. § 1988; and

F.      For the reasons set forth in Counts I and II, grant Plaintiffs such other and further relief as this Court may deem just and proper.


                                        Respectfully submitted,

                                        LEECH TISHMAN FUSCALDO & LAMPL, LLC


**JURY TRIAL DEMANDED**                 */s/ Alexander Y. Wilkinson*
                                        Richard J. Cromer, Esq.
                                        PA ID No. 79214

                                        David V. Weicht, Esq.
                                        PA ID No. 65191

                                        Alexander Y. Wilkinson, Esq.
                                        PA ID No. 329435

                                        525 William Penn Place, 28th Floor
                                        Pittsburgh, PA 15219
                                        (412) 261-1600