# EXHIBIT U

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2
                    - - - - -

3
BUILDERS ASSOCIATION OF      )
4   METROPOLITAN PITTSBURGH      )
    and S. RAND WERRIN,          )
5                                )
              Plaintiffs,        )
6                                )
              vs.                ) Civil Action No.
7                                ) 2:22-cv-00706-RJC
    CITY OF PITTSBURGH,          )
8                                )
              Defendant.         )
9
                    - - - - -

10
    DEPOSITION OF JAMES M. EICHENLAUB, A 30(b)(6) WITNESS
11  FOR BUILDERS ASSOCIATION OF METROPOLITAN PITTSBURGH

12              Wednesday, May 29, 2024

13          Filed on behalf of the Defendant

14          Counsel of Record for this Party:

15              Joseph A. Carroll, Esquire
                Meyer, Unkovic & Scott LLP
16          353 Smithfield Street, Suite 1300
              Pittsburgh, Pennsylvania  15222
17                      And
                Hillary M. Weaver, Esquire
18          City of Pittsburgh, Department of Law
                313 City-County Building
19                  414 Grant Street
              Pittsburgh, Pennsylvania  15219

20

21              LAGAMBA REPORTING SERVICES
                  302 Maxwell Street
22              Pittsburgh, PA  15205
                  (412) 458-0439

23
                    - - - - -

24

25

1           DEPOSITION OF JAMES M. EICHENLAUB

2    a 30(b)(6) witness herein for Builders Association

3    of Metropolitan Pittsburgh, called by the Defendant

4    for examination, taken pursuant to the Federal

5    Rules of Civil Procedure, by and before Michelle L.

6    Hall, a Registered Merit Reporter and a Notary

7    Public in and for the Commonwealth of Pennsylvania,

8    at the law office of Meyer, Unkovic & Scott, 535

9    Smithfield Street, Suite 1300, Pittsburgh, PA,

10    scheduled to commence at 9:00 o'clock a.m.

11    COUNSEL PRESENT:

12    For the Plaintiffs:

13            Richard Cromer, Esquire
                 Leech Tishman Fuscaldo & Lampl, LLC
14            525 William Penn Place, 28th Floor
                 Pittsburgh, Pennsylvania  15219
15            rcromer@leechtishman.com

16    For the Defendant:

17            Joseph A. Carroll, Esquire
                 Meyer, Unkovic & Scott LLP
18            535 Smithfield Street, Suite 1300
                 Pittsburgh, Pennsylvania  15222
19            jac@muslaw.com

20                  And

21            Hillary M. Weaver, Esquire
                 City of Pittsburgh, Department of Law
22            313 City-County Building
                 414 Grant Street
23             Pittsburgh, Pennsylvania  15219
                 hillary.weaver@pittsburghpa.gov
24

    Also Present:  Caitlin Williams, Summer Associate
25                 Meyer, Unkovic & Scott LLP

```
 1    to do a 20-unit project.  But once this ordinance
 2    came into play, they dropped it to 19 so they
 3    didn't have to -- you know, because the taking was
 4    so significant that it was easier to drop a unit
 5    than to stay at 20 and have to comply with the
 6    ordinance as it's written.
 7        Q.   Was that a member?
 8        A.   Yes.
 9        Q.   And what's the name of that member?
10        A.   Paramount Construction.  So, in a way, they
11    were impacted by the ordinance because they had to
12    drop one of the units in order to stay out of the
13    clutches of this ordinance.
14        Q.   So, just to confirm, you have -- BAMP has
15    actual knowledge that Laurel Communities applied
16    for a variance from the ordinances?
17        A.   Not from the ordinance.  I believe that was
18    a variance applied in Polish Hill before it went
19    into effect, but it would have to comply with this
20    ordinance.
21             So they were in litigation I believe
22    over another aspect of that project before this
23    ordinance; so they would -- they have to get
24    through that before they would have to apply for
25    the ordinance -- for the variance related to this.
```

1      Q.   How do you know any of that information

2    about the Laurel Communities project?

3      A.   Talking with the member.

4      Q.   Okay.  And who specifically did you

5    communicate with?

6      A.   Marty Gillespie.  I believe that was in one

7    of our responses.

8      Q.   So, just to make sure I understand, so,

9    BAMP's understanding is that Laurel Communities had

10    some sort of legal action prior to the

11    implementation of the first of these two

12    ordinances?

