# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

BUILDERS ASSOCIATION OF
METROPOLITAN PITTSBURGH
and
S. RAND WERRIN,

              *Plaintiffs*,

    v.

CITY OF PITTSBURGH,

              *Defendant*.

Civil Action No. 2:22-cv-00706-RJC

Judge: Robert J. Colville

---

**BRIEF OF *AMICI CURIAE* THE OAKLAND PLANNING AND DEVELOPMENT CORPORATION, LAWRENCEVILLE UNITED, THE BLOOMFIELD DEVELOPMENT CORPORATION, THE POLISH HILL CIVIC ASSOCIATION, THE HILL DISTRICT CONSENSUS GROUP, AND THE FAIR HOUSING PARTNERSHIP OF GREATER PITTSBURGH**

Kevin Quisenberry (PA No. 90499)
Community Justice Project
100 Fifth Avenue, Suite 900
Pittsburgh, PA 15222
(412) 434-6002
kquisenberry@cjplaw.org

Mary Minehan McKenzie* (PA No. 47434)
Meghan Binford* (PA No. 321212)
Olivia Mania** (PA No. 336161)
Public Interest Law Center
2 Penn Center 1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
267-546-1319
mmckenzie@pubintlaw.org
mbinford@pubintlaw.org
omania@pubintlaw.org

Brook Hill** (D.C. Bar No. 1044120)
Kelechi Agbakwuru** (D. C. Bar No. 1619056)
Lawyers' Committee For Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8307
bhill@lawyerscommittee.org
kagbakwuru@lawyerscommittee.org

 *Pro hac vice* pending
** *Pro hac vice* forthcoming

Attorneys for *Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................................... iii

I.      BACKGROUND AND SUMMARY OF ARGUMENT ......................................................... 1

II.     INTEREST OF *AMICI CURIAE* .................................................................................. 2

III.    ARGUMENT ...................................................................................................................... 5

   A.   The public interest favors denying the preliminary injunction. .......................................... 5

   B.   Plaintiffs are unable to succeed on the merits because the IZO is not a taking. ................. 7

   C.   Plaintiffs are unable to succeed on the merits because Pittsburgh has the municipal power to enact its IZO .................................................................................................................. 12

IV.    CONCLUSION ................................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*2910 Georgia Ave. L.L.C. v. Dist. of Columbia*,
234 F. Supp. 3d 281 (D.D.C. 2017) .................................................................. 8, 10

*Alto Eldorado P'ship v. Cnty. of Santa Fe*,
634 F.3d 1170 (10th Cir. 2011) ............................................................................. 8

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994) ................................................................................. 16

*Andrus v. Allard*,
444 U.S. 51 (1979) ......................................................................................... 10, 12

*Apartment Ass'n of Metro. Pittsburgh, Inc. v. City of Pittsburgh*,
261 A.3d 1036 (Pa. 2021) ............................................................................... 14, 15

*California Bldg. Indus. Ass'n v. City of San Jose*,
351 P.3d 974 (Cal. 2015) ....................................................................................... 8

*Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for Southern California*,
508 U.S. 602 (1993) ............................................................................................. 11

*Fed. Hous. Admin v. Darlington, Inc.*,
358 U.S. 84 (1958) ............................................................................................... 11

*Home Builders Ass'n of Greater Chicago v. City of Chicago*,
213 F. Supp. 3d 1019 (N.D. Ill. 2016) ............................................................... 8, 11

*Keystone Bituminous Coal Ass'n v. Duncan*,
771 F.2d 707 (3d Cir. 1985), *aff'd*, 480 U.S. 470 (1987) ............................. 9, 10, 11

*Knick v. Twp. of Scott, Pennsylvania*,
588 U.S. 180 (2019) ............................................................................................... 7

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) ............................................................................................. 12

*Lingle v. Chevron U.S.A. Inc.*,
 544 U.S. 52 (2005) ............................................................... 9

*Loretto v. Teleprompter Manhattan CATV Corp.*,
 458 U.S. 419 (1982) ........................................................ 7, 8

*Lucas v. S.C. Coastal Council*,
 505 U.S. 1003 (1992) ........................................................... 7

*Main St. Dev. Grp., Inc. v. Tinicum Twp. Bd. of Supervisors*,
 19 A.3d 21 (Pa. Cmwlth. 2011) ........................................ 15

*Merchant & Evans, Inc. v. Roosevelt Bldg. Products Co., Inc.*,
 963 F.2d 628 (3d Cir. 1992) ............................................. 16

*Murr v. Wisconsin*,
 582 U.S. 383 (2017) ......................................................... 10

*Nekrilov v. City of Jersey City*,
 45 F.4th 662 (3d Cir. 2022) ......................................... 7, 9, 11

*Pace Res. Inc. v. Shrewsbury Twp.*,
 808 F.2d 1023 (3d Cir. 1987) ....................................... 8, 9, 11

*Palazzolo v. Rhode Island*,
 533 U.S. 606 (2001) ........................................................... 7

*Penn Cent. Transp. Co. v. City of New York*,
 438 U.S. 104 (1978) .................................................. passim

*Pennsylvania Rest. and Lodging Ass'n v. City of Pittsburgh*,
 211 A.3d 810 (Pa. 2019) ............................................. 13, 14

*Rogin v. Bensalem Twp.*,
 616 F.2d 680 (3d Cir. 1980) ............................................. 10

*Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*,
 570 F. Supp. 3d 129 (D.N.J. 2021), *rev'd in part on other grounds*, 58 F.4th 696 (3d Cir. 2023)
 ...................................................................................... 12

