IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BUILDERS ASSOCIATION OF
METROPOLITAN PITTSBURGH and
S. RAND WERRIN,

     Plaintiffs,     Civil Action No. 2:22-CV-00706-RJC

vs.

CITY OF PITTSBURGH,

     Defendant.

**REPLY TO CITY OF PITTSBURGH'S
BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

  Plaintiff Builders Association of Metropolitan Pittsburgh ("BAMP"), by its undersigned Counsel, submits this Reply to City of Pittsburgh's Brief in Opposition to Motion for Preliminary Injunction.

**I. The City's Arguments Regarding BAMP's Standing and Ripeness Ignore Reality and the United States Supreme Court's Decision in *Knick v. Township of Scott*.**

  The City's arguments on standing and ripeness conveniently ignore the actual facts in this matter and the clear dictates of the United States Supreme Court's decision in *Knick v. Township of Scott*, 588 U.S. 180 (2019).

  **A. BAMP has standing to request an injunction on behalf of its Members.**

  With regard to standing, the following facts are undisputed: (a) Walnut Capital Management, Inc. is a member of BAMP, and was a member of BAMP, at the time that this action was filed; (b) Walnut Capital Management, Inc. is an affiliate of Walnut Capital McKee, LP

1

("Walnut McKee"); (c) BAMP has a long standing practice of not requiring every affiliate of its members to join BAMP (*See* Citation to Testimony of Jim Eichenlaub, ECF No. 112, n. 2); (d) Todd E. Reidbord, President of Walnut Capital Management, Inc. filed an Affidavit with BAMP's Response In Opposition to Motion to Dismiss confirming that Walnut Capital Management, Inc.'s affiliate, Walnut McKee, would be harmed by the City's IZ Ordinance (ECF No. 112-2); (e) Walnut McKee is now a member of BAMP; and (e) the City has applied the requirements of its Inclusionary Zoning Ordinance (the "IZ Ordinance") to Walnut McKee who is a BAMP Member, and whose affiliate was a BAMP Member at the time that the litigation was filed. See *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (Article III of the Constitution requires that a plaintiff establish standing to sue in federal court. A plaintiff meets that burden by showing "(i) that [the plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."); *Horne v. Flores*, 557 U.S. 433, 445 (2009) ("the critical question is whether at least one petitioner has 'alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction'"); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint. … For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right"). *Summers v. Earth Island Inst.,* 555 U.S. 488, 498 (2009)(In order to establish associational standing, an organization must make specific allegations that at least one identified member has suffered or would suffer harm.)

Regardless of any confusion that the City attempts to create in its Brief, nothing changes the actual facts associated with this matter. For years, the City has taken the position in this matter that BAMP does not have standing because the IZ Ordinance has not been applied to a BAMP Member. Now, the City acknowledges that the IZ Ordinance has, in fact, been applied to a BAMP Member. Yet somehow, the City continues to seek to delay an adjudication on the merits of this matter by raising an unsupported standing argument.

B.     The City's Ripeness Argument Is Contrary To *Knick v. Township of Scott*.

The City's arguments on the ripeness of a Federal Takings Claim were expressly repudiated by the United States Supreme Court in its Decision of *Knick v. Township of Scott*, 588 U.S. 180 (2019).

The City's first argument is that BAMP's request for an adjudication is premature at this time. The United States Supreme Court addressed this very issue in *Knick*, stating:

> ***We now conclude that the state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of our takings jurisprudence, and must be overruled. A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it.*** That does not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities. ***But it does mean that the property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time***.

*Knick*, at 184 (Emphasis Added).

This is consistent with other well-established jurisprudence that provides that an impacted property owner may bring an injunction when their constitutional rights are being violated. See *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982); *Murr v. Wisconsin*, 582 U.S. 383, 393-394 (2017); and *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149-150 (2021).

The City's next assertion is that BAMP Member Walnut McKee needed to exhaust its City Code and State Remedies and file for a variance prior to BAMP having a right to bring this action. This assertion was expressly addressed in the portion of *Knick* that overruled *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172 (1985). As the Court stated:

> Williamson County held that the developer's Fifth Amendment claim was not ripe for two reasons. First the developer still had an opportunity to seek a variance from the appeals board, so any taking was therefore not yet final. . . The second holding of Williamson County is that the developer had no federal takings claim because he had not sought compensation "through the procedures the State ha[d] provided for doing so."

*Knick*, at 187-188.

