**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BUILDERS ASSOCIATION OF METROPOLITAN PITTSBURGH and S. RAND WERRIN, | ) ) ) | No. 2:22-cv-706-RJC |
| | ) | |
| Plaintiffs, | ) | Judge Robert J. Colville |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF PITTSBURGH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is Defendant, City of Pittsburgh's, Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) arguing that the Court lacks subject matter jurisdiction because Plaintiffs' claims are not ripe and because Plaintiffs lack standing. ECF No. 105. Also, before the Court is Plaintiffs, Builders Association of Metropolitan Pittsburgh and S. Rand Werrin's, Motion for a Temporary Restraining Order and Preliminary Injunction. ECF No. 120. The Motions have been fully briefed and are ripe for disposition.

## I. Procedural History & Factual Background

### A. Procedural History

Plaintiff, Builders Association of Metropolitan Pittsburgh ("BAMP"), filed its Complaint on May 12, 2022. ECF No. 1. On August 15, 2022, the City filed its Motion to Dismiss the Complaint (ECF No. 29) and its Brief in Support (ECF No. 30). On October 31, 2022, BAMP filed its Opposition to the City's Motion to Dismiss (ECF No. 44) and its Brief in Opposition (ECF No. 45). The City filed its Reply Brief on November 18, 2022. ECF No. 48. On April 3, 2023,

the Court issued its Memorandum Opinion (ECF No. 54) and Order (ECF No. 55) granting, in part, and denying, in part, the City's Motion to Dismiss.[1]

On October 6, 2023, Plaintiffs filed their Amended Complaint adding S. Rand Werrin as a party to this action.[2]  ECF No. 80.  The City filed its Answer on November 3, 2023.  ECF No. 82.  On December 20, 2023, the Court entered a Case Management Order (ECF No. 91) which set deadlines for the parties to engage in discovery.  The parties agreed to engage in discovery in phases and the initial phase of discovery focused only on the Court's subject matter jurisdiction.  ECF No. 91.

On August 23, 2025, the City filed its Motion to Dismiss the Amended Complaint (ECF No. 105) pursuant to Rule 12(b)(1) along with its Brief in Support (ECF No. 106) and Appendix (ECF No. 107).  On October 24, 2024, Plaintiffs filed their Brief in Opposition.  ECF No. 112.  On November 7, 2024, the City filed its Reply.  ECF No. 113.  On November 15, 2024, Plaintiffs filed their Sur-Reply.  ECF No. 116.  On November 19, 2025, the City filed its Motion for Oral Argument.  ECF No. 117.

Then, on July 31, 2025, Plaintiffs filed their Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 120) along with their Brief in Support (ECF No. 122).  On August 15, 2025, the City filed its Brief in Opposition (ECF No. 125) along with its Proposed Findings of Fact and Conclusions of Law (ECF No. 126) and an Affidavit by Corey Layman (ECF No. 127), the Chief Zoning Officer and Zoning Administrator for the Department of City Planning.  On August 22, 2025, Plaintiffs filed their Reply Brief.  ECF No. 139.

---

[1] The Court's Opinion and Order also denied a Motion to Intervene (ECF No. 31) filed by various proposed intervenors.

[2] Attached as Exhibits to the Amended Complaint are a Declaration of James M. Eichenlaub, the Executive Director of BAMP, as well as copies of the relevant ordinances that are the subject of this lawsuit.

On August 15, 2025, the Oakland Planning and Development Corporation, Lawrenceville United, the Bloomfield Development Corporation, the Polish Hill Civic Association, the Hill District Consensus Group, and the Fair Housing Partnership of Greater Pittsburgh sought leave to participate in this action as *amici curiae* and file an amicus brief.  ECF Nos. 130, 131.  The Court granted the *amici curiae's* Motion for Leave on August 19, 2025 (ECF No. 136) and docketed the amicus brief (ECF No. 137).  The Court ordered any party to file a response to the amicus brief by August 26, 2025.  ECF No. 136.  No responses were filed.

The Court held oral argument on the pending Motion to Dismiss and Motion for Preliminary Injunction on October 27, 2025.

### B. Factual Background

#### i. Allegations in the Amended Complaint

The Builders Association of Metropolitan Pittsburgh is a Pennsylvania non-profit trade association with over 400 members, including builders and developers who own property within Pittsburgh.  Am. Compl. ¶¶ 5, 8.  Dr. Werrin is one of these members and an owner of real property in Pittsburgh.  *Id.* ¶¶ 13-14.  Broadly speaking, Plaintiffs allege that Ordinance 2021-1414, enacted by the City on May 2, 2022, along with Ordinance 2022-0592, adopted by the City on February 28, 2023, are unconstitutional.  Am. Compl. ¶ 23.  Plaintiffs allege that BAMP's members, including Dr. Werrin, own property within the areas controlled by these Ordinances.  *Id.* ¶¶ 8, 15.

Plaintiffs allege that Ordinance 2021-1414 ("Inclusionary Zoning Ordinance" or "IZO") "creates so-called 'Inclusionary Zoning Districts' in certain areas of the City, namely: (i) Lower, Central, and Upper Lawrenceville, (ii) Bloomfield, and (iii) Polish Hill."  Am. Compl. ¶ 25 (citing Ordinance § 907.04.A.1).  Further, Plaintiffs allege that amendments to the Inclusionary Zoning

Ordinance, contained in Ordinance 2022-0592, "have extended these areas to large portions of the City's Oakland Neighborhoods). *Id.*

Plaintiffs further allege that the IZO applies to both new constructions and substantial improvements to buildings that contain:

> a. '… 20 or more dwelling units' or '20 or more sleeping rooms . . . within a Multi-Suite Residential use' or 'any combination' of such dwelling units and sleeping rooms (Ordinance § 907.04.A.5(a), (b), and (c)); or
>
> b. '. . . (i) one (1) or more zoning lots marketed as a single or unified project, (ii) sharing common elements or common financing, or (iii) comprising a part of a planned development.' (Ordinance § 907.04.A.5(a); *see id.* at (b) and (c)).

*Id.* at ¶ 27.

Plaintiffs allege that for the above identified subject properties, ten percent of all units must be set aside as "Inclusionary Units" that will be rented or sold at below-market prices. *Id.* at ¶ 28. Additionally, should any residential complex with more than 20 units suffer "substantial damage," this Set-Aside requirement will be triggered even where the owner does not wish to rebuild the residential complex. *Id.* ¶ 29. Plaintiffs further allege that the IZO requires the Inclusionary Units be equal to the market rate units in all ways and that the core amenities must be shared with no additional charges or restrictions to the individuals renting or purchasing the Inclusionary Units. *Id.* at ¶¶ 30-31. Further, the IZO sets forth the "Allowable Pricing" criteria for renting and selling these Inclusionary Units. *Id.* ¶¶ 32-33.

Plaintiffs allege that the City enforces the IZO by "denying certificates of occupancy where there has not been compliance." *Id.* ¶ 35. For rental units, a certificate of occupancy will only be issued where the Applicant has "(1) '[r]ecord[ed] a deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary standards and related City regulations, such restriction to be prepared by the Director of City Planning or their designee'; or (2) '[e]nter[ed]

into a master lease of the unit with an Affordable Housing Provider for the entire Affordability

Term….'" *Id.* (quoting Ordinance, §§ 907.04.A.6(b) and 907.04.A.4).  Similarly, for units to be

sold, a certificate of occupancy will only be issued where the Applicant has "(1) '[r]ecord[ed] a

deed restriction allowing the City and Eligible Households to enforce these on-site inclusionary

standards and related City regulations, such to be prepared by Director of City Planning or their

designee, obliging owner-occupancy of the unit and restricting additional debt that can be secured

against the property;' or (2) '[sold] the unit to a Community Land Trust.'"  *Id.* ¶ 36 (quoting

Ordinance, § 907.04.A.6(c)).