13      A.   I believe so, yes.

14      Q.   Okay.  So, did Laurel Communities apply for

15    a variance from the two ordinances that are at

16    issue in this case?

17      A.   I -- I guess -- I don't believe -- again,

18    not knowing completely, but I don't believe they

19    have.  They haven't reached that stage yet.

20      Q.   So, the Laurel Communities project is still

21    ongoing?

22      A.   It's in a hold -- it's in a holding pattern

23    I understand based on the initial variance request

24    and the appeal of that.  But it's still one that I

25    believe that they would like to do.

1      Q.   So, I just want to make sure I understand.

2   So, to your knowledge, or to BAMP's knowledge,

3   Laurel Communities applied for a variance of a

4   prior ordinance prior to these two ordinances?

5      A.   It's to their overall zoning ordinance of

6   the City.

7      Q.   And do you know, is that a proceeding

8   ongoing?

9      A.   I believe so.

10      Q.   Okay.  So, to your knowledge, it has not

11   been denied?

12      A.   The initial -- the initial variance request

13   was denied, which is I believe under appeal.

14      Q.   And you mentioned this Echo project in

15   Bloomfield.  Is that one of the projects that you

16   mentioned?

17      A.   Yes.

18      Q.   Okay.  And that Echo is not a member of

19   BAMP?

20      A.   Echo is not a member of the Association.

21      Q.   All right.  Has echo applied for a variance

22   from these two ordinances that are at issue in this

23   case?

24      A.   Yes.

25      Q.   How do you know that?

 1    project, they have submitted the initial -- the

 2    initial process to get approvals.

 3        Q.   So my question is -- so your Declaration

 4    says that it would begin such projects in the next

 5    few months.  I'm trying to understand what you

 6    meant by that.

 7        A.   When I say "begin," I mean going to the

 8    plan review, starting the process.  Or, you know,

 9    there's a lot of work that goes into it before you

10    start actually building.

11             The government approvals in the City of

12    Pittsburgh take years.  They may -- they are ones

13    who would have started that process within the

14    months if they could have.

15        Q.   So, would beginning it -- beginning it

16    would mean submitting a site plan and a development

17    plan?

18        A.   A preliminary plan or finalized the

19    purchase of the land or gotten, you know -- you

20    know, sometimes they don't actually buy the land

21    until they go -- each project is a little

22    different.  They would have gotten a, you know, a

23    time to do diligence.  You know, so from the very

24    beginning of the -- you know, started doing

25    preliminary drawings, doing those sort of things,

1    not necessarily putting a shovel in the ground.

2            Financing.  There's a lot of enti- --

3    you know, obviously financing is impacted by this

4    ordinance because their return of the -- of the --

5    the return of their investment is impacted by this

6    ordinance; so that also would involve the financing

7    aspects of it.

8        Q.   So, I'm handing you, this is what has been

9    premarked as Deposition Exhibit No. 4.

10           (Deposition Exhibit No. 4 was premarked

11   for identification.)

12       A.   Uh-huh.

13       Q.   All right.  Do you recognize this

14   Deposition Exhibit No. 4?

15       A.   This is our response to request for

16   documents, production of documents.

17       Q.   Okay.  Did you participate in the -- did

18   you provide information for these responses?

19       A.   I worked with our attorneys in preparing

20   this document, yes.  I provided the -- I provided

21   the information that you requested.

22       Q.   Okay.  And so I'm going to refer you

23   specifically to it's Interrogatory No. 4.  Excuse

24   me, Interrogatory No. 5 on Page 4.

25       A.   Yes.

1  this Deposition Exhibit 6?

2  　　A.　　BAMP, no.

3  　　Q.　　Okay.

4  　　A.　　BAMP members do, but BAMP itself, no.

5  　　Q.　　Is BAMP aware of any requests asking for

6  the zoning to be reclassified related to this

7  project?

8  　　A.　　I don't know anything about the specifics

9  of this project.

10  　　Q.　　Okay.  All right.  You can put that aside.

11  　　A.　　Other than it's -- as the document says, it

12  has to comply with the IZ.

13  　　Q.　　All right.  So, I'm going to turn to some

14  questions about Dr. Werrin.  I'll pause for a

15  second, though.  I, at most, maybe have half an

16  hour.  It might be less than that.  I want to give

17  you an opportunity to take a break.