*Sheetz v. Cnty. of El Dorado, California*,
  601 U.S. 267 (2024) ........................................................................ 12

*Singer v. City of New York*,
  417 F. Supp. 3d 297 (S.D.N.Y. 2019) .............................................. 12

*Yee v. City of Escondido, California*,
  503 U.S. 519 (1992) ....................................................................8, 11

**Statutes**

53 P.S. § 10103 ........................................................................... 13, 14

53 P.S. § 10105 ................................................................................ 15

53 P.S. § 10301(a)(2.1) .................................................................... 15

53 P.S. § 10601 ................................................................................ 14

53 P.S. § 10603(b)(2) ....................................................................... 14

53 P.S. § 10604 ................................................................................ 15

53 Pa.C.S. § 2962(f) ................................................................... 13, 14

PITTSBURGH, PA., CODE § 267.03 ................................................... 1, 9

PITTSBURGH, PA., CODE § 267.05 ................................................... 1, 9

PITTSBURGH, PA., CODE § 904.10 ................................................... 1, 9

PITTSBURGH, PA., CODE § 907.04 ........................................... 1, 8, 9, 15

PITTSBURGH, PA., CODE § 915.07 ................................................... 1, 9

**Other Authorities**

BLOOMFIELD DEV. CORP., https://bloomfieldpgh.org/ (last visited Aug. 15, 2025) ...................... 3

CITY OF PITTSBURGH, PITTSBURGH HOUSING NEEDS ASSESSMENT FINAL REPORT (Jan. 2022),
  https://apps.pittsburghpa.gov/redtail/images/21887_Pittsburgh_HNA_Final_Report.pdf ........ 5

DAVE BREINGAN & DRUTA BATT, PITTSBURGH COMMUNITY REINVESTMENT GROUP, THE CASE
  FOR CITYWIDE MANDATORY INCLUSIONARY ZONING IN PITTSBURGH (2025) ............................ 6

Emily Thaden & Ruoniu Wang, *Inclusionary Housing in the United States: Prevalence, Impact,
  and Practices*, LINCOLN INST. OF LAND POL'Y (2017) ............................................. 7

FAIR HOUS. P'SHIP OF PITTSBURGH, https://fhp.org/# (last visited Aug. 15, 2025) ........................ 5

HILL DIST. CONSENSUS GRP., https://www.hilldistrictconsensusgroup.org/ (last visited Aug. 15, 2025) ................................................................................................................................. 4

Jiayi Xu & Danielle Hale, *December Rental Data: Rents Surged by 10.1% in 2021*, REALTOR.COM (Jan. 26, 2022), https://www.realtor.com/research/december-2021-rent/ .......... 6

LAWRENCEVILLE UNITED, http://www.lunited.org/ (last visited Aug. 15, 2025) ........................... 3

*Our Guiding Principles*, OAKLAND PLAN. & DEV. CORP., https://www.opdc.org/ourguidingprinciples (last visited Aug. 15, 2025) ................................. 2

POLISH HILL CIVIC ASS'N, https://www.polishhillcivicassociation.org/ (last visited Aug. 15, 2025) ....................................................................................................................................... 4

RICK JACOBUS, LINCOLN INST. OF LAND POL'Y, INCLUSIONARY HOUSING: CREATING AND MAINTAINING EQUITABLE COMMUNITIES (2015) ......................................................................... 6

ROBERT DAMEWOOD, REGIONAL HOUSING LEGAL SERVICES, BUILDING INCLUSIVE COMMUNITIES: A REVIEW OF LOCAL CONDITIONS, LEGAL AUTHORITY AND BEST PRACTICES FOR PITTSBURGH (Jan. 24, 2022), https://www.rhls.org/2022/01/building-inclusive-communities-report-on-inclusionary-zoning-updated-with-new-information/ ................................................................ 6

Ruoniu (Vince) Wang, Wei Kang & Xinyu Fu, *Do Inclusionary Zoning Policies Affect Local Housing Markets? An Empirical Study in the United States*, 158 CITIES (Mar. 2025), https://www.sciencedirect.com/science/article/abs/pii/S0264275125000368?dgcid=author .... 6

Ryan Deto, *Where is Pittsburgh's Population Growth Occurring and Who is Driving it?*, PITT. CITY PAPER (Aug. 25, 2021), https://www.pghcitypaper.com/news/where-is-pittsburghs-population-growth-occurring-and-who-is-driving-it-20072229#:~:text=The%20city%20lost%2010%2C660%20Black,about%201%2C800%20additional%20Black%20residents ............................................................................. 6

U. Ctr. for Soc. & Urb. Rsch, *First Look at the 2020 Decennial Census: Pittsburgh Region*, PITT. PERSPS. (Aug. 12, 2021), https://www.pittsburghperspectives.org/l/first-look-at-the-2020-decennial-census-pittsburgh-region/ ...................................................................................... 6

U. Ctr. for Soc. & Urb. Rsch., *Pittsburgh Real Estate Values Rising Their Fastest Since the 1970s*, PITT. PERSPS. (July 27, 2022), https://www.pittsburghperspectives.org/l/pittsburgh-real-estate-values-rising-their-fastest-since-the-1970s/ ................................................................... 6

*Why Housing Matters*, HABITAT FOR HUMAN. OF GREATER PITTSBURGH, https://www.habitatpittsburgh.org/why-housing-matters (last visited Aug. 15, 2025) ............. 5

**Rules**

Fed. R. App. P. 29(4)(e) ................................................................................ 2

**Constitutional Provisions**

Pᴀ. Cᴏɴsᴛ. art. IX, § 2 .......................................................................... 12, 13