In overruling *Williamson County*, the Supreme Court noted:

> Contrary to Williamson County, a ***property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it.*** The Clause provides: "[N]or shall private property be taken for public use, without just compensation." It does not say: "Nor shall private property be taken for public use, without an available procedure that will result in compensation." ***If a local government takes private property without paying for it, that government has violated the Fifth Amendment—just as the Takings Clause says—without regard to subsequent state court proceedings.*** And the property owner may sue the government at that time in federal court for the "deprivation" of a right "secured by the Constitution."

*Knick*, at 189 (Emphasis Added).

4

The City seeks to obfuscate the significance of the Takings claim by noting that Walnut McKee applied for a variance associated with the development of its project. The variance that Walnut McKee applied for, and received, was related to the height of its parking structure. It had nothing to do with the requirements of the IZ Ordinance. The City's parking structure variance argument is a red herring that does not change the fact that BAMP Member Walnut McKee was not required to apply for a variance from the IZ Ordinance requirements prior to initiating this action. *See Urbanizadora Versalles, Inc. v. Rivera Rios,* 701 F.2d 993, 997-999 (1st Cir. 1983) (rejecting an argument that the takings claimant had to use "their local remedies, judicial and administrative," because "there is no requirement of exhaustion of administrative remedies in section 1983 actions"); *Foster v. City of Detroit*, 405 F.2d 138, 145 (6th Cir. 1968) (holding, in a takings case, that "a party may normally resort to a federal court without having first exhausted the judicial remedies of the state courts" (quoting 1A James Wm. Moore, et al., Moore's Federal Practice, P0.201, p. 2023 (1961))); *Archer Gardens, Ltd. v. Brooklyn Ctr. Dev. Corp.*, 468 F. Supp. 609, 613 (S.D.N.Y. 1979) (holding a takings claimant did not need to exhaust state remedies). Again, the state of the law is clear that if a government agency makes a formal and final decision harming property or impairing property rights, the owner may sue to establish that it is a taking warranting a compensation remedy under the Just Compensation Clause. *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 5 (1984).

Adding further insult to injury, the City conveniently failed to inform this Court that the City of Pittsburgh Planning Commission recommended approval, on a Citywide basis, of the IZ Ordinance in January of 2025. **Since February of 2025, the City Zoning Administrator has taken**

5

***the position that the IZ Ordinance applies to every single applicable development application under the pending ordinance doctrine.*** It is time for the City's ripeness posturing charade to end.

      **C.**     **Plaintiffs' Claims that IZ Ordinance Performs Regulatory Takings Are Ripe.**

The City acknowledges that it required BAMP Member Walnut McKee to issue a commitment letter memorializing the requirement to place a restrictive covenant (the "Restrictive Covenant") on its property as a precondition to receiving the City's Record of Zoning Approval (the "ROZA"). The restrictions imposed by the City, as part of the issuance of the ROZA, include: (1) requiring 16 Units to be Inclusionary Units; (2) that the Restrictive Covenant be recorded prior to the issuance of a Certificate of Occupancy; and (3) that the Restrictive Covenants run with the land. (*See* Affidavit of Corey Layman, P. 2 and IZ Commitment Letter, P. 2).

***Plaintiffs' claims have now undisputedly ripened, once the City imposed the requirement that a covenant be placed on the property as a precondition to the issuance of the ROZA and as a precondition to the issuance of the Certificate of Occupancy***. Once the City inflicted concrete harm on the BAMP members' private property interests, Plaintiffs' claims became ripe for adjudication. *Blanchette v. Connecticut General Ins. Corporations*, 419 U.S. 102, 138-144 (1974); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990).

**II.**    **The City does not have the authority to enact the IZ Ordinance.**

The question of whether the City has the authority to enact the IZ Ordinance is a threshold question for this litigation. As set forth in the Plaintiffs' Memorandum of Law, the City has consistently and repeatedly lost its various attempts to regulate the business operations of

6

companies which conduct business within its borders under the Business Exclusion Provision of Section 2962(f) of the Home Rule Law. For example, the Pennsylvania Supreme Court struck down the City's: (1) Protection of Displaced Contract Workers' Ordinance, which was an attempt to force new service employers in a given building to keep employees of a prior service employer in the same building. *See Building Owners and Managers Association of Pittsburgh v. City of Pittsburgh*, 985 A.2d 711, 716 (Pa. 2009); (2) Safe and Secure Buildings Act, which was an attempt to require training of security personnel in certain buildings. *See Pennsylvania Restaurant and Lodging Association v. City of Pittsburgh,* 211 A.3d 810, 838 (Pa. 2019); (3) the Source of Income Act, which required landlords to consider housing choice vouchers and to accept the same as part of analyzing a potential tenant's income qualifications. *See Apartment Association v. City of Pittsburgh*, 261 A.3d 1036, 1054 (Pa. 2021).