Outside of the above requirements, Plaintiffs allege that the following provisions of the

IZO seek "to deprive developers, owners and landlords of Subject Properties – including BAMP

members – of their property or otherwise impose[] unlawful requirements."  *Id.* ¶ 37.  These

provisions include:

> a. compelling, as to rental units, evictions/non-renewals of private citizen tenants
> in certain circumstances.  *See*, e.g., *Id.* § 907.04.A.6;
>
> b. regulating the handling of, use rules regarding, and allocations of costs among
> tenants or among condominium/planned community residents for parking, pools,
> gyms, and other amenities.  *See*, e.g., *Id.* § 907.04.A.6(i);
>
> c. requiring the submission to and recording of onerous deed restrictions / master
> leases against the title (which leases, by exceeding 30 years, require developers to
> pay a realty transfer tax, part of which goes to the City).  *See Id.* § 907.04.A.6;
>
> d. regulating or affecting details of, and having material obligations determined
> based upon, matters of property title.  *See*, e.g., *Id.* § 907.04.A.5(b) (regarding
> requirements for recorded covenants and/or recorded master leases), *Id.* §
> 907.04.A.5(a) (having obligations potentially triggered based on whether a
> "planned development" or condominium with common elements is used as part of
> the business structure/form of ownership relating to the property).  Also, matters of
> financing/mortgages relating to the property.  See, e.g., *Id.* § 907.04.A.5(a)
> (aggregating separate developments based on "common financing"), and *Id.* §
> 907.04.A.4 (setting maximum below-market sale price based on happenstance of
> future national circumstances applicable to one type of fixed rate mortgage);

e. requiring owners in certain circumstances to sell at below-market price to certain private "non-profit" entities that may in the future be approved, without standards, by unelected City officials. *See*, e.g., *Id.*, § 907.04.A.4 (definition of "Community Land Trust"), and *Id.* § 907.04.A.6(c)(2);

f. forcing private landlords to act as an adjunct to the governmental housing authority and engage in burdensome annual interactions with such authorities or other nongovernmental or governmental parties to whom such powers may be delegated, without any set standards, by the unelected City officials, even though there has been no choice to engage in HUD Section 8 or similar programs. *See*, e.g., § 907.04.A.6(b)(2);

g. prohibiting the use by owners of "lease purchase agreements" in certain contexts. *See* e.g., *Id.* § 907.04.A.4 (definition of "Inclusionary Owner- Occupied Unit.");

h. requiring current and future owners of impacted Inclusionary Owner-Occupied Units to either record with the recorder of deeds an onerous deed restriction against the title of the property burdening it with material restrictions--including for example by expressly "restricting additional debt that can be secured against the property"--negatively impacting the value and limiting the practical ability to sell, as well as the use, of such real estate for an initial term of ***at least 35 years***, and if sold during that period, ***extending for an additional 35 years***, or be forced to sell it to a "Community Land Trust". *See*, e.g., *Id.* § 907.06(c) and (f); and

i. requiring current and future owners/landlords of impacted Inclusionary Rental Units to either record with the recorder of deeds an onerous deed restriction against the title of the property, or enter into a master lease with an "Affordable Housing Provider," negatively impacting the value and limiting the practical ability to sell and arrange for certain types of financing, as well as the use, of such real estate for an initial term of ***at least 35 years***, and if sold during that period, ***extending for an additional 35 years***. *See*, e.g., *Id.* § 907.06(b) and (f).

*Id.* ¶ 37 (emphasis in original).

Plaintiffs further allege that while the IZO sets forth an alternative method of compliance outside of setting aside ten percent of a project for Inclusionary Units, such alternative "does not cure the constitutional violations because (i) there is no guarantee that BAMP members – or any other person subject to the Ordinance – would be able to use the alternative method, and (ii) the alternative method also entails violations of the Takings Clause and the doctrine of unconstitutional conditions." *Id.* ¶ 38. Specifically, Plaintiffs allege that the alternative method is

only applicable where the City determines that on-site Inclusionary Units are not feasible in which case Inclusionary Units constructed off-site may be permitted. *Id.* ¶ 39. For off-site units, a minimum of twelve percent of the units shall be Inclusionary Units and they shall not be located more than one quarter of a mile from the subject site with comparable public transit to the subject site. *Id.* ¶¶ 40-41.

Plaintiffs also challenge Ordinance 2022-0592 ("Oakland Ordinance"), which, in essence, Plaintiffs allege expands the requirements of the IZO to Pittsburgh's Oakland neighborhood. *Id.* ¶ 43. Specifically, BAMP highlights the following provisions of the Oakland Ordinance:

a. expanding the City's Inclusionary Zoning Overlap Map to include large sections of the City's Oakland neighborhoods, including the requirement that 10% of the Units within the Oakland Inclusionary District be "affordable" at 50% of AMI [Average Median Income];

b. the creation of a new set of requirements within the UC-E District which are set forth in Section 904.09 of the City's Code. The Oakland Ordinance places particularly onerous restrictions on Multi-Suite Residential (General) Use. The Code defines Multi-Suite Residential (General) as a MultiSuite Residential Use with 8 or more sleeping rooms. Under the Oakland Ordnance, this use is required to meet the following standards:

In the UC-E District:

Multi-Suite Residential uses shall meet one (1) of the following standards in the UC-E District:

(a) All residential shall units meet the requirements of 907.04.A.6 and shall otherwise follow the processes and procedures of 907.04.A, excluding 907.04.A.5 Applicability and 907.04.A.7 Off-Site Inclusionary Standards. ***One hundred (100) percent of the units shall be affordable and shall be located on site***; or

(b) Residential housing shall be less than fifty (50) percent of the Gross Floor Area in a mixed-use structure. For purposes of this calculation, shared spaces between residential uses and commercial shall be excluded from the calculation of Gross Floor Area. (Emphasis Added).

*Id.* ¶ 43 (emphasis in original).  Plaintiffs allege that as a result of the Oakland Ordinance, "if a property owner wishes to develop a mixed-use residential structure which has greater than 50 percent of the Gross Floor as residential, one hundred (100) percent of such units must be affordable."  *Id.* ¶44.

Plaintiffs allege that Dr. Werrin is directly impacted by the Ordinances because he seeks to develop or to sell for development his properties, which are mixed-use residential properties. *Id.* ¶ 45-56.  Plaintiffs further allege that the Ordinances limit Dr. Werrin's property rights and the value of his property.  *Id.* ¶ 47.

As a result of the above, Plaintiffs allege that the IZO and Oakland Ordinance violate the Takings Clause of the United States Constitution both as-applied to Plaintiffs and on their face. *Id.* ¶¶ 50-73.  Further, Plaintiffs allege that the Ordinances violate Article IX, sec. 2 of the Pennsylvania Constitution and "the Home Rule Law" both as-applied to Plaintiffs and on their face.  *Id.* at ¶¶ 74-86.

### ii.  Additional Facts[3]

The City has not presented any evidence contradicting the characterizations of the Ordinances detailed by Plaintiffs in the Amended Complaint and outlined by the Court above. That said, the City has presented evidence that the City's Zoning Code, of which the Ordinances are a part, allows applicants to seek administrative exceptions, special exceptions, and/or variances from the City's Zoning Board of Adjustment.  ECF No. 106 at 3.  Plaintiffs do not dispute that such exceptions and variances are available, however, they do argue that these variances and/or exceptions are difficult to obtain.  ECF No. 45 at 8, 14.

---

[3] Because, as discussed *infra*, the City is raising a factual attack to the Amended Complaint, the Court may consider evidence outside of the pleadings and weigh such evidence.

For purposes of the Motions before the Court, the parties focus their arguments on certain members of BAMP. These members include Dr. Werrin, Laurel Communities, Walnut Capital, and Paramount Construction.

Dr. Werrin is a property owner in Pittsburgh and a current member of BAMP, although Dr. Werrin was not a member of BAMP at the time the Amended Complaint was filed.[4] Dr. Werrin is the owner or partial owner of certain real property located at 3504, 3506, 3508, and 3510 Fifth Avenue. Plaintiffs argue that Dr. Werrin is unable to sell the above property in light of the Ordinances and is therefore suffering financial harm.[5] The City, however, has submitted evidence of sales agreements for the above properties that were executed after the passage of the Ordinances. *See* ECF Nos. 107-8, 107-9, 107-10, 107-11. While these sales agreements exist, there is no evidence in the record that the sale of the above properties have been finalized. Plaintiffs have not contested these sales agreements.