18  　　A.　　Sure.

19  　　　　　　THE WITNESS:  Restroom?

20  　　　　　　MR. CARROLL:  Yes.

21  　　　　　　(Recess was taken.)

22  BY MR. CARROLL:

23  　　Q.　　Is Dr. Werrin a member of BAMP?

24  　　A.　　Yes, he is.

25  　　Q.　　And what type of member is Dr. Werrin?

1    A.   He's a builder member.

2    Q.   What does it mean to be a builder member?

3    A.   They are involved in the construction and

4    land development, remodeling.  They are the folks

5    who are actually doing the actual -- and it's not a

6    firm, you know -- those are the general aspects of

7    the -- of the definitions.  But we don't --

8         In our application, they have a choice

9    between a builder and associate member, and it's

10   oftentimes, you know, they are -- we -- a garage

11   door installer is not a builder.  But if that

12   garage company was also involved in land

13   development, then they could, you know, be

14   classified as a -- as a builder member.  But we

15   don't go that -- go through an extensive vetting

16   process.

17        The classification has a lot to do with

18   being a voting member or how many votes you have or

19   seats you have on our state and national Boards.

20   We're all in it together.  But that's really the

21   differentiation between -- our Board of Directors

22   has one more builder member than an associate

23   member because it is a builders' association.  But

24   the other main reason for those classifications

25   relates to the structure of our state and national

1    association and how many voting seats you have on

2    those Boards.

3        Q.   And how did Dr. Werrin become a builder as

4    opposed to an associate member?

5        A.   In this instance, he's proposing to do

6    development.  Dr. Werrin is an investor and a

7    property owner who wants to do development of a

8    specific property with other partners, and so he --

9    you know, in this instance, it's -- he's still a

10   member, but, yes, he is a builder member and he --

11   in this instance, he would fall under that

12   classification of a builder member versus an

13   associate.

14           Architects, engineers and those sorts of

15   things are generally the associates.  The lumber

16   suppliers, those sort of things.  But can 84 Lumber

17   be a builder member even though their predominant

18   business is supplying lumber?  Yes, probably,

19   because they do a lot of development -- they do

20   development as well.  So they could if they

21   wanted -- you know, if they so chose could

22   reclassify themselves to be a builder member.

23       Q.   Is BAMP aware of Dr. Werrin developing any

24   properties prior to the current property?

25       A.   Dr. Werrin is a dentist.  Dr. Werrin is a

1    property investor.  Dr. Werrin is involved in

2    development.  He could be involved also with

3    partners, real estate folks.  Perhaps they --

4    again, I'm not sure specifically, but he could

5    partner with a Walnut Capital as the -- so he would

6    be an investor and as a developer, but he would --

7              Dr. Werrin certainly knows his

8    limitations; so he would be involving other

9    professionals to assist him in redeveloping and

10   investing of his property.  So he would have other

11   partners that he would work with and rely upon in

12   making -- in guiding him with that process.

13       Q.   So, again, just beyond the current project,

14   is BAMP aware of Dr. Werrin developing any other

15   properties?

16       A.   I haven't spoken to him.  He may have.

17       Q.   But BAMP is not aware of any other

18   projects?

19       A.   No.

20       Q.   Does Dr. Werrin have a leadership role in

21   BAMP?

22       A.   No.

23       Q.   Is he on any committees?

24       A.   No.

25       Q.   Or Boards?  Or the Board, rather?

1        A.   To be honest with you, other than Laurel

2    Communities, none of the folks that I have

3    mentioned here -- well, McKinney had a woman, a

4    person who was in involved on the apartment side as

5    a past president.  But all of these folks, other

6    than Laurel Communities, is -- does not have a

7    position on the Board.

8        Q.   When did Dr. Werrin become a member of

9    BAMP?

10       A.   Late August of this year.  Of last year, I

11   believe.  Late August, maybe.

12       Q.   What's the exact date?

13       A.   I don't know the exact date.  I -- I have

14   members come and go constantly.  But he certainly

15   was a member before we filed the Amended Complaint.

16       Q.   I don't want to trip you up here.  Would

17   October of -- would October make -- would that

18   potentially be accurate, or do you have a strong

19   opinion on August?