U.S. Cᴏɴsᴛ. amend. V................................................................................ 2

# I.    BACKGROUND AND SUMMARY OF ARGUMENT

In the face of a prolonged affordable housing crisis and deep housing segregation, the City of Pittsburgh enacted an Inclusionary Zoning Ordinance ("IZO") to counteract the escalating inability of low- and moderate-income Pittsburgh residents, who are disproportionately Black, to secure housing that is affordable. Like many inclusionary zoning policies that courts have upheld across the country, Pittsburgh's IZO requires developers to set aside 10 percent of units in residential projects of 20 units or more so that lower income households also benefit from new development. PITTSBURGH, PA., CODE §§ 907.04(A)(5), 907.04(A)(6)(e). Pricing for inclusionary units cannot exceed 30 percent of the monthly income of a household earning 50 percent Area Median Income ("AMI") for rentals and 28 percent of the monthly income of a household earning 70 percent AMI for owner-occupied housing. *Id.* § 907.04(A)(4).[1]

Although Plaintiffs in their Amended Complaint call Pittsburgh's IZO "extortion," Amended Compl. ¶ 64, ECF No. 80, in fact, in tandem with the IZO, the City enacted a variety of incentives for developers, including increasing the maximum tax abatement for rental properties subject to IZO to $250,000 per year for ten years. PITTSBURGH, PA., CODE §§ 267.03(b), 267.05(e)(1). In addition, developers willing to accept housing choice vouchers in inclusionary units are permitted to charge higher rents closer to or equal to market rate. *Id.* § 907.04(A)(4).[2]

In May 2022, Plaintiff Building Association of Metropolitan Pittsburgh ("BAMP") filed a Complaint challenging Pittsburgh's IZO, amending the Complaint in October 2023 after the IZO was expanded to include the Oakland neighborhood. Now, based only on conclusory allegations

---

[1] Additionally, an inclusionary unit's features must be equivalent to those in a market-rate unit and it must have the same access to building amenities. PITTSBURGH, PA., CODE §§ 907.04(A)(6)(h)–(i). The affordability term—the time period for which the requirements of the IZO Ordinance apply—is 35 years, subject to renewal for an additional 35 years if the unit is sold during the initial affordability term *Id.* § 907.04(A)(6)(f).

[2] Furthermore, in Oakland, projects subject to IZO are extended height incentives allowing developers to build two additional stories under the City's zoning code. PITTSBURGH, PA., CODE §§ 915.07(D)(4), PITTSBURGH, PA., CODE § 904.10(C)(1).

that IZO will harm one of BAMP's new members, Walnut Capital McKee, L.P., Plaintiffs seek a preliminary injunction, arguing the IZO is an improper taking of private property without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution, U.S. CONST. amend. V, and that the City does not have authority under its Home Rule Law and the Pennsylvania Constitution to enact the IZO.

Where Defendant's opposition to this preliminary injunction primarily focuses on the lack of imminent harm and standing issues, this *amicus* brief raises three important considerations in more depth: (1) granting the preliminary injunction would not be in the public interest given the critical need for affordable housing and evidence that the IZO is working; (2) Plaintiffs are unlikely to succeed on the merits because courts have generally held that inclusionary zoning is not a taking and Plaintiffs fall far short of establishing a violation of the Takings Clause; and (3) Plaintiffs are unlikely to succeed on the merits because Pittsburgh has municipal power to enact its IZO.

## II.     INTEREST OF *AMICI CURIAE*[3]

**Oakland Planning and Development Corporation** ("OPDC") is a nonprofit organization committed to making "Oakland a beautiful, well-designed, sought-after neighborhood, in which a diverse mix of residents and visitors flourish." *Our Guiding Principles*, OAKLAND PLAN. & DEV. CORP., https://www.opdc.org/ourguidingprinciples (last visited Aug. 15, 2025). OPDC provides affordable rental housing, sells homes to homeowners, organizes and advocates for residents, and facilitates planning processes as a registered community organization serving the four Oakland neighborhoods. For over 40 years, OPDC has supported Oakland residents to secure safe and

---

[3] No counsel for a party authored this brief in whole or in part and no person other than *amici* and their counsel made a monetary contribution to its preparation or submission. Fed. R. App. P. 29(4)(e). And under Federal Rule of Appellate Procedure 26.1 and Local Civil Rule of Court 7.1(A), each *Amicus* represents that it is a non-governmental corporation with no parent company and is not publicly traded.

affordable housing, connect with resources and services to expand opportunities, improve their quality of life, and strengthen community. OPDC was a primary advocate for the extension of the IZO to Oakland and the IZO has been central to OPDC's strategic plan. OPDC works closely with developers carrying out projects which will implement inclusionary zoning to further its goal of promoting access to affordable housing.

**Lawrenceville United** ("LU") is an inclusive, resident-driven, nonprofit organization with 856 members that works to improve the quality of life for all Lawrenceville residents. LAWRENCEVILLE UNITED, http://www.lunited.org/ (last visited Aug. 15, 2025). LU works in the areas of community planning and development, community engagement and advocacy, and community restoration and beautification. LU has led numerous housing advocacy campaigns to support residents at risk of being priced out of their homes. LU also provides direct support services to homeowners and renters facing housing issues. LU has dedicated significant time, resources, and effort to advancing inclusionary zoning. LU led campaigns to adopt the first iteration of IZO in Pittsburgh—the Interim Planning Overlay District (IPOD) in Lawrenceville and later the IZO at issue. LU has been involved in the implementation of the IZO, supporting developers and City Planning staff, and maintains a list of residents seeking inclusionary units.