As discussed in the Plaintiffs' Memorandum, the Pennsylvania Supreme Court set forth a two-part test in *Apartment Association* to determine whether the Home Rule Law's "Business Exclusion Provision" has been violated. The first part of the test requires the Court to review whether the challenged ordinance in question imposes an affirmative burden on businesses that would require the businesses to act in ways that the business would not be obligated to act in the absence of the challenged ordinance. *See Apartment Association*, at 1046. In this matter, there can be no question that the IZ Ordinance requires businesses to act in a way that they would not otherwise act but for the existence of the IZ Ordinance. The Set Aside Requirement, the Equivalent Interiors Requirement, the Pricing Cap, and the Deed Restrictions are all requirements that a property owner, in this case BAMP Member Walnut McKee, would not otherwise have to comply with. As the Pennsylvania Supreme Court stated in the *Apartment Association* case, ". . . in this

7

case, the complex web of administrative obligations unwilling landlords must accept to satisfy the Ordinance finds no equally clear source of statutory authority." *Apartment Association*, at 1048.

The second part of the test, assuming that the first part is satisfied, requires a court to review whether the ordinance is expressly authorized by statute. *Apartment Association*, at 1045-1046. In this case, there is no express statutory authority for the City to regulate all housing construction of more than twenty (20) units in such a manner. Simply put, if the City did not have the authority in *Apartment Association* to force the landlords to view a tenant's source of income as including the funds associated with housing vouchers, it would be absurd to contend that the City can require landlords to impose the Set Aside Requirements, the Equivalent Interiors Requirement, the Pricing Cap, and the Deed Restrictions, all contained in the IZ Ordinance.

In an attempt to get around the statutorily authorized portion of the Pennsylvania Supreme Court's test, the City has now taken the position, for the first time ever, that the City's actions are somehow authorized by the Pennsylvania Municipalities Planning Code, as codified at 53 P.S. §10101 et seq. (the "MPC"). This position is ridiculous and contrary to the statute itself and well-settled case law. Section 107(a) of the MPC specifically defines "Municipality" as "any city of the second class A or third class, borough, incorporated town, township of the first of second class, county of the second class through eight class, home rule municipality, any similar general purpose unit of government." 53 P.S. 10107(a) (West 2025). This definition specifically excludes cities of the first class ("Philadelphia"), cities of the second class ("Pittsburgh"), and counties of the second class ("Allegheny County"). This exclusion has been recognized, for decades, by the City, as well as by the appellate courts. *See Nernberg v. City of Pittsburgh,* 620 A.2d 692, 694 n.5 (Pa Cmwlth. 1993) ("As a city of the second class, Pittsburgh is not subject to the MPC, which applies to all

8

municipalities in Pennsylvania other than cities of the first class (Philadelphia) and of the second class (Pittsburgh) and counties of the second class (Allegheny County)); *First Avenue Partners v. City of Pittsburgh Planning Commission*, 151 A.3d 715, 719 (Pa. Cmwlth. 2016) ("The City is governed by the provisions of the Zoning Code, not the Pennsylvania Municipalities Planning Code"); *Vitti v. ZBA of Pittsburgh,* 710 A.2d 653, 660, n.4 (Pa. Cmwlth. 1998) ("It should be noted that the Pennsylvania Municipalities Planning Code (MPC) . . . does not apply to the City of Pittsburgh"). Thus, the City's attempt to somehow utilize the MPC as a statutory dictate to justify its illegal actions must also be rejected.

### III. Plaintiffs Are Entitled to a Preliminary Injunction.

A plaintiff seeking a preliminary injunction must make a clear showing that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).

#### A. Plaintiffs are likely to succeed on the merits.

Plaintiffs are highly likely to succeed on the merits. First, as set forth above, the City does not have the legal authority to adopt and/or implement the IZ Ordinance under the Business Exclusion Provision of Section 2962(f) of the Home Rule Law.

Second, even if the City did somehow have the authority to enact the IZ Ordinance, the IZ Ordinance effectuates an impermissible, unconstitutional taking. The City would have this Court believe that it has the unlimited power to burden discrete property interests to advance its legitimate purposes, and that no inquiry is permitted into whether its power was used appropriately.