Laurel Communities is not a member of BAMP, but it is an affiliate of a BAMP member, Laurel Development. *See* ECF No. 113 at 3; ECF No. 116 at 2. Plaintiffs argue that Laurel Communities has multiple developments under contract and that it would "pursue a development in excess of twenty units . . . if the inclusionary zoning provisions under the Ordinances were not applicable" but, that as a result of the financial impacts associated with complying with the

---

[4] The evidence submitted by the City shows that Dr. Werrin paid his membership dues to BAMP on October 16, 2023, *see* ECF No. 107-16 at 3, but that the Amended Complaint in this matter was filed on October 6, 2023. These documents further reflect that Dr. Werrin's membership with BAMP did not start until November 1, 2023. *Id.* Plaintiffs have at no point disputed these facts but, nonetheless, argue that the Court may still consider Dr. Werrin as a member of BAMP for the purposes of ruling on the pending Motions.

[5] The City provided additional evidence that Dr. Werrin submitted a preapplication with the City indicating that he planned to build a development at 3510 Fifth Avenue. ECF No. 106 at 13. The City argues that Dr. Werrin's proposal failed to comply with other zoning requirements and therefore, Dr. Werrin cannot show that his proposed project will be subject to the Ordinances at issue. *Id.* at 13-14. Plaintiffs have never argued that this preapplication from Dr. Werrin proves standing or ripeness and, therefore, the Court will not consider this preapplication in ruling on the instant Motions.

Ordinances, it has capped the number of units in its developments at nineteen units. ECF No. 112 at 7. The City argues that BAMP may not rely on an affiliate to prove standing; that Plaintiffs failed to disclose Laurel Communities in discovery; and that the alleged harm to Laurel Communities is insufficient for the Court to find that BAMP has standing or that its claims are ripe. *See* ECF No. 113. Additionally, the City argues that Laurel Communities has never sought a variance or exception from the Ordinances for any of its properties and Plaintiffs do not dispute this fact.

Turning to Walnut Capital, Plaintiffs argue that BAMP member Walnut Capital conducts business through its non-member affiliate, Walnut Capital – McKee ("McKee").[6] ECF No. 112 at 6; ECF No. 116 at 2. After the close of jurisdictional discovery and the filing of the pending Motion to Dismiss, but sometime before Plaintiffs filed their Motion for Preliminary Injunction, McKee became a member of BAMP. ECF No. 122 at 2 n.1. As to McKee, it is currently developing a 160 residential unit, 12 story apartment complex project ("The Caroline") which falls within the Ordinances at issue. ECF No. 112 at 6; ECF No. 122 at 2. In order to receive a Record of Zoning Approval, a precondition to the issuance of a building permit, McKee agreed that "a Deed restriction is recorded allowing the City and Eligible Households to enforce the on-site inclusionary standards and related City regulations prior to the issuance of a Certificate of Occupancy." ECF No. 122 at 2-3 (internal citations omitted) (cleaned up). As such, on May 20, 2025, McKee complied with the Department of City Planning's request and provided the City with an IZ Commitment Letter and Restrictive Covenant Agreement so that the City could process the Record of Zoning Approval. *Id.* at 3. At no point has McKee applied for a variance, special

---

[6] Plaintiffs additionally mention that Pitt Blue Holdings is an affiliate of Walnut Capital, however, Plaintiffs have raised no argument as to how Pitt Blue Holdings supports their claims or the asserted basis for the Court's subject matter jurisdiction, specifically standing and ripeness. Therefore, the Court will not consider Pitt Blue Holdings when ruling on the instant Motions.

exception, or other relief from the Ordinances. ECF No. 125 at 5. The City has not disputed that

The Caroline has proceeded with the IZ Commitment Letter and Restrictive Covenant Agreement,

but does argue that McKee was not a member of BAMP at the time the Amended Complaint was

filed or at the time the parties engaged in jurisdictional discovery. *Id.* at 4.

Lastly, Paramount Construction, a member of BAMP, has elected to decrease the number

of units in a development project located in Oakland from twenty units to nineteen units to avoid

the requirements of the Ordinances. ECF No. 112 at 7.

## II.    Legal Standard

### A. Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the

"court's 'very power to hear the case.'" *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir.

2006) (quoting *Mortensen v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.

1977)). The party asserting the existence of federal jurisdiction bears the burden of proving that

jurisdiction over the subject matter actually exists. *Brown v. Tucci*, Civil Action No. 12-1769,

2013 WL 2190145 (W.D. Pa. May 20, 2013) (citing *Development Finance Corp. v. Alpha Housing*

*& Health Care*, 54 F.3d 156, 158 (3d Cir. 1995)).

There are two types of Rule 12(b)(1) motions. A "facial" attack assumes that the

allegations of the complaint are true, but contends that the pleadings fail to present an action within

the court's jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.

1977). The United States Court of Appeals for the Third Circuit has explained:

> In reviewing a facial attack, "the court must only consider the allegations of the
> complaint and documents referenced therein and attached thereto, in the light most
> favorable to the plaintiff." *In re Schering Plough Corp.*, 678 F.3d at
> 243 (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000))
> (internal quotation marks omitted). Thus, a facial attack calls for a district court to
> apply the same standard of review it would use in considering

> a motion to dismiss under Rule 12(b)(6), i.e., construing the alleged facts in favor
> of the nonmoving party.

*Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). A "factual"

attack, on the other hand, argues that, while the pleadings themselves facially establish jurisdiction,

one or more of the factual allegations is untrue, causing the case to fall outside the court's

jurisdiction. *Id.* In such a case, "no presumptive truthfulness attaches to plaintiff's allegations"

and the court must evaluate the merits of the disputed allegations because "the trial court's ... very

power to hear the case" is at issue. *Id.* With a factual attack, the Court is free to consider evidence

outside the pleadings and weigh that evidence. *Petruska*, 462 F.3d at 302 n.3; *see also Gould*

*Elecs., Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000). "[T]he existence of disputed material facts

will not preclude the trial court from evaluating for itself the merits of jurisdictional

claims." *Petruska*, 462 F.3d at 302 n.3 (quoting *Mortenson*, 549 F.2d at 891).

Here, because the City's Motion relies on evidence outside of the pleadings, the City's

Motion is considered to be a factual attack as to jurisdiction.

### B.  Motion for Preliminary Injunction

With respect to the standard for the issuance of a preliminary injunction, the United States

Court of Appeals for the Third Circuit has explained:

The decision to issue a preliminary injunction is governed by a four-factor test:

> To obtain an injunction, the plaintiffs had to demonstrate (1) that
> they are reasonably likely to prevail eventually in the litigation and
> (2) that they are likely to suffer irreparable injury without relief. If
> these two threshold showings are made the District Court then
> considers, to the extent relevant, (3) whether an injunction would
> harm the [defendants] more than denying relief would harm the
> plaintiffs and (4) whether granting relief would serve the public
> interest.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)).  "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994)).  "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties."  *Kos Pharms.*, 369 F.3d at 708 (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir.1990)).

## III.    Discussion

### A.  Motion to Dismiss

The City argues that the Court should dismiss Plaintiffs' Amended Complaint pursuant to Rule 12(b)(1) for lack of standing and because their claims are not ripe.  ECF No. 106 at 2.  As stated *supra*, the City raises a factual attack and, therefore, the Court may consider evidence outside of the pleadings.  Further, the Court may consider the entire record when analyzing a factual attack and is not confined to the evidence submitted in support of the Motion to Dismiss.  *See International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc.*, 673 F.2d 700, 710 (3d Cir. 1982) ("In determining its jurisdiction, therefore, it is incumbent upon the district court to examine the entire record before it").  Here, Plaintiffs filed their Motion for Preliminary Injunction after the filing of the Motion to Dismiss, and in the relevant briefing, the parties present additional evidence that is relevant to the Court's consideration of the Motion to Dismiss.[7]

---

[7] No party has argued that the Court may not consider the evidence submitted in support of the Motion for Preliminary Injunction when ruling on the Motion to Dismiss.  Further, during oral argument, the parties engaged in substantial argument surrounding the entire record in this case when presenting argument on the Motion to Dismiss.

### i.  Federal Takings Claims

### a.  Ripeness

The Court begins with determining whether Plaintiffs' federal claims are ripe.  As explained by the Eastern District of New York, "[r]ipeness is a barrier to standing because standing requires a plaintiff to have suffered an 'injury in fact,' *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), and a plaintiff bringing an unripe claim has often not yet been injured." *WG Woodmere LLC v. Incorporated Village of Woodsburgh*, 2:23-CV-6066, 2025 WL 1663600, at *5 (E.D. N.Y. June 12, 2025) (citing *Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83, 110 (2d Cir. 2019)).[8]

With respect to the ripeness requirement, the United States Court of Appeals for the Third Circuit has explained that "[t]he ripeness doctrine serves to 'determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'"  *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004) (quoting *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003)).  Generally, in a land-use case, "a property owner does not have a ripe, constitutional claim until the zoning authorities have had 'an opportunity to arrive[] at a final, definitive position regarding how [they] will apply the regulations at issue to the particular land in question.'"  *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 597 (3d Cir.