20       A.   I'm not going to give you a specific date.

21   I know it was prior to the Amended Complaint.

22   He -- you know, in his investigation, I believe,

23   you know, that -- when he was looking to invest in

24   this property, he heard about this ordinance, and

25   then, you know, was -- became aware that we were

1      filing a Complaint on it.

2              And I think he was not very pleased with

3      what was happening, so he wanted to join the

4      Association and was willing to put his name on the

5      Complaint.

6      Q.   So BAMP's understanding is that he became a

7      member essentially to pursue this litigation?

8      A.   To assist us in -- we -- we picked up a

9      number of members on this litigation, and we lost

10     one member.  Your company, your firm, dropped out

11     of the Association.  But we picked up a number of

12     folks who -- from the initial Complaint filed, you

13     know, said, "I believe in what you're doing.  I

14     would like to know a little bit more about the

15     Association," you know, and then we -- we have

16     that -- our membership roster changes constantly,

17     every month.

18              Members, you know, come in.  Some

19     members let their membership lapse, and they may

20     reinstate later on.  It's a moving, you know,

21     breathing organization.  But we picked up a number

22     of members as a result of this.  Not necessarily

23     willing to put their name on the suit, but just

24     wanted to support us in believing what we were

25     doing was right and fighting for the industry.

1      Q.   Does BAMP have a record of the membership

2  date of its members?

3      A.   I can -- yes.  If we -- if I was asked

4  specifically when the date he joined, I could go to

5  our records and find out when his -- what month he

6  was approved.

7      Q.   Okay.  And would it just be the month or

8  does it have the date also?

9      A.   I would have to go and then look at a

10  deposit, you know -- you know, dues deposits and

11  that sort of thing.  But, yeah, we would -- I could

12  probably narrow it down to when he was -- there's a

13  process that we have to, quote/unquote, approve the

14  membership.

15          Even though they may have paid us,

16  there's -- we have to do that through our national

17  association who's generally the keeper of members,

18  so to speak, and, so, I could go back and see when

19  that was actually approved with NAHB.  That doesn't

20  mean when we received the application or -- you

21  know, there's usually a couple days.  In some

22  instances, it's even longer if they -- some people

23  apply and they say, "Invoice me," so then we have

24  to invoice them.

25          We don't approve that membership until

1    the check is received.  Some people can go online

2    and approve -- you know, apply right away.  So we

3    have their payment, but then we still have to go

4    through the approval process of approving their

5    membership; so their money then is transferred

6    through the online payment portal to NAHB.  NAHB

7    may not post it until the end of the month.

8          So when are they specifically?  We

9    recognize it when we approve them, and NAHB may be

10   two weeks lagging in their membership.

11        Q.   When you say "NAHB," what is that?

12        A.   That's the National Association of Home

13   Builders.  That's our national organization that's

14   involved, you know, in, again, working with us in

15   this case.  And the Pennsylvania Builders

16   Association is our state association.  Members who

17   join are members of all three organizations.

18        Q.   So just taking a step back, if someone

19   approaches you to become a member of BAMP, how does

20   that process work?

21        A.   There's two ways to join.  There's a paper

22   application that they can fill out and submit and

23   either process with a credit card or with a check.

24   In some instances, they ask to be invoiced.

25          Then we also have an online application

1    on our Website where people can go in and fill out

2    the information that is required, and, again,

3    either pay immediately or ask for an invoice.

4        Q.   And what --

5        A.   Then there's a submission.  We get notes of

6    the submission; then we have to approve it.  You

7    know, there's a -- there's a process.

8        Q.   So, when that -- whether it's in the mail

9    or delivered or through the Website, who does that

10   application go to?

11       A.   It goes to us at the local level.

12       Q.   Okay.

13       A.   And then Georgia, my staff person, does

14   some of the paperwork.  It's -- there's a process.

15   But I open the mail, so I may see it first.  But

16   then it's turned over to her to actually do the

17   processing.

18       Q.   Is there any sort of review or

19   investigation of that paperwork once it comes in?

20       A.   We -- the only requirement to be a member

21   is that they -- you know, that, you know, they have

22   to be an established business.  Sometimes we check

23   on it.

24            Oftentimes there is a sponsor; so,

25   there's a part of the application that says, you

1    know, "Who recommended you to be a member?"

2    Sometimes that's -- more oftentimes than not, it's

3    left blank because it's not a required field.  We

4    will sometimes reach out to them.