The **Bloomfield Development Corporation** ("BDC") is a nonprofit Registered Community Organization (RCO) for the Bloomfield neighborhood. BLOOMFIELD DEV. CORP., https://bloomfieldpgh.org/ (last visited Aug. 15, 2025). BDC's members include more than 8,000 residents and 180 businesses in Bloomfield. BDC works to build a thriving, diverse community through equitable engagement. BDC pursues its mission through housing advocacy, public space improvements, community engagement, facilitating public processes for new development activities, and operating a farmers' market. BDC has long advocated for inclusionary zoning as a

means to promote inclusivity. Bloomfield is in need of affordable housing as part of proposed and anticipated developments in the neighborhood. BDC has made the expansion of inclusionary zoning to Bloomfield an organizational priority since 2019.

The **Polish Hill Civic Association** ("PHCA") is a nonprofit, membership-based community benefit organization with 113 members that organizes neighborhood activities in the Polish Hill section and advocates for the Polish Hill community. POLISH HILL CIVIC ASS'N, https://www.polishhillcivicassociation.org/ (last visited Aug. 15, 2025). Part of its mission is to preserve the sense of community in Polish Hill while promoting economic and housing development opportunities to improve the quality of life for residents. The PHCA works to promote affordable housing and has vigorously advocated for the IZO to increase affordable housing and promote an inclusive community. The work of the PHCA to advance inclusionary zoning is reflective of the priorities of the Polish Hill community to ensure that major residential developments in the neighborhood are accessible to people with a variety of incomes.

The **Hill District Consensus Group** ("HDCG") is a nonprofit whose mission is to create pathways for residents to overcome economic, social, and housing disparities. HILL DIST. CONSENSUS GRP., https://www.hilldistrictconsensusgroup.org/ (last visited Aug. 15, 2025). The HDCG's membership includes numerous neighborhood groups and approximately 200 individuals. The HDCG has long advocated for development that reflects community priorities, organizing to ensure that development efforts achieve shared prosperity across diverse economic and demographic groups. The HDCG has used economic justice organizing strategies to prevent market forces from developing land so as to cause residential displacement, gentrification, and other forms of economic oppression. The HDCG sees inclusionary zoning as an important tool for ensuring housing equity. The Hill District is comprised of majority low-income Black residents

facing significant displacement because of a lack of affordable housing and the increasing cost of living.

The **Fair Housing Partnership of Greater Pittsburgh** ("FHP") is a full-service fair housing enforcement nonprofit organization that ensures equal housing choice through education, fair housing analysis, enforcement actions, outreach, and community organizing in western Pennsylvania. FAIR HOUS. P'SHIP OF PITTSBURGH, https://fhp.org/# (last visited Aug. 15, 2025). The FHP works to end racial segregation in housing. The FHP identifies the quantifiable racial segregation in the Pittsburgh region and takes action to foster residential integration by making affordable housing available in middle and high-income areas with substantial white populations. The FHP has been a constant advocate for inclusionary zoning in Pittsburgh.

## III. ARGUMENT

### A. The public interest favors denying the preliminary injunction.

Granting a preliminary injunction is plainly not in the public interest. Pittsburgh is experiencing an affordable housing crisis that pushes low- and moderate-income residents out of the city and away from better schools and transportation options or, in the alternative, forces them to pay steep rent while forgoing other necessities like retirement savings and health care.[4] The latest Pittsburgh Housing Needs Assessment found a shortage of over 8,000 affordable housing units at the lowest income tiers across Pittsburgh.[5] The shortage disproportionately affects Pittsburgh's Black residents and re-entrenches barriers to racial and economic integration for all

---

[4] *Why Housing Matters*, HABITAT FOR HUMAN. OF GREATER PITTSBURGH, https://www.habitatpittsburgh.org/why-housing-matters (last visited Aug. 15, 2025). Indeed, between 2015 and 2019 the City of Pittsburgh lost over 3,000 households earning less than 30% Area Median Income ("AMI"). CITY OF PITTSBURGH, PITTSBURGH HOUSING NEEDS ASSESSMENT FINAL REPORT 105 (Jan. 2022), https://apps.pittsburghpa.gov/redtail/images/21887_Pittsburgh_HNA_Final_Report.pdf.
[5] *Id.* at 106.

Pittsburgh residents.[6] From 2010 to 2020, Pittsburgh lost more than 10,000 Black residents, 13 percent of the City's Black population.[7]

The affordable housing shortage is not caused by lack of development. Between 2010 and 2019, developers built roughly the same number of multifamily units as in the previous three decades.[8] Yet residential housing prices in the Pittsburgh metropolitan area are rapidly increasing.[9] In 2021, rents increased by 18.5 percent and home sale prices increased by 14 percent.[10]

The ripple effects created by a lack of affordable housing—market instability, displacement, racial and economic segregation, loss of cultural diversity—affect individuals across all income levels.[11] By integrating affordable units into market-rate projects, Pittsburgh's IZO creates opportunities for socioeconomic diversity and equal access to amenities and services in developing communities. And it is working. Inclusionary zoning is on track to produce more than 150 units of affordable housing in high-demand neighborhoods in just five years.[12] By enacting the IZO, Pittsburgh is disrupting the growing shortage of affordable housing so that all Pittsburghers

---

[6] U. Ctr. for Soc. & Urb. Rsch, *First Look at the 2020 Decennial Census: Pittsburgh Region*, PITT. PERSPS. (Aug. 12, 2021), https://www.pittsburghperspectives.org/l/first-look-at-the-2020-decennial-census-pittsburgh-region/.