9

This position is contrary to well established precedent. In fact, as set forth in *Lucas v. South Carolina Coastal Commission*, the Supreme Court confirmed that it is well within the province of the Courts to determine whether ". . .private property is being pressed into some form of public service under the guise of mitigating serious public harm." *Lucas*, 505 U.S. 1003, 1018 (1992). Once this Court commences this inquiry, it is clear that: (a) the IZ Ordinance singles out certain property owners to "bear the burden" of remedying a problem to which they have not contributed more than others. *Nollan v. California Coast Commission*, 483 U.S. 825, 835, n.4 (1987); and (b) the IZ Ordinance impermissibly forces certain developers ". . . alone to bear public burdens which, in all fairness and justice should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 325 (1893) (The Just Compensation Clause prevents government from "loading upon one individual more than his just share of the burdens of government").

The IZ Ordinance is also a textbook example of a violation of the Unconstitutional Conditions doctrine. The Unconstitutional Conditions doctrine provides that ". . .the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Management District*, 570 U.S. 595, 604 (2013) (Citations Omitted).

In discussing the application of the Unconstitutional Conditions doctrine in the nature of "land use", the Supreme Court has noted that the Courts must balance two realities. The first reality is that:

> . . . land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take. ***By conditioning a building permit on the owner's deeding over a public right-of-way, for example, the government can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise***

> ***require just compensation***. So long as the building permit is more valuable than any just compensation the owner could hope to receive for the right-of-way, the owner is likely to accede to the government's demand, no matter how unreasonable. ***Extortionate demands of this sort frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them.***

*Koontz,* at 605 (Emphasis Added) (Citations Omitted).

The second portion of the balancing test requires balancing whether the proposed land uses threaten to impose costs on the public that dedications of property can offset. *Id.* In balancing these two factors, the Supreme Court has stated:

> Nollan and Dolan accommodate both realities by allowing the government to condition approval of a permit on the dedication of property to the public so long as there is a "nexus" and "rough proportionality" between the property that the government demands and the social costs of the applicant's proposal. Our precedents thus enable permitting authorities to insist that applicants bear the full costs of their proposals while still forbidding the government from engaging in "out-and-out ... extortion" that would thwart the Fifth Amendment right to just compensation ... ***Under Nollan and Dolan the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts.***

*Koontz,* at 606-607 (Emphasis Added) (Internal Citations Omitted).

This matter clearly falls within the Unconstitutional Conditions doctrine. The City cannot establish any nexus as to how the construction of these new apartments directly impacts the City's purported affordable housing problem. Additionally, the City also cannot establish the rough proportionality associated with conditioning the issuance of a ROZA, a building permit and Certificate of Occupancy for this project on the recording of a Restrictive Covenant that requires ten percent (10%) of the units to be "affordable" at 50% AMI for a period of 35 years, among other things. As the Supreme Court noted in *Koontz*:

11

> ***Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation***. As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury.

*Koontz*, at 607.

Given the City's lack of authority to adopt the IZ Ordinance, the burden which the IZ Ordinance disproportionately places on the project, and the dictates of the Unconstitutional Conditions Doctrine, the Plaintiffs will succeed on the merits once the Court has concluded its inquiry.

### B. Plaintiffs will suffer irreparable harm if the enforcement of the IZ Ordinance is not enjoined.

Irreparable harm means that the moving party will be injured in such a way that adequate compensatory or other corrective relief will not be available at a later date in the ordinary course of litigation. *Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d. 581, 596 (W.D. Pa. 2009).

Plaintiffs have alleged that their rights under the Takings Clause have been violated. As the Supreme Court recognized in *Knick*, a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it, and the property owner may sue the government at that time in federal court for the "deprivation" of a right "secured by the Constitution." *Knick,* at 189. Moreover, "[t]he violation of a fundamental constitutional right constitutes irreparable injury." *Doe v. U.S. Department of Homeland Security*, 2025 WL 360534, at 10 (W.D. Pa. 2025).

Given the aforementioned framework, BAMP members are clearly suffering irreparable harm from the City's enforcement of the IZ Ordinance. Certain BAMP members have abandoned projects and/or altered projects directly because of the IZ Ordinance. (Affidavit of E. Martin Gillespie, ECF No. 112-3).