---

[8] As stated above, the City has argued that, pursuant to Rule 12(b)(1), Plaintiffs' claims are not ripe.  The Court notes that, while the issue has not been addressed by the Third Circuit, courts in the Second Circuit have found that, when analyzing ripeness in the land use context, a court should only apply the Rule 12(b)(6) standard and not the Rule 12(b)(1) standard.  *WG Woodmere LLC v. Town of Hempstead*, 20-CV-03903, 2022 WL 17359339, at *4 (E.D. N.Y. Dec. 1, 2022).  The *Woodmere* court based this holding on the idea that ripeness is prudential rather than jurisdictional in the land use context.  Here, Plaintiffs have not disputed that the Court may apply the Rule 12(b)(1) standard when considering whether their claims are ripe.  Further, the Court finds that, based on the below analysis, the Court's determination would be the same under either standard.

1998) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985)).  This is referred to as the finality rule.

When determining whether Plaintiffs' claims are ripe, the Court must consider each claim on its own.  Here, Plaintiffs have argued that the Ordinances at issue violate the Takings Clause both facially and as-applied to Plaintiffs.  The Court will take each claim in turn.

### 1.  As-Applied Takings Claim

The standard for determining whether an as-applied takings claim is ripe has been set forth by the Supreme Court in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*.  In *Williamson County*, the Supreme Court held that a land use claim, such as this one, "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."  *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), overruled on other grounds, *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180 (2019).  The Supreme Court has since explained that "nothing more than *de facto* finality is necessary."  *Pakdel v. City and Cnty. of San Francisco*, 594 U.S. 474, 479 (2021).  As such "a plaintiff's failure to properly pursue administrative procedures may render a claim unripe if avenues still remain for the government to clarify or change its decision[,]" but once the government has "committed to a position[,]" the "finality requirement is relatively modest" and "[a]ll a plaintiff must show is that there is no question about how the regulations at issue apply to the particular land use in question."  *Id.* at 478–80.

Here, the City argues that Plaintiffs' as-applied takings claim is unripe because Dr. Werrin has not applied for a special exception, variance, or any other relief from the Ordinances.  ECF No. 106 at 16.  Further, the City argues that BAMP cannot identify a single member who has-

applied for a special exception, variance, or any other relief from the Ordinances. *Id.* at 17. Plaintiffs, however, argue that it is futile for them to seek an exception or variance because the City's "regulatory regime does not offer the possibility of a variance from the confiscatory IZO regulations at issue, nor can Plaintiffs obtain relief from the unconstitutional harms imposed under the Ordinance through a special exception or administrative exception." ECF No. 112 at 10.[9] Specifically, Plaintiffs argue that the Ordinances themselves do not include specific variance provisions or provisions for administrative exceptions and that the City's Zoning Code sets forth procedures for variances and administrative exceptions that are so extreme that they would never be granted. ECF No. 45 at 8, 14. Further, Plaintiffs argue that while the Ordinances set forth a procedure for a special exception, a special exception just subjects the developer to a different set of unconstitutional harms. *Id.* at 13.

To begin, Plaintiffs have not alleged, nor have they presented any evidence, that Dr. Werrin or any member of BAMP has applied for a variance, special exception, administrative exception, or any other form of relief from the Ordinances at issue.[10] Therefore, the Court must determine whether Plaintiffs have established *de facto* finality. The *de facto* requirement "ensures that a plaintiff has actually 'been injured by the Government's action' and is not prematurely suing over a hypothetical harm." *Pakdel*, 594 U.S. at 479 (quoting *Horne v. Department of Agriculture*, 569 U.S. 513, 525 (2013)). The Court finds that Plaintiffs have not established *de facto* finality despite their arguments that seeking a variance or exception would be futile.[11]

---

[9] In making this argument, Plaintiffs refer the Court to their opposition brief, ECF No. 45, submitted in response to the City's first Motion to Dismiss. The Court has reviewed the arguments raised therein.

[10] Plaintiffs do not dispute this fact in their briefing.

[11] There are no allegations in the Amended Complaint suggesting that seeking a variance or exception would be futile. Instead, Plaintiffs raise rather conclusory arguments in their briefing that obtaining a variance or exception would be futile.

The Court begins by looking at the Ordinances themselves. The IZO provides for the following special exception process:

907.04.A.7 Off-Site Inclusionary Standards

Where provision of Inclusionary Units on-site is determined not to be feasible, inclusionary units constructed off-site may be permitted as a Special Exception in accordance with Section 922.07, subject to [some additional] standards.

Zoning Code § 907.04.A.7, Am. Compl., Ex. B. The parties have not pointed the Court to any exception or variance provisions in the Oakland Ordinance and the Court is likewise not aware of any. Turning to the Zoning Code itself, the parties are in agreement that it provides procedures for a developer to seek a variance, special exception, or administrative exception. ECF No. 113 at 12; ECF No. 45 at 8-14.

Despite Plaintiffs' arguments that seeking a variance, special exception, or administrative exception would be futile, Plaintiffs' claims are indistinguishable from cases in which an as-applied takings claim has been found unripe in the absence of a final decision. *See Congregation Anshei Roosevelt v. Planning and Zoning Bd. of Borough of Roosevelt*, 2008 WL 4003483, at *9–13 (D. N.J. Aug. 21, 2008) (finding that the plaintiffs' claims were unripe because the plaintiffs had not sought a variance despite the plaintiffs' argument that seeking a variance was futile in light of the burdensome requirements); *see also Smalis v. City of Pittsburgh*, 2:19-CV-1609, 2024 WL 1076108, at * (W.D. Pa. March 12, 2024) (finding that the plaintiff's land use claim was not ripe when the plaintiff had not pled any facts that he applied for and was denied a variance); *see also Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 596–608 (S.D. N.Y. 2013) (collecting cases); cf. *Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Tp.*, 996 F. Supp. 409, 419, (D. N.J. 1998) (finding that it would have been futile for the plaintiff to apply for a variance when the Zoning Officer of the Township testified that it

was "extremely unlikely" a variance would be granted and that he would not recommend a variance).  While it may in fact be extremely difficult for Plaintiffs to obtain a variance, special exception, or administrative exception, as argued, the fact remains that such avenues are still available for Plaintiffs and BAMP members.  Without a final decision as to how the Ordinances will be applied to Plaintiffs, "it will be impossible to know whether the [ordinances] go[] 'too far' because [the Court] will not know how far the regulation [actually] goes." *WG Woodmere*, 2022 WL 17359339, at * 6.

Additionally, at oral argument, Plaintiffs further argued that, given the variance procedures available in the City's Zoning Code, requiring Plaintiffs to seek a variance would be akin to requiring them to exhaust state remedies—a requirement that they contend the Supreme Court overturned in *Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180 (2019).  Before it was overturned, the exhaustion requirement required a plaintiff to obtain just compensation under state law in state court in order for his/her federal takings claim to be ripe.  Here, Plaintiffs have presented no clear basis for how the City's variance procedures are akin to a requirement that they seek just compensation under state law.  The finality requirement simply requires that there be a final decision as to how the ordinance at issue will be applied while the exhaustion requirement requires a party to seek judicial or administrative review of a decision.  These are distinct requirements and the Supreme Court in *Knick* specifically stated that the validity of the finality requirement was not at issue when it overturned the exhaustion requirement.  *Knick*, 588 U.S. at 188.  Further, the City's variance and special exception procedures allow for an individual to submit an application for such relief, completely separate to a request for just compensation.  Lastly, other courts in this district have found that a plaintiff's federal takings claim was unripe where the plaintiff failed to seek a variance or special exception under the City's zoning code.  *See*

*Smalis v. City of Pittsburgh*, 2:19-CV-1609, 2024 WL 1076108, at *3 (W.D. Pa. March 12, 2024); *see also Restaurant Enterprises, LLC v. City of Pittsburgh*, Civil Action No. 16-1393, 2016 WL 4962926, at *10 (W.D. Pa. Sept. 16, 2016). As such, Plaintiffs' argument has no merit and plaintiffs were required to seek a variance or special exception in order for their claims to be ripe.