5              And we have people who join for several

6    reasons.  We have insurance programs, so people

7    join for the insurance programs.  People join

8    because they want to be involved in our networking

9    or our educational programs.  You know, there are

10   different reasons.

11             But we -- the application is reviewed by

12   our Membership Committee and then is ultimately

13   retroactively approved by our Board of Directors.

14   There is a -- they approve it.  They are given the

15   list and we -- there's a policy that allows us to,

16   once the Membership Committee reviews it, we can

17   go -- we will approve it, and it usually -- you

18   know, it could take up to two weeks to file -- to

19   go through the entire process.

20        Q.   Does BAMP have a copy of Werrin's

21   application?

22        A.   Yes.

23        Q.   And --

24        A.   I'm sure we could find it.  I believe his

25   was done online.  We would have to go back and see

1    if we can, you know -- but I believe his

2    application was an online application.

3        Q.   And you're able to access those online

4    submissions?

5        A.   I believe so.  I -- I don't think we would

6    lose them.  I think she -- I think they're stored

7    in the application process.  But if not, we can

8    certainly get the records from NAHB of when that --

9    you know, because NAHB has records -- the

10   individual, their classification, their

11   subclassifications, their sponsor, if a sponsor was

12   designated.  So, we would be able to pull that

13   from --

14           But that date is going to be when --

15   when it entered into the NAHB system, not

16   necessarily into our system.

17       Q.   And there could be a difference between the

18   two?

19       A.   There could be a difference.

20       Q.   But would your paperwork be able to --

21   would that indicate when Dr. Werrin became a member

22   of BAMP as opposed to NAHB?

23       A.   A specific date?  You know, because I --

24   because his -- his -- his application would have

25   been on our Board of Directors -- in the minutes.

1    Again, the Board meets every other month.  So, it

2    would -- you know, and then they approve

3    retroactive.

4         I would have to -- I would have to look

5    as far as a specific date of when it was actually

6    submitted.  I know all of them things occurred

7    prior to us submitting the Amended Complaint.

8    Q.    And does BAMP have member dues for members?

9    A.    Yes.  It's $850 a year.

10   Q.    Okay.  And when you become a member, is

11   that the same payment that you need to make?

12   A.    That's the payment that you pay.  That's

13   the amount that you pay to become a member for 12

14   months.  We have members who pay on a monthly

15   basis.  They're allowed to do a monthly or

16   quarterly basis.

17        But the bulk of our members -- I believe

18   in Mr. Werrin -- Dr. Werrin's case it was paid

19   for -- it was an annual payment.

20   Q.    Okay.  And Dr. Werrin paid that when he

21   applied or when he became a member?

22   A.    Again, I -- I believe so.  But I can't

23   without seeing the record in front of me

24   specifically confirm that, but most likely, yes.

25   And in some instances -- no, it's -- yeah.

1

                        COMMONWEALTH OF PENNSYLVANIA    )
2                       COUNTY OF ALLEGHENY              )

3       I, Michelle L. Hall, a notary public in and for the
              Commonwealth of Pennsylvania, do hereby
4       certify that the witness, JAMES M. EICHENLAUB, was
     by me first duly sworn to testify the truth, the whole
5         truth, and nothing but the truth; that the
           foregoing deposition was taken at the time and
6         place stated herein; and that the said deposition
              was recorded stenographically by me and then
7           reduced to typewriting under my direction, and
     constitutes a true record of the testimony given by
8          said witness, all to the best of my skill and
                              ability.

9
                        I further certify that the inspection,
10      reading and signing of said deposition were not
     waived by counsel for the respective parties and by
11      the witness and if after 30 days the transcript has
         not been signed by said witness that the witness
12      received notification and has failed to respond and
         the deposition may then be used as though signed.

13
                        I further certify that I am not a relative,
14   or employee of either counsel, and that I am in no
        way interested, directly or indirectly, in this
15                              action.

16                   IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 3rd day of
17                          June, 2024.

18

19

Commonwealth of Pennsylvania - Notary Seal
Michelle L. Hall, Notary Public
Allegheny County
My commission expires April 18, 2025
Commission number 1169477
Member, Pennsylvania Association of Notaries

20

                                    _Michelle L. Hall_
                              Michelle L. Hall
21                            Notary Public

22

23

24

25