[7] Ryan Deto, *Where is Pittsburgh's Population Growth Occurring and Who is Driving it?*, PITT. CITY PAPER (Aug. 25, 2021), https://www.pghcitypaper.com/news/where-is-pittsburghs-population-growth-occurring-and-who-is-driving-it-20072229#:~:text=The%20city%20lost%2010%2C660%20Black,about%201%2C800%20additional%20Black%20residents.

[8] ROBERT DAMEWOOD, REGIONAL HOUSING LEGAL SERVICES, BUILDING INCLUSIVE COMMUNITIES: A REVIEW OF LOCAL CONDITIONS, LEGAL AUTHORITY AND BEST PRACTICES FOR PITTSBURGH 3 (Jan. 24, 2022), https://www.rhls.org/2022/01/building-inclusive-communities-report-on-inclusionary-zoning-updated-with-new-information/. Further, IZOs like the one at hand have been found not to decrease the production of housing. *See generally* Ruoniu (Vince) Wang, Wei Kang & Xinyu Fu, *Do Inclusionary Zoning Policies Affect Local Housing Markets? An Empirical Study in the United States*, 158 CITIES (Mar. 2025), https://www.sciencedirect.com/science/article/abs/pii/S0264275125000368?dgcid=author.

[9] U. Ctr. for Soc. & Urb. Rsch., *Pittsburgh Real Estate Values Rising Their Fastest Since the 1970s*, PITT. PERSPS. (July 27, 2022), https://www.pittsburghperspectives.org/l/pittsburgh-real-estate-values-rising-their-fastest-since-the-1970s/.

[10] Jiayi Xu & Danielle Hale, *December Rental Data: Rents Surged by 10.1% in 2021*, REALTOR.COM (Jan. 26, 2022), https://www.realtor.com/research/december-2021-rent/.

[11] RICK JACOBUS, LINCOLN INST. OF LAND POL'Y, INCLUSIONARY HOUSING: CREATING AND MAINTAINING EQUITABLE COMMUNITIES 55 (2015).

[12] DAVE BREINGAN & DRUTA BATT, PITTSBURGH COMMUNITY REINVESTMENT GROUP, THE CASE FOR CITYWIDE MANDATORY INCLUSIONARY ZONING IN PITTSBURGH 4 (2025).

have the opportunity to live in their city. The public interest counsels strongly in favor of denying a preliminary injunction. [13]

**B. Plaintiffs are unable to succeed on the merits because the IZO is not a taking.**

Plaintiffs have not and indeed cannot establish that the IZO is a "regulatory taking" of BAMP's members' property. PI Br. 6, ECF No. 122.[14] Although not once cited by Plaintiffs, *Penn Central* supplies the applicable standard for this Court to determine whether the IZO constitutes a regulatory taking. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978).[15] *Penn Central* requires consideration of: (1) "the character of the government action;" (2) "the regulation's economic effect on the landowner;" and (3) "the extent to which the regulation interferes with reasonable investment-backed expectations." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (*citing Penn Cent.*, 438 U.S. at 124–25); *see also Nekrilov v. City of Jersey City*, 45 F.4th 662, 673 (3d Cir. 2022). Instead of presenting any facts which might establish a regulatory taking under these factors, Plaintiffs instead make broad conclusory statements only that the IZO

---

[13] Pittsburgh's result is consistent with the long track record of successful inclusionary zoning programs nationwide. As of 2017, inclusionary zoning programs produced over 170,000 units of affordable housing across 886 jurisdictions in 25 states and the District of Columbia. Emily Thaden & Ruoniu Wang, *Inclusionary Housing in the United States: Prevalence, Impact, and Practices*, LINCOLN INST. OF LAND POL'Y (2017), at 31.

[14] Although not argued in their preliminary injunction motion, Plaintiffs in their Amended Complaint also claim that the IZO has caused them "to suffer the permanent physical occupation of their property" and loss of the "economically viable use of their property." Amended Compl. ¶¶ 68, 70, ECF No. 80. Under the Supreme Court's takings jurisprudence, Pittsburgh's IZO is not a per se, or total, taking as it does not involve the relatively narrow circumstances in which a regulation either results in a "permanent physical occupation" under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982), or denies a landowner "all economically beneficial use" of their property under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992). To establish a taking under *Loretto*, the plaintiff must suffer a "permanent physical occupation" of its land that is "qualitatively more severe than a regulation of the use of property." 458 U.S. at 434–36. Similarly, the IZO is not a taking under *Lucas* which states that economic regulations result in a taking, "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle." 505 U.S. at 1019 (emphasis in original).

[15] Plaintiffs rely solely on *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 185–86 (2019), but *Knick* stands only for the proposition that a plaintiff may bring a case in federal court to vindicate his rights under the Takings Clause without first pursuing remedies under state law. *Id.* at 194.

"significantly impacts the construction, financing, leasing, viability of the active construction project." PI Br., Ex. B ¶ 8, ECF No. 121-2. That is not enough to establish a taking.