*The most significant example of the irreparable harm is the City's requirement that BAMP Member Walnut McKee, as a precondition to receiving both its ROZA and its Certificate of Occupancy, record a restrictive covenant against its property memorializing all of the requirements of the IZ Ordinance including, but not limited to, the (a) Set Aside Requirement, (b) the Equivalent Interiors Requirement, (c) the Pricing Cap, and (d) the Deed Restrictions*. This condition, which is in effect, impose harm that is significantly more than economic. It is imposing perpetual restrictions on property rights which, at minimum, restrict the marketability and viability of BAMP Members' projects. The IZ Ordinance will actually force BAMP Member Walnut McKee to make decisions, which it would otherwise not have to make, about who is eligible to receive housing, whether it can lease to students, the amount that it can charge for rent, and the overall operation and financial viability of its Project. The restrictions imposed by the City are analogous to the same level of restrictions that the Third Circuit found to cause irreparable harm as BAMP Members "would suffer a substantial loss of business" absent injunctive relief. *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 255 (3d. Cir. 2011), referencing *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932 (1975). In addition, the City's attempt to focus this Court's attention only on the economic aspects of the IZ Ordinance ignores the fundamental takings analysis to which the Plaintiffs are entitled, and ignores the express direction of *Knick*.

### C.    Injunctive Relief Will Not Result in Greater Harm to the Nonmoving Party.

The third factor used by the courts to determine whether to grant injunctive relief is whether granting preliminary relief will result in even greater harm to the non-moving party than to the movant. *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999).

There will be no harm to the City as the Plaintiffs are simply requesting that the City abide by its legal obligations and not infringe upon the BAMP Members' rights. *See Lozano v. City of Hazelton,* 459 F. Supp. 2d 332, 336 (M.D. Pa. 2006). In addition, development in the City of Pittsburgh existed for more than 200 years without the IZ Ordinance. The City will not be prejudiced from a further preclusion from allowing the IZ Ordinance to be take effect.

### D.    Public Interest Favors Granting the TRO / Preliminary Injunction.

The focus of this prong is "whether there are policy considerations that bear on whether the order should issue." *11A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane,* §2948.4 at 200-201 (2d. Ed. 1995). There is a strong public interest in protecting Fifth Amendment rights as incorporated by the Fourteenth Amendment and limiting the government from imposing Unconstitutional Conditions on the grant of a permit. The public interest would be best served if Plaintiffs were given the opportunity to be free of the imposition of the unauthorized, illegal, and unconstitutional requirements that have been imposed on them and its members. In addition, the imposition of these requirements significantly and irreparably harms the construction, financing, leasing, and viability of numerous projects throughout the City of Pittsburgh.

**CONCLUSION.**

For the reasons set forth herein, Plaintiffs are entitled to, and respectfully request, an entry of a Temporary Restraining Order and Preliminary Injunction enjoining the enforcement of the IZ Ordinance by the City, the City's officers, agents, servants, employees, and attorneys and any other persons who are in active concert with the City until further Order of Court.

Dated: August 22, 2025

Respectfully submitted,

GOLDBERG, KAMIN & GARVIN, LLP

s/ Jonathan M. Kamin

JONATHAN M. KAMIN, ESQUIRE
PA I.D. No. 81958
jonathank@gkgattorneys.com

1806 Frick Building
437 Grant Street
Pittsburgh, PA 15219
(412) 281-1119


LEECH TISHMAN FUSCALDO & LAMPL, LLC

s/ Richard J. Cromer
PA I.D. No. 79214

s/Daniel P. Yeomans
PA. I.D. No. 323449

525 William Penn Place, 28th Floor
Pittsburgh, PA 15219
(412)261-1600

Counsel For Plaintiffs:
BUILDERS ASSOCIATION OF
METROPOLITAN PITTSBURGH and
S. RAND WERRIN

15

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the REPLY TO CITY OF PITTSBURGH'S BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION was electronically filed on August 22, 2025. Notice of this filing will be sent to all counsel of record via the Court's electronic case filing system and constitutes service of this filing under Rule 5(b) of the Federal Rules of Civil Procedure. Parties may access this filing through the Court's ECF system.

Date:  August 22, 2025

Respectfully submitted,
GOLDBERG, KAMIN & GARVIN, LLP

s/ Jonathan M. Kamin

JONATHAN M. KAMIN, ESQUIRE
PA I.D. No. 81958
jonathank@gkgattorneys.com

1806 Frick Building
437 Grant Street
Pittsburgh, PA 15219
(412) 281-1119