For the reasons stated above, Plaintiffs' as-applied takings claim is not ripe and is therefore dismissed, with prejudice, from this action, but without prejudice to Plaintiffs pursuing said claim via the filing of a new lawsuit, should Plaintiffs' claim become ripe and should it be otherwise warranted. The Court finds that amendment, in this action, would be futile given that the parties engaged in months of jurisdictional discovery and Plaintiffs have been unable to present any evidence, to date, that Dr. Werrin or any BAMP member has received a final decision.

### 2. Facial Takings Claim

The Court now turns to Plaintiffs' facial takings claim. As previously determined by the Court, the finality rule, detailed above, only applies to as-applied challenges and not facial challenges. ECF No. 54 at 9.

> The Third Circuit has held that in as-applied challenges "in cases involving land-use decisions, a property owner does not have a ripe constitutional claim until the zoning authorities have had an opportunity to arrive at a final, definitive position regarding how they will apply the regulations at issue to the particular land in question." *Sameric Corp. of DE v. City of Philadelphia*, 142 F.3d 582 (3d Cir. 1998). *See also Acierno v. Mitchell*, 6 F.3d 970, 974-975 (3d Cir. 1993); *Taylor Investment, Ltd. v. Upper Darby Twp.*, 983 F.2d 1285 (3d Cir. 1993). Under the "finality rule," a plaintiff property owner must prove that a "final decision has been reached by the agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds."
>
> . . .
>
> The finality rule does not apply "to facial attacks on a zoning ordinance, i.e., a claim that the mere enactment of a regulation either constitutes a taking without just compensation, or a substantive violation of due process or equal protection." *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006).

*RHJ Medical Center, Inc. v. City of DuBois*, 754 F. Supp. 2d 723, 766-67 (W.D. Pa. 2010).

Despite the Court's prior ruling on the City's first Motion to Dismiss, and clear authority from the Third Circuit, the City attempts to argue that Plaintiffs' facial takings claim is unripe. In sum, the City argues that "Plaintiffs cannot show that any application of the [Ordinances] would be unconstitutional or that the 'mere enactment' of the [Ordinances] has denied them the economically viable use of their land because the Ordinances are "subject to discretion" in light of the ability of Plaintiffs to seek a variance or exception. ECF No. 106 at 18. Further, the City argues that Dr. Werrin's sale of his property demonstrates that the mere enactment of the Ordinances has not deprived him of the economically viable use of his property. *Id.* at 20.

While the City attempts to assert that Plaintiffs' claims are not ripe, its arguments, instead, go to the merits of the case. Such arguments may have been more appropriately made in a motion to dismiss brought pursuant to Rule 12(b)(6) or prove to be more appropriately asserted in a motion for summary judgment. Third Circuit precedent is clear that the finality rule does not apply to facial takings claims and that the mere enactment of the Ordinances is enough. The City has not pointed the Court to any case law to the contrary. The case law cited by the City is easily distinguishable from this case, and its current procedural posture, and is not relevant to the Court's consideration of whether Plaintiffs' facial takings claim is ripe. *See Adams v. City of Seattle*, C22-1767, 2024 WL 3253297, at *3–4 (W.D. Wash. June 28, 2024) (In which the defendant moved for *summary judgment* on the grounds that the plaintiff's facial attack lacked merit and was time barred and that the plaintiff's as-applied claim was not ripe. The court, in considering the *merits* of the plaintiff's facial attack, found that the plaintiff could not show that the mere enactment of the ordinance constituted a taking because, in part, the ordinance allowed individuals to seek a waiver).

Therefore, for the reasons stated above, Plaintiffs' facial takings claim is ripe.

### b.  Standing

The Court now turns to the issue of standing as to Plaintiffs' federal claims.  Plaintiffs seek monetary, declaratory, and injunctive relief, and, therefore, each plaintiff must have standing.  *See Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, Civil Action No. 19-1334, 2025 WL 1884852, at *5 (D. Del. July 8, 2025) (collecting cases explaining that in actions for monetary damages, each and every plaintiff must have standing, while in the context of claims solely for injunctive relief, only one plaintiff must have standing).

Because BAMP seeks to pursue only claims on behalf of its members and does not allege any injury to itself, the Court must determine if BAMP has associational standing to bring its claims.  An association has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested required the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977).  Here, because Dr. Werrin is a member of BAMP, the question of whether Dr. Werrin has standing will be answered when determining whether BAMP has associational standing.

Plaintiffs are required to demonstrate standing on each of their claims and for each form of relief that they seek.  *Davis v. Federal Election Com'n*, 554 U.S. 724, 734 (2008).  Here, Plaintiffs allege that the Ordinances violate the Takings Clause both on their face and as-applied to BAMP.  *See* Am. Compl.   Because, as detailed above, the Court has determined that Plaintiffs' as-applied takings claim is not ripe, the Court need not determine if Plaintiffs have standing to bring such a claim.

This said, for the reasons discussed and developed below, the Court would likewise find that Plaintiffs have not presented sufficient evidence of an injury-in-fact for purposes of standing

in support of their as-applied takings claim.  When asserting standing in an as-applied challenge, typically, the plaintiff must prove that the regulation at issue has actually been applied to plaintiff. *Dolls, Inc. v. City of Coralville, Iowa*, 425 F. Supp. 2d 958, 972 (S. D. Iowa 2006).  Here, the Court has found that the non-members relied upon by BAMP to assert standing do not possess the required indicia of membership to be considered members of BAMP for purposes of determining standing.  Further, for many of the reasons stated elsewhere in this Opinion, Plaintiffs have failed to present evidence of anything more than a hypothetical injury.

### 1. Facial Takings Claim

Here, the City asserts that BAMP cannot meet any of the elements of associational standing but only raises specific arguments as to the first element.[12]  ECF No. 106 at 9-14.  BAMP argues that it can establish standing through its members and specifically highlights Dr. Werrin, McKee, Laurel Communities, and Paramount Construction.  ECF No. 112 at 3-7.

Therefore, the Court must determine whether any member of BAMP has standing to sue on its own.  An individual has standing when the following three requirements are met: 1) injury-in-fact, 2) causation, and 3) redressability.  *See generally*, U.S. Const. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  The Court notes that the City has raised substantial arguments surrounding whether McKee and Laurel Communities are members of BAMP and whether such members were properly disclosed during discovery.  Additionally, the City argues that BAMP cannot rely on Dr. Werrin's membership for purposes of establishing

---

[12] The City additionally "challenges the concept of association standing generally" but states that the "Court not need to reach this larger issue, however, given that BAMP cannot show it meets the elements required for associational standing."  ECF No. 106 at 9.

standing because Dr. Werrin was not a member of BAMP at the time the Amended Complaint was filed.[13]  ECF No. 113 at 7.

Before considering whether Plaintiffs have standing, the Court must determine what evidence a plaintiff must offer to prove that they have standing, and specifically, to prove that they have suffered an injury in fact.

As recently detailed by the Middle District of Pennsylvania:

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." [*Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)] (internal citation and quotation marks omitted).  "For an injury to be particularized, it must affect the plaintiff in a personal and individual way."  *Id.*  "Particularization is necessary to establish injury in fact, but it is not sufficient.  An injury in fact must also be concrete."  *Id.*  "A concrete injury must be *de facto*; that is, it must actually exist."  *Id.*  "Concreteness, therefore, is quite different from particularization."  *Id.*  "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles."  *Id.* at 340, 136 S.Ct. 1540.  "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.  Article III standing requires a concrete injury even in the context of a statutory violation."  *Id.* at 341, 136 S.Ct. 1540.

*1789 Foundation, Inc v. Schmidt*, 781 F. Supp. 3d 282, 310 (M.D. Pa. 2025).

The standard for determining whether a plaintiff has suffered an injury-in-fact for purposes of standing in a takings claim is a distinct question.[14]  In *Knick*, the Third Circuit made it clear that when a plaintiff is asserting a facial challenge, "the law in question must still typically be applied— or at least be at risk of imminent application.  That is because plaintiffs must always demonstrate

---

[13] At this time, the Court will set aside any arguments concerning discovery and whether Dr. Werrin was a member of BAMP at the time the Amended Complaint was filed because the Court find that, even considering all of Plaintiffs' arguments, Plaintiffs have failed to prove that they have standing.