First, in considering the "character of the government action" the Court must decide whether it is akin to a "physical invasion" or to "a public program adjusting the benefits and burdens of economic life to promote the public good," with the presumption that the latter is true. *Penn Cent.*, 438 U.S. at 124; *see Pace Res. Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1030 (3d Cir. 1987) (instructing that in assessing character, the government is "entitled to a presumption that it does advance the public interest"). The Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions" without running afoul of the Takings Clause even when the regulation produces economic injuries to a landowner. *Yee v. City of Escondido, California*, 503 U.S. 519, 528–29 (1992) (quoting *Loretto*, 458 U.S. at 440). Moreover, the federal courts have uniformly agreed, upholding inclusionary zoning at every turn, on the grounds that it is a land use regulation that does not effectuate a taking. *Alto Eldorado P'ship v. Cnty. of Santa Fe*, 634 F.3d 1170, 1178 (10th Cir. 2011) (rejecting takings claim to ordinance requiring developers to sell a percentage of land as affordable housing and record associated deeds); *see also 2910 Georgia Ave. L.L.C. v. Dist. of Columbia*, 234 F. Supp. 3d 281, 304 (D.D.C. 2017) (agreeing inclusionary zoning ordinance was permissible exercise of police power); *Home Builders Ass'n of Greater Chicago v. City of Chicago*, 213 F. Supp. 3d 1019, 1027 (N.D. Ill. 2016); *California Bldg. Indus. Ass'n v. City of San Jose*, 351 P.3d 974, 991–92 (Cal. 2015).

Pittsburgh's IZO squarely falls within this line of cases. On its face, the City determined the IZO was "necessary" to "promote the public health and welfare by increasing the supply of affordable housing." PITTSBURGH, PA., CODE §§ 907.04.A.2–A.3. Like similar ordinances in other jurisdictions, the IZO promotes the public interest by requiring developers to set aside ten percent

of units so that lower income households also benefit from new development. Plaintiffs even concede that Pittsburgh enacted the IZO to advance the public interest and states that the goal of the IZO is "laudable." Amended Compl. ¶ 3, ECF No. 80. Consistent with "adjusting the benefits and burdens of economic life," the City offsets the cost of providing inclusionary units with incentives, including an enhanced tax abatement, increased price points for inclusionary units where housing choice vouchers are accepted, and the ability to build above the allowable height in certain neighborhoods. *See* PITTSBURGH, PA., CODE §§ 267.03(b), 267.05(e)(1), 907.04(a)(4), 915.07(D)(4), 904.10(C)(1).

Second, under *Penn Central*, a plaintiff must demonstrate that the regulation severely interferes with its ability to economically benefit from its property. 438 U.S. at 124. To that end, the "magnitude" of the regulation's economic impact on the owner's property interests must rise to where the regulation drastically interferes with the uses or significantly diminishes the value of the property. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005); *see also Pace Res.*, 808 F.2d at 1031. Then, the plaintiff must show that regulation severely interferes with the plaintiff's "reasonable, distinct, investment-backed expectations." *Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707, 713 (3d Cir. 1985), *aff'd*, 480 U.S. 470 (1987).

In the Third Circuit, courts routinely dismiss takings claims that allege that zoning ordinances deprive parties of economically viable uses where the property retains commercially exploitable uses. *See, e.g.*, *Nekrilov*, 45 F.4th at 674 (despite home-share owners' inability to operate short-term rental businesses under a newly passed ordinance, there was no "'drastic[]' reduction in the value of the property . . . especially as the properties retain multiple economically beneficial uses"); *Pace Res.*, 808 F.2d at 1031 (although industrial use was no longer available under new zoning ordinance, ordinance was not a taking because the land still retained other

exploitable uses); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 692 (3d Cir. 1980).

Here, the limits the IZO imposes on BAMP's members have smaller economic consequences than those alleged in the cases cited above. The IZO still permits the developer to engage in the same commercial use as before, that is, developing multifamily properties for rental or sale. Further, because the IZO impacts only a small portion of the entire property (10 percent of the total units, that is, 16 of McKee's 160 units), the impact on the use of the *entire property* is well below drastic. *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017) (explaining that regulation's impact must be assessed in relation to entire property); *Andrus v. Allard*, 444 U.S. 51, 66 (1979) (explaining that property must be viewed in the "aggregate" when assessing impact of ordinance); *2910 Georgia Ave.*, 234 F. Supp. 3d at 294–98 (analyzing whether an inclusionary zoning ordinance effectuated a regulatory takings based on its effect on an entire building rather than on individual units). The restriction on ten percent of units, or "one strand" in the developer/owner's bundle of rights, plainly does not destroy the "full" bundle of property rights and cannot be construed as a taking. *Andrus*, 444 U.S. at 65–66.

Further, Plaintiffs have not presented any facts related to the diminution in the property's value. To be construed as a taking, the challenged action—here, the IZO—must be shown to "destroy or severely" reduce the value of the existing property. *Rogin*, 616 F.2d at 690. Unlike cases where plaintiffs provided courts with comparative cost estimates of the impact of challenged regulations on property values, *see Keystone*, 480 U.S. at 497, here Plaintiffs only provide conclusory allegations. *See* PI Br. 10, ECF No. 122 (asserting the IZO places "significant restrictions on the marketability, property rights and viability of the BAMP Members' projects and specifically BAMP Member Walnut McKee's project"); Amended Compl. ¶ 37(g), (h), ECF No. 80. Because vague claims of loss prevent the Court from assessing the "magnitude" of the IZO's

impact, the Court cannot find Plaintiffs are likely to prevail on the merits of their Takings Clause claim. *See Home Builders Ass'n*, 213 F. Supp. 3d at 1029 (dismissing regulatory takings challenge to IZO because plaintiff failed to proffer estimated loss in value beyond "some" loss).