[14] Much of the parties briefing on all of the pending Motions raises only one argument as to standing across all claims.  However, at oral argument, the parties provided additional argument as to how standing may be determined in an as-applied versus facial challenge.

the 'irreducible constitutional minimum' of Article III standing." *Knick v. Township of Scott*, 862 F.3d 310, 320 (3d Cir. 2017), vacated in part, 932 F.3d 152 (3d Cir. 2019) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Therefore, unlike ripeness, the mere enactment of the regulation at issue does not automatically give rise to an injury-in-fact adequate to confer a plaintiff standing, even if she has a ripe claim.  Further case law is clear that simply owning property that may, at some unidentified hypothetical time in the future, be affected by the regulation at issue is insufficient to establish an injury-in-fact.  *See id.* at 319 (finding that the plaintiff could not base standing on a future invasion of her property without demonstrating an "actual or imminent, not conjectural and hypothetical" injury because simply owning property subject to a hypothetical enforcement is "too speculative"); *see also Dolls, Inc. v. City of Coralville, Iowa*, 425 F. Supp. 2d 958, 978 (S. D. Iowa 2006) ("[Plaintiff] has not claimed why it should be permitted to allege that the City's adult-use regulatory scheme effects a taking on its face when it has alleged neither it, nor any other business, has been deprived of anything as a result of anything the City has done."); *see also Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468, 476 (9th Cir. 1994,) overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (a plaintiff bringing a "facial claim need not show that his particular property is affected, [but] for standing purposes he must at the least demonstrate that he was a property owner subject to the statute at the time of its enactment" (internal citations omitted)).[15]

---

[15] At oral argument, the City argued that, when considering a facial challenge, the Court should only consider the harm suffered by the plaintiff at the time the law at issue was enacted and that any injury subsequent to the enactment of the law could not be relied upon.  The Court need not determine whether such a standard is appropriate because, even considering the injuries relied upon by Plaintiffs, the Court finds that Plaintiffs do not have standing, for the reasons discussed *infra*.

i.  Dr. Werrin

Starting with Dr. Werrin, the Court finds that Plaintiffs have failed to prove that he has suffered an injury-in-fact.  Plaintiffs have presented no evidence that the Ordinances have been applied or are at risk of being applied to Dr. Werrin's properties.  Instead, Plaintiffs have only argued that Dr. Werrin has suffered an economic injury based on his inability to sell his properties.  To begin, the Court has, at least, a reasonable basis to take pause as to Plaintiffs' arguments on this point in light of the sales agreements executed for Dr. Werrin's properties.  Further, even assuming that Dr. Werrin is unable to sell his properties, such an injury is hypothetical at best and Plaintiffs have presented no evidence or argument that Dr. Werrin's injury is casually related to the Ordinances or could be redressed by a favorable court decision.  *See Bojicic v. DeWine*, 569 F. Supp. 3d 669, 682 (N.D. Ohio 2021) (finding that the plaintiff's economic harm was sufficient to prove an injury in fact because it was not speculative or hypothetical).  There are numerous factors that affect an individual's ability to sell property and Plaintiffs have presented no evidence that the Ordinances are a substantial, or even partial, cause of Dr. Werrin's harm.  As such, the Court finds that Dr. Werrin lacks standing to bring his facial takings claim and that BAMP cannot rely on him to assert association standing.

ii.  McKee

Turning to McKee, before resolving the issue of standing, the Court must first determine whether McKee is a member of BAMP for purposes of standing.  To begin, standing must be determined as of the commencement of the suit.  *Lujan*, 504 U.S. at 571 n.5.  Here, the parties are in agreement that, at the time the Amended Complaint was filed, McKee was not a member of BAMP.  As such, Plaintiffs cannot rely on his subsequently created membership status to support

their claim of standing.  Therefore, the question remains whether the Court may consider a non-member affiliate, like McKee, for the purpose of determining standing.

BAMP has cited no case law in support of its assertion that the Court may consider non-member affiliates, instead pointing to BAMP's bylaws and Eichenlaub's deposition testimony arguing that said evidence establishes that affiliates/subsidiaries are members.  ECF No. 116 at 2-3.  The City points the Court to *Am. Legal Found. v. F.C.C.*, 808 F.2d 84 (D.C. Cir. 1987), arguing that an organization cannot assert standing on behalf of supporters who are not members of the organization.  ECF No. 113 at 3.  Further, the City argues that allowing BAMP to assert standing in such a way would mean that "any person or entity could manufacture standing by unilaterally declaring an 'affiliation' with a named plaintiff."  *Id.* at 4.

In *Am. Legal Found.* the D.C. District Court was confronted with a question distinct from the one raised by the parties here.  In *Am. Legal Found.* the court considered whether the plaintiff was a trade association that could assert associational standing, not whether an affiliate of a member is a member for purposes of standing.  In analyzing this question, the court held that the plaintiff could not assert standing on behalf of its supporters because the plaintiff's relationship with its supporters "bear[ed] none of the indicia of a traditional membership organization."  808 F.2d at 90.  In doing so, the court looked to the Supreme Court's holding in *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333 (1977) and noted that "the Supreme Court held that the Washington Commission successfully asserted associational standing because 'for all practical purposes [it] perform[ed] the functions of a traditional trade association," which clearly could satisfy association standing requirements."  *Am. Legal Found.*, 808 F.2d at 90 (quoting *Hunt*, 432 U.S. at 344) (alternations in original).

Here, the Court is not confronted with the question of whether BAMP should be treated like a traditional membership association that may assert standing on behalf of its members like the D.C. Court addressed in *Am. Legal Found.* or the Supreme Court addressed in *Hunt*. The City does not contest that BAMP is a membership association. Instead, the City argues that affiliates/subsidiaries of members of BAMP, who are not themselves direct members, should not be considered members for the purpose of determining standing. Based on the City's arguments, the Court finds the D.C. District Court's decision in *Securities Industry and Financial Markets Ass'n v. United States Commodity Future Trading Commission*, 67 F. Supp. 3d 373 (D. D.C. 2014) to be highly persuasive.

In *Securities*, the D.C. court analyzed whether the plaintiff association had standing based on its U.S. based members when the U.S. based members were not themselves subject to the challenged rules and, instead, only the U.S. based members' foreign affiliates, who were not formal members, were subject to the challenged rules. 67 F. Supp. 3d at 402, 406–07. The court held that the plaintiff associations could not rely on the U.S. based members to establish associational standing because the U.S. based members were not themselves injured, only their affiliates were. *Id.* at 406–09. This was in part because the U.S. based members were not themselves "membership associations" created to represent the interests of their entire corporate families. *Id.* However, the Court then went on to find that the plaintiff associations could assert standing based on the affiliates themselves, even though the affiliates were not listed on the membership rolls, because the affiliates were "functionally members of the associations for purposes of an associational standing analysis." *Id.* at 409–10. In coming to this decision, the court engaged in the following analysis:

> Plaintiffs are correct that the associational standing doctrine does not formalistically limit an association's membership to those listed on its membership rolls. *Hunt*, 432 U.S. at 344–45, 97 S.Ct. 2434; *accord Am. Legal Found. v. FCC*, 808 F.2d 84, 89–90 (D.C.Cir.1987). Instead, membership extends to those

who "possess all of the indicia of membership in an organization." *Hunt,* 432 U.S. at 344–45, 97 S.Ct. 2434.  This Circuit has identified three indicia of membership: "(i) electing the entity's leadership[,] (ii) serving in the entity, and (iii) financing the entity's activities." *Basel Action Network,* 370 F.Supp.2d at 69 (citing *Fund Democracy, LLC v. SEC,* 278 F.3d 21, 26 (D.C.Cir.2002)).

Although *Hunt* applied its "indicia of membership" test to a non-traditional organization that lacked formal members, *see* 432 U.S. at 344–45, 97 S.Ct. 2434, the Court can divine no reason why the test should not also apply to traditional trade associations that purport to represent, in addition to their formal members, the interests of informal members as well.  As plaintiffs' declarants stated, the plaintiff associations "maintain[ ] formal membership rolls for administrative purposes." ISDA Decl. ¶ 7; *accord* SIFMA Decl. ¶ 7; IIB Decl. ¶ 7.  "Requiring separate, formal memberships [for] each [affiliated] entity would be cumbersome and confusing, as many of [their] members have complex corporate structures, which are subject to change." ISDA Decl. ¶ 7; *accord* SIFMA Decl. ¶ 7; IIB Decl. ¶ 7. The Court concludes that "[u]nder the circumstances presented here, it would exalt form over substance," *Hunt,* 432 U.S. at 345, 97 S.Ct. 2434, to deny plaintiffs the advantages of the "indicia of membership" test simply because they maintain limited, formal membership rolls "for administrative purposes."