Finally, Plaintiffs have not presented facts that the IZO interferes with its "reasonable distinct investment-backed expectations" as required under the third *Penn Central* factor. *Keystone*, 771 F.2d at 713, *aff'd*, 480 U.S. 470 (1987). These expectations are subject to two limiting principles: (1) requiring a plaintiff to show the regulation has "nearly the same effect as the complete destruction of the property right of the owner," with (2) the implicit understanding that to be reasonable the expectations must account for the state's authority to regulate private property to further the public interest. *Pace Res.*, 808 F.2d at 1033. The interference claimed here fails on both counts.

A municipality's passage of an ordinance to regulate the residential housing market to promote housing affordability is a paradigmatic example of allowable government action that typically does not violate the Takings Clause. *See, e.g.*, *Yee*, 503 U.S. at 528–29. There should be no surprise to Plaintiffs that their expected return on investments may be tempered by the government's right to regulate, particularly in a field as extensively regulated as housing. *Home Builders Ass'n*, 213 F. Supp. 3d at 1030; *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for Southern California*, 508 U.S. 602, 645 (1993) ("[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.") (quoting *Fed. Hous. Admin v. Darlington, Inc.*, 358 U.S. 84, 91 (1958)). "Zoning laws often affect some property owners more severely than others" but this does not by itself establish a taking. *Penn Central*, 438 U.S. at 133–34; *see also Nekrilov*, 45 F.4th at 675 (citing *Penn Central*, 438 U.S. at 125-127) ("[T]he Supreme Court has rejected

takings claims" even "'when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm'").

As noted above, Plaintiffs speculate that the IZO significantly restricts the "marketability, property rights and viability" of BAMP Members' projects including the project at issue in the preliminary injunction. PI Brief 10. *See also* Amended Compl., Ex. B ¶ 10, ECF No. 80-1 (the IZO will force BAMP members to either "suffer losses and harms" by complying with the measure or "suffer other losses and harms" to property value, economic opportunities, and profits due to abandonment of projects). But hypothetical assertions fail to show that the degree of alleged interference caused by the IZO "ha[s] nearly the same effect as the complete destruction" of the property owner's rights. *Penn Central*, 438 U.S. at 127. Rather Plaintiffs' perceived investment losses appear to chiefly rest on their expectation to exploit property through its most profitable use. Government action that prohibits the "most profitable use" of property does not constitute a taking. *Andrus*, 444 U.S. at 66; *see also Penn Cent.*, 438 U.S. at 130.[16]

### C. Plaintiffs are unable to succeed on the merits because Pittsburgh has the municipal power to enact its IZO.

The Pennsylvania Constitution vests every municipality with the right and power to frame, adopt and conduct its affairs pursuant to a home rule charter. Pa. Const. art. IX, § 2. This

---

[16] Plaintiffs also argue that the IZO is an exaction that violates the unconstitutional conditions doctrine. PI Br. 7, ECF No. 122. However, a land use condition is only subject to the unconstitutional conditions doctrine where it would "be[] a compensable taking if imposed outside the permitting process." *See Sheetz v. Cnty. of El Dorado, California*, 601 U.S. 267, 281 (2024) (Sotamayor, J., concurring); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013) ("A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing."). Here, the unconstitutional conditions doctrine does not apply because analysis under the *Penn Central* factors demonstrates that the IZO is not a taking. *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F. Supp. 3d 129, 210 (D.N.J. 2021), *rev'd in part on other grounds*, 58 F.4th 696 (3d Cir. 2023) ("[A]bsent the pleading of facts [or evidence] sufficient to demonstrate a 'taking,' an unconstitutional conditions doctrine claim fails." (quoting *Singer v. City of New York*, 417 F. Supp. 3d 297, 327 (S.D.N.Y. 2019)).

delegation of the Commonwealth's powers is very broad. A municipality that adopts a home rule charter is empowered to exercise *any and all* powers or functions of government that are not denied by the Constitution, by an Act of the General Assembly or by the municipality's home rule charter, itself. *Id.* As the Pennsylvania Supreme Court has made clear, "a home-rule municipality's exercise of legislative power is presumed valid, absent a specific constitutional or statutory limitation; and all grants of municipal power to municipalities shall be liberally construed in favor of the municipality." *Pennsylvania Rest. and Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 817–24 (Pa. 2019) (citation modified).

At issue here is the specific limitation on home rule authority, codified at Section 2962(f) of the Pennsylvania Consolidated Statutes, commonly known as the Business Exclusion. 53 Pa.C.S. § 2962(f). Contrary to Plaintiffs' assertions, this constraint on home rule authority is, by its own terms, quite limited. PI Br. 7, ECF No. 122; *Pennsylvania Rest.*, 211 A.3d at 824 (holding "the Business Exclusion provides that a home-rule municipality seeking to invoke this exception is entitled to the benefit of affirmative grants of authority applicable to *any* class of municipality as a whole, or reflected in codes that apply to all municipalities together."). In other words, the exception to the Business Exclusion permits home rule municipalities to regulate business if there is *any* source of municipal power in state law that authorizes such regulation.