The question presented, then, is whether any of plaintiffs' U.S.-based members' foreign affiliates—who [defendant] acknowledges are directly affected by the extraterritorial application of the entity-level Title VII Rules, CFTC Suppl. Br. at 3—"possess all of the indicia of membership" in the plaintiff associations. *Hunt,* 432 U.S. at 344–45, 97 S.Ct. 2434.  Applying *Hunt,* the Court finds that plaintiffs have demonstrated that the British firm J.P. Morgan Securities plc ("PLC") possesses "all of the indicia of membership" necessary to be considered a *functional* member of [plaintiffs] for purposes of the associational standing analysis.  [Plaintiffs] extend to PLC all of the benefits incidental to formal membership because PLC is affiliated with a formal member of each association— J.P. Morgan Securities LLC [] and JPMorgan Chase & Co. [].  SIFMA Decl. ¶ 10; ISDA Decl. ¶ 9; *see also* JPMorgan Decl. ¶ 1.  In their regulatory, legislative, and litigation roles, [Plaintiffs] advocate on behalf of the interests of both formal members as well affiliated entities like PLC.  SIFMA Decl. ¶¶ 7, 9; ISDA Decl. ¶¶ 8, 10.  Likewise, PLC can participate in the associations' decision-making processes by providing input on formal regulatory or legal filings, attending associational meetings with regulatory officials and legislators, SIFMA Decl. ¶ 9, and sitting on and voting in association working groups, committees, and task forces.  ISDA Decl. ¶ 9.  It appears to the Court that the only distinction between PLC and the *formal* members of [plaintiffs] is that PLC is not listed on the associations' membership rolls.  PLC otherwise possesses all of the rights and obligations of formal membership within the associations.  Thus, "for all practical purposes" [plaintiffs] "perform[ ] the functions of ... traditional trade association[s]" as to PLC. *Hunt,* 432 U.S. at 344, 97 S.Ct. 2434.  This is sufficient

to demonstrate that PLC is functionally a member of [plaintiffs] for purposes of the associational standing analysis.

*Id.* at 410–12.

Therefore, based on the above, the question before the Court is whether McKee possesses all of the indicia of membership in BAMP for purposes of associational standing. The Court finds that the record lacks any information by which such a determination could be made and, as such, Plaintiffs have not met their burden to establish standing. There is no record evidence detailing how affiliate non-members are treated by BAMP, only that BAMP does not require affiliates of members to become members themselves. *See* Eichenlaub Depo, ECF No. 107-1, at 50:7-9 ("we don't require each of the entities that [a member] owns to become a member of the Association."); *see also* BAMP Bylaws, ECF No. 113-3, (which offer no information as to affiliates of members or whether said affiliates pay dues, may attend meetings, or may vote).[16] Further, there is no evidence that McKee possesses all the indicia of membership necessary to be considered a functional member of BAMP. There is no evidence before the Court that McKee may participate in BAMP's decision-making process, attend meetings, vote, sit on boards, pay dues, or otherwise possess all the rights and obligations of formal membership. Therefore, because McKee is not a traditional member of BAMP and because it lacks the indicia of membership, it is not functionally a member of BAMP for purposes of associational standing. As such, BAMP may not rely on any injury to McKee to prove standing.

---

[16] For clarification purposes, the Court acknowledges that BAMP's Bylaws address an "Affiliate Membership" which is open to "any individual who is an employee of a firm or corporation who is a member in good standing." Bylaws at 4. This is a distinct category of membership that is unrelated to affiliate corporations which are at issue in this case. *See* ECF No. 113 at 4; *see also* ECF No. 116 at 2-3. Additionally, outside of the Affiliate Membership, the "Associate Membership" category specifically references an "Affiliated Association," *see* Bylaws at 3, but offers no further information as to what an Affiliated Association is or any information supporting a finding that any affiliated association/member has indicia of membership.

iii.  <u>Laurel Communities</u>

Because Laurel Communities is also not a formal member of BAMP, the Court must undergo a similar analysis to the one conducted above for McKee.  As detailed above, nothing in the record supports a finding that non-member affiliates, in general, possess the indicia of membership necessary to be considered a formal member of BAMP.  As such, the Court looks to Laurel Communities, specifically, to determine if it possesses any indicia of membership.  The only evidence in the record that supports any basis for indicia of membership as to Laurel Communities, is testimony from Eichenlaub, which implies that Laurel Communities, at some point, held a position on BAMP's Board[17].  Eichenlaub Depo, ECF No. 113-4, at 77:1-7.  Even with this testimony, there is no further evidence in the record as to when or how long Laurel Communities held said Board position, what the specific position was, or whether Laurel Communities otherwise paid dues, attended meetings, or voted.[18]  The Court must weigh the relevant *Hunt* factors when determining whether Laurel Communities possesses indicia of membership, and here, the Court finds that Laurel Communities' potential Board position is not enough, on its own, to support a finding that it possesses indicia of membership.[19]

Further, even if the Court were to find that Laurel Communities possesses indicia of membership, the Court would not find that Laurel Communities suffered an injury-in-fact for

---

[17] Neither party highlighted this testimony to the Court and Plaintiffs did not offer this testimony as support for their argument that non-member affiliates may be considered functional members for purposes of an associational standing analysis.

[18] BAMP's Bylaws concerning payment of dues only address dues owed by members, not Board members.  *See* Bylaws at 3-4.  Further, the Bylaws do not state that a Board member has a right to vote, instead they state that "only eligible voting members of the Board shall have the right to vote."  Bylaws at 8.

[19] The Court notes that it may consider whether each non-member affiliate possesses the necessary indicia of membership and, as such, any evidence submitted in support of Laurel Communities, individually, does not affect the Court's analysis as to McKee.  *See Securities Industry and Financial Markets Association*, 67 F. Supp. 3d at 410-11 (considering only whether one non-member affiliate possesses the indicia of membership, not whether all non-member affiliates possess indicia of membership).

associational standing purposes.   Plaintiffs have only argued, conclusorily, that Laurel Communities suffered an injury-in-fact because it voluntarily elected to cap the number of units in its developments at nineteen units to avoid the effects of the Ordinances.   The Court acknowledges that in some cases, this "but for" injury—that a plaintiff would have engaged in conduct but for the ordinance—can be sufficient to prove an injury-in-fact.   However, the Court must be presented with sufficient allegations or evidence to ensure that such an injury is not purely hypothetical or speculative.   *See Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 623 (7th Cir. 2019) (finding that some of the plaintiffs lacked standing because they had failed to allege with particularity "how the Ordinance (and not some other factors) is preventing or hampering any of their own home-sharing activities in Chicago"); *see also Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, NY, 945 F.3d 83, 110 (2d Cir. 2019) (Finding that plaintiff's allegation that he would have built and operated a rabbinical college but for the challenged zoning laws was insufficient to assert an injury-in-fact because plaintiff "never submitted a formal proposal for the building project, applied for a permit, or engaged in any other conduct that would implicate or invoke the operation of the challenged zoning laws"); cf. *Mogan v. City of Chicago*, 115 F.4th 841, 845-46 (7th Cir. 2024) (Finding that the plaintiff had sufficiently alleged an injury-in-fact when the plaintiff provided specific allegations that he would have rented his unit on Airbnb absent the ordinance and specifically alleged that he purchased the unit with the intent to rent it and that he had rented the unit in the past and relied on rental income in the past.   Additionally, the plaintiff calculated how much money he could make on the unit versus the number of fines that would be imposed to detail how the ordinance financially harmed him).

Here, the Court has nothing more than an affidavit from Laurel Communities' CEO stating that, as a result of the financial burden of the Ordinances, Laurel Communities has elected to

reduce the number of units that would have otherwise been built. *See* ECF No. 112-3. There is no evidence before the Court that Laurel Communities had taken any steps to develop a property with more than nineteen units, nor is there any evidence that the Ordinances would have been applied to Laurel Communities in the event it elected to build a development with twenty or more units. As such, Plaintiffs have failed to present anything more than a hypothetical injury which does not meet the requirements for standing.

Further, Eichenlaub's deposition testimony provides that Laurel Communities was engaged in litigation concerning one of their developments related to matters unrelated to the Ordinances at issue. *See* Eichenlaud Depo, ECF No. 107-1, at 32:14-25. As such, it is purely hypothetical to assume that the Ordinances would be applied to said property because it is hypothetical to assume that said property development would move forward.

iv.   Paramount Construction

Finally, as to Paramount Construction, the parties are in agreement that Paramount Construction is a member of BAMP that the Court may consider for purposes of associational standing. Plaintiffs assert that Paramount Construction's injury is identical to the one suffered by Laurel Communities. However, unlike Laurel Communities, the Court is not in possession of any affidavit from an owner or employee at Paramount Construction stating that, but for the Ordinances, it would have built a development with greater than nineteen units. The only evidence submitted as to such an argument is the deposition testimony of Eichenlaub. *See* ECF No. 112 at 7. Therefore, for the reasons discussed above, the injury alleged is purely hypothetical and does not meet the requirements of standing.

Therefore, for these reasons, Dr. Werrin has failed to establish that he suffered an injury-in-fact and he does not have standing to bring his facial takings claim. Further, BAMP has failed

to establish that McKee or Laurel Communities have the required indicia of membership to be considered functional members of BAMP or that any asserted member of BAMP, including McKee, Laurel Communities, Paramount Construction, or Dr. Werrin suffered an injury-in-fact. Accordingly, BAMP does not have standing to bring its facial takings claim.  As such, Plaintiffs' facial takings claim is dismissed, with prejudice, from this action, but without prejudice to Plaintiffs pursuing said claim via the filing of a new lawsuit, should Plaintiffs be able to establish that they suffered an injury-in-fact sufficient to garner standing and should it be otherwise warranted.  The Court finds that amendment, in this action, would be futile given that the parties engaged in months of jurisdictional discovery and Plaintiffs, to date, have been unable to present any evidence that Dr. Werrin or any BAMP member has standing.

### ii. Pennsylvania Constitutional Claims

Given that the Court, for reasons discussed at length throughout this opinion, has found that the Court lacks subject matter jurisdiction to consider Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C.A. § 1367(a).  A district court may, however, decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C.A. § 1367(c)(3).  In deciding whether to decline to exercise supplemental jurisdiction, "the district court should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.'"  *Growth Horizons, Inc. v. Delaware Cty., Pa.*, 983 F.2d 1277, 1284 (3d Cir. 1993) (quoting *United Mine Workers v. Gibbs*,

383 U.S. 715, 726 (1966)). Here, the Court finds that the factors of judicial economy, convenience, fairness, and comity all weigh in favor of this Court declining to exercise supplemental jurisdiction.

### B. Motion for Temporary Restraining Order and Preliminary Injunction

The Court now turns to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. Temporary restraining orders and preliminary injunctions are governed by the same standard; however, the court may issue a preliminary injunction only on notice to the adverse party. Fed. R. Civ. P. 65 (a)(1). With respect to the standard for the issuance of a preliminary injunction, the United States Court of Appeals for the Third Circuit has explained:

> The decision to issue a preliminary injunction is governed by a four-factor test:
>
>> To obtain an injunction, the plaintiffs had to demonstrate (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)). "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Kos Pharms.*, 369 F.3d at 708 (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)). The Court notes that the Third Circuit has adopted a flexible approach which requires courts to consider the factors taken together,

such that a plaintiff who shows greater irreparable harm may show a lower likelihood of success on the merits and vice versa. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).

To begin, Plaintiffs' Motion seeks a universal injunction, that is, an injunction which "prohibit[s] enforcement of a law or policy against anyone[,]" because Plaintiffs' Motion seeks to have the Court enjoin the City from applying the Ordinances against anyone. *See Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). The Court directed the parties to address the Court's ability to issue universal injunctions in light of the Supreme Court's holding in *Trump v. Casa, Inc.* However, at oral argument, Plaintiffs asserted that they were not seeking a universal injunction and instead, were only seeking an injunction prohibiting the enforcement of the Ordinances against Plaintiffs and BAMP members.[20] Because Plaintiffs are, purportedly, no longer seeking a universal injunction, the Court may not need to determine whether it has the authority to issue such an injunction.[21] As such, the Court turns to whether issuance of an injunction or temporary restraining order is appropriate.

As to the first factor, likelihood of success on the merits, "a sufficient degree of success for a strong showing exists if there is a reasonable chance or probability[ ] of winning." *Xie v. GUANHE Home essentials*, No. 2:25-CV-00265, 2025 WL 1039233, at *2 (W.D. Pa. Apr. 8, 2025)

---

[20] Plaintiffs asserted that, should their Motion be granted, they would provide the Court with a comprehensive list of BAMP members, as well as any affiliate non-members, who the injunction would apply to.

[21] Despite Plaintiffs' assertion that they are no longer seeking a universal injunction, they are still seeking an injunction as to not just BAMP members, but non-member affiliates. Such a request is still overly broad and raises all the same concerns that were expressed by the majority in *Trump v. Casa*, given that Plaintiffs are requesting an injunction on behalf of non-members, who are likely not considered plaintiffs in this action. As discussed above, BAMP's bylaws do not maintain a membership category for affiliates of members and, at least for standing purposes, the non-members relied upon by BAMP did not possess the indicia of membership required to be considered functional members of BAMP. As such, the Court finds that extending an injunction to non-members of an organization, especially when such non-members have not been identified for the Court, is an overly broad request that likely goes beyond the authority of the Court. *See Trump v. Casa*, 606 U.S. 831, 837 (2025) (discussing how universal injunctions, and injunctive relief granted to nonparties, exceeds judicial authority).

(quoting *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 256 (3d Cir. 2020)).  In order to succeed on the merits, Plaintiffs must establish that they have jurisdiction to bring their claims. For the reasons discussed above, Plaintiffs have not established a reasonable probability that they will be able to establish jurisdiction because their federal claims lack standing and ripeness.

Further, the Court does not find that Plaintiffs have shown a likelihood of irreparable harm. First, "in order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following trial."  *Checker Cab of Philadelphia Inc. v. Uber Technologies, Inc.*, 643 Fed. App'x 229, 232 (3d Cir. 2016).  Further, "[p]laintiff must 'demonstrate[] a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages.'"  *Id.* (quoting Adams v. Freedom Forge Corp., 204 F.3d 475, 484-85 (3d Cir. 2000)) (alterations in original).  Here, Plaintiffs primarily allege that the Ordinances violate the Takings clause and "as multiple courts have explained, the proper remedy for a Takings violation is not injunctive relief, but rather monetary damages."  *Willowbrook Apartment Associates, LLC v. Mayor & City Council of Baltimore*, Civil Case No. SAG-20-1818, 2020 WL 3639991, at *3 (D. Md. July 6, 2020) (collecting cases); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 358 (E.D. Pa. 2020) (finding that injunctive relief was not an available remedy for a Takings Clause violation).

Additionally, Plaintiffs have failed to demonstrate irreparable harm because BAMP has not shown that all of its members will be irreparably harmed.  The Third Circuit is clear that "in the absence of a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed, we do not believe that a court can enter a mass preliminary injunction."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000).  Here, Plaintiffs' basis for a temporary restraining order and preliminary injunction relies entirely on the fact that

36

McKee has been harmed by the Ordinances, not that all members of BAMP have been harmed. *See* ECF No. 122 at 10; *see also* ECF No. 139 at 13. As such, Plaintiffs have failed to offer any foundation by which the Court could infer that virtually all members of BAMP have been irreparably harmed. Further, Plaintiffs' general, conclusory arguments that all BAMP members have been/are being harmed by the Ordinances is purely speculative. Therefore, Plaintiffs have failed to meet their burden of showing that they face irreparable harm.

As such, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is denied.

## IV.    Conclusion

For the reasons discussed above, the City's Motion to Dismiss, as to the federal claims, is granted, with prejudice, as to this action, and without prejudice, as to Plaintiffs pursuing a new action should they later be able to establish jurisdiction and should said new lawsuit be otherwise warranted. Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is denied. An appropriate Order of Court follows.


BY THE COURT:


*/s/Robert J. Colville*
Robert J. Colville
United States District Judge


DATED: November 10, 2025

cc: All counsel of record