Plaintiffs completely ignore that the Pennsylvania Municipalities Planning Code ("MPC") authorizes Pennsylvania municipalities to enact zoning ordinances that ensure housing is available for people of all income levels in a balanced and inclusionary manner, 53 P.S. § 10103. In evaluating whether a home rule municipality's regulation of business is "expressly" authorized by statute, the Pennsylvania Supreme Court has held that an authorizing statute is "express" when it is "clear and unmistakable" in its *general* grant of authority. *See Pennsylvania Rest.*, 211 A.3d 810

at 839. The statute need not be textually explicit about every aspect of the authority delegated, as the General Assembly cannot be expected to anticipate every eventuality to which the municipality might apply the authority. *Id.* at 830 n.19; *accord Apartment Ass'n of Metro. Pittsburgh, Inc. v. City of Pittsburgh*, 261 A.3d 1036, 1043 (Pa. 2021) ("To require the legislature to specify each permissible action and concomitant burden in detail would hamstring home-rule municipalities from exercising their home-rule authority in any way that burdens businesses, undercutting the general presumption in favor of home rule.") (citation modified). Rather than textual specificity, the statute must clearly and unmistakably grant ordinance-making authority, and there must be a "nexus" between the over-arching intent of the enabling statute and the objectives and requirements of the ordinance. *Id.*

The MPC delegates zoning power to nearly all classes of municipalities in Pennsylvania. 53 P.S. § 10103. It expressly authorizes municipalities to "enact, amend and repeal zoning ordinances to implement comprehensive plans and to accomplish any of the purposes of [the MPC]" and specifically states that such zoning ordinances "may permit, prohibit, regulate, restrict and determine," among other things, the "use of structures." 53 P.S. §§ 10601, 10603(b)(2). This express grant of ordinance-making authority is precisely the kind of statutory delegation enumerated in Section 2962(f) and recognized by the Pennsylvania Supreme Court. *See* 53 Pa.C.S. § 2962(f).

Equally clear is the "nexus" between the "overarching intention" of the MPC and the objectives and requirements of the IZO. *Apartment Ass'n*, 261 A.3d at 1045. Among other provisions that illustrate that nexus, the MPC states that a municipality's comprehensive plan shall include a "plan to meet the housing needs of present residents and of those individuals and families anticipated to reside in the municipality, which may include . . . the accommodation of expected

new housing in different dwelling types and at appropriate densities for households of all income levels." 53 P.S. § 10301(a)(2.1); *see also* 53 P.S. § 10105, 10604 (setting forth the intent and purposes of the MPC's delegation of authority to municipalities, including to "guid[e the] . . . development and growth [and] uses of land and structures").

The nexus between these purposes of the MPC and the objectives and requirements of Pittsburgh's IZO could hardly be clearer. The IZO reflects the City's determination that inclusionary zoning is "necessary to increase the production of affordable housing to meet existing and anticipated housing and employment needs" and "will provide adequate balances by ensuring that the neighborhoods can continue to offer new housing units at a variety of price points." PITTSBURGH, PA., CODE § 907.04.A.2 (articulating need for Zoning Overlay); *see also id*. § 907.04.A.3 (outlining the full purpose and intent of the IZO). The General Assembly contemplated precisely the type of purpose and objectives underlying the IZO when it delegated zoning authority to municipalities under the MPC. *See, e.g.*, 53 P.S. §§ 10105, 10301(a) (2.1), 10604.

Furthermore, a zoning ordinance is presumed valid and requires the challenging party show that it is arbitrary, unreasonable, and unrelated to public health, safety, and general welfare. *Main St. Dev. Grp., Inc. v. Tinicum Twp. Bd. of Supervisors*, 19 A.3d 21, 27–28 (Pa. Cmwlth. 2011). Plaintiffs cannot satisfy that burden. To the contrary, the IZO creates "Inclusionary Zoning Districts" in certain neighborhoods where the City deemed it necessary to increase the production of affordable housing to meet existing and anticipated housing needs and to provide a diverse range of housing choices. In short, the IZO is related to the City's legitimate objectives. *See, e.g., Apartment Ass'n*, 261 A.3d at 1049 ("[E]ven a substantial burden [upon a business] may be incidental for purposes of the Business Exclusion if the statutory warrant for it is clear."). Plaintiffs' "home rule" challenge to the IZO is without merit.

## IV.    CONCLUSION

For the foregoing reasons, *Amici* urge this Court to deny Plaintiff's Motion for a

Preliminary Injunction.[17]

Dated: August 15, 2025                    Respectfully submitted,

                                          By: */s/ Meghan Binford*
                                          Mary Minehan McKenzie* (PA No. 47434)
                                          Meghan Binford* (PA No. 321212)
                                          Olivia Mania** (PA No. 336161)
                                          Public Interest Law Center
                                          2 Penn Center 1500 JFK Blvd., Suite 802
                                          Philadelphia, PA 19102
                                          267-546-1319
                                          mmckenzie@pubintlaw.org
                                          mbinford@pubintlaw.org
                                          omania@pubintlaw.org

                                          Kevin Quisenberry (PA No. 90499)
                                          Community Justice Project
                                          100 Fifth Avenue, Suite 900
                                          Pittsburgh, PA 15222
                                          (412) 434-6002
                                          kquisenberry@cjplaw.org

                                          Brook Hill** (D.C. Bar No. 1044120)
                                          Kelechi Agbakwuru** (D. C. Bar No. 1619056)
                                          Lawyers' Committee For Civil Rights Under Law
                                          1500 K Street NW, Suite 900
                                          Washington, DC 20005
                                          (202) 662-8307
                                          bhill@lawyerscommittee.org
                                          kagbakwuru@lawyerscommittee.org

                                          *Pro hac vice* forthcoming
                                          ** *Pro hac vice* forthcoming
                                          Attorneys for *Amici Curiae*

---

[17] Where, as here, Plaintiffs cannot "produce[] evidence sufficient to convince the district court that all four factors favor preliminary relief"—including likelihood of success on the merits and that granting the injunction is in the public interest—the injunction must be denied. *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (quoting *Merchant & Evans, Inc. v. Roosevelt Bldg. Products Co., Inc.*, 963 F.2d 628, 632–33 (3d Cir. 1